**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(RICHMOND DIVISION)**

| | |
|---|---|
| PHILIP MORRIS USA INC., | |
| Plaintiff, | |
| v. | **Civil Action No. 3:15-cv-00577-JAG** |
| AMERICAN ACCESSORIES INTERNATIONAL, L.L.C., | |
| Defendant. | |

## MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT OF PLAINTIFF PHILIP MORRIS USA INC.

## TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ..................................................................... 1

II.    UNDISPUTED MATERIAL FACTS ............................................................ 2

    A.    The 3-in-1 Flashlight............................................................................2

        1.    AAI's Development of the Flashlight Concept ...........................2

        2.    AAI's Development of the Flashlight Design .............................3

        3.    AAI's Creation of the Instruction Sheet ....................................4

        4.    AAI's Development and Approval of Pre-Production Testing Requirements ................................................................5

        5.    Consumer Reports of Ignition and AAI's Concessions of the Flashlight's Defects................................................................6

    B.    The Consumer Product Safety Commission ........................................7

    C.    PM USA's Notification to CPSC and Recall of the Flashlight .............9

    D.    The Purchase Orders ........................................................................12

III.    STANDARD OF REVIEW ........................................................................ 13

IV.    ARGUMENT .............................................................................................. 14

    A.    PM USA Is Entitled to Summary Judgment on Its Breach of Contract Claim (First Cause of Action)................................................14

        1.    The Purchase Orders Impose Legally Enforceable Warranties and Indemnity Obligations on AAI. ........................15

        2.    AAI Materially Breached the Express Terms of the Purchase Orders. ...................................................................16

            a.    AAI Breached Its Promise to Provide a Product Free from Defects. ........................................................17

            b.    AAI Breached Its Promise to Assume Responsibility for the Suitability, Adequacy, and Safety of the Design of the Flashlight............................20

            c.    AAI's Adherence to Product Specifications Does Not Absolve It from Liability. ......................................21

d.   AAI Breached Its Promise to Indemnify PM USA for the Costs Associated with Delivering a Defective Product..........................................................22

3.   AAI Is Responsible for the Full Extent of PM USA's Losses.........................................................................24

B.   PM USA Is Entitled to Summary Judgment on Its Claims for Breach of Express Warranty and Breach of Implied Warranty of Merchantability ............................................................25

1.   AAI Breached Express Warranties as a Matter of Law (Second Cause of Action) .........................................25

2.   AAI Breached an Implied Warranty of Merchantability as a Matter of Law (Third Cause of Action)....................................26

V.   CONCLUSION.......................................................... 27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allstate Fin. Corp. v. Financorp, Inc.*,
    934 F.2d 55 (4th Cir. 1991) ....................................................................................25

*Am. Sales Corp. v. Adventure Travel, Inc.*,
    867 F. Supp. 378 (E.D. Va. 1994) ..........................................................................24

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986)................................................................................................14

*Bala v. Commonwealth of Va. Dep't of Conservation & Recreation*,
    No. 3:12CV748-HEH, 2014 WL 1281235 (E.D. Va. Mar. 27, 2014)....................17

*Bayliner Marine Corp. v. Crow*,
    257 Va. 121 (1999) .................................................................................................26

*Bell BCI Co. v. Old Dominion Demolition Corp.*,
    294 F. Supp. 2d 807 (E.D. Va. 2003) .....................................................................22

*Carpenter Insulation & Coatings v. Statewide Sheet Metal & Roofing*,
    937 F.2d 602, 1991 WL 120315 (4th Cir. 1991) ...................................................23

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)................................................................................................13

*Centex Constr. v. Acstar Ins. Co.*,
    448 F. Supp. 2d 697 (E.D. Va. 2006) .....................................................................16

*Foothill Capital Corp. v. E. Coast Bldg. Supply Corp.*,
    259 B.R. 840 (E.D. Va. 2001).................................................................................16

*Fournier Furniture, Inc. v. Waltz-Holst Blow Pipe Co.*,
    980 F. Supp. 187 (W.D. Va. 1997) .........................................................................26

*Hubbard v. Dresser, Inc.*,
    271 Va. 117 (2006) .................................................................................................25

*Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)................................................................................................14

*Nat'l Airlines, Inc. v. Shea*,
    292 S.E.2d 308 (Va. 1982)......................................................................................24

*PMA Capital Ins. Co. v. US Airways, Inc.*,
    271 Va. 352 (2006) ........................................................................................................22

*In re Stokes*,
    198 B.R. 168 (E.D. Va. 1996)........................................................................................24

*Twin Lakes Mfg. Co. v. Coffey*,
    222 Va. 467 (1981) ........................................................................................................26

*Verizon Virginia, LLC v. XO Commc'ns, LLC*,
    No. 3:15-CV-171, 2015 WL 6759473 (E.D. Va. Nov. 5, 2015) ............................................16

*Vienna Metro LLC v. Pulte Home Corp.*,
    786 F. Supp. 2d 1076 (E.D. Va. 2011) .................................................................................14

*Yates v. Pitman Mfg., Inc.*,
    257 Va. 601 (1999) ........................................................................................................25

**Statutes**

15 U.S.C. § 2052(a)(5) ...........................................................................................................8

15 U.S.C. § 2052(a)(11) .........................................................................................................9

15 U.S.C. § 2064(b) ..........................................................................................................8, 9

15 U.S.C. § 2064(d) ...............................................................................................................8

15 U.S.C. § 2069 ....................................................................................................................8

Va. Code § 8.2-206 ...............................................................................................................15

Va. Code § 8.2-313 ...............................................................................................................25

Va. Code § 8.2-314 ...............................................................................................................26

**Other Authorities**

16 C.F.R. § 1115.14(c) ...........................................................................................................8

16 C.F.R. § 1115.14(d) ...........................................................................................................8

16 C.F.R. § 1115.14(e) ...........................................................................................................8

76 Fed. Reg. 71554, 2011 WL 5592923 (Nov. 18, 2011) ............................................................8

Fed. R. Civ. P. 56(a) ............................................................................................................14

Order, CPSC Docket No. 11-C0009, 76 Fed. Reg. 49751, 49752 (Aug. 11, 2011)
(available at http://www.cpsc.gov//PageFiles/101502/perfectfitness.pdf) ...............................8

Va. Prac. Prod. Liab. § 3:5..........................................................................................................17

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(E), Plaintiff Philip Morris USA Inc. ("PM USA") submits this memorandum in support of its Motion for Partial Summary Judgment against Defendant American Accessories International, L.L.C. ("AAI"). The Motion seeks summary judgment on PM USA's claims for breach of contract (First Cause of Action), breach of express warranty (Second Cause of Action), and breach of implied warranty of merchantability (Third Cause of Action).

## I.      PRELIMINARY STATEMENT

By this action, PM USA seeks to hold AAI accountable for delivering a defective product and refusing to indemnify PM USA for its losses in violation of the parties' agreements.  PM USA contracted with AAI to design and supply a promotional product for distribution to PM USA's adult cigarette smokers 21 years of age and older.  The product that AAI devised was a "3-in-1 flashlight" (the "Flashlight") consisting of a flashlight, compass, and storage compartment containing matches.

As it turned out, the Flashlight was defective.  AAI placed the match striker pad inside the match storage compartment, with no effective way to prevent the matches from catching fire inside the compartment and no warning about the risk of unintended ignition.  Not long after the first shipments of the Flashlight, consumers began reporting incidents of the matches inside the Flashlight's storage compartment unintentionally igniting.  As of today, PM USA has received over 100 consumer reports of unintended ignition, including reports of the Flashlight exploding and 34 reports of injury, some serious and requiring medical attention.

Within weeks of receiving the first consumer reports, PM USA notified the U.S. Consumer Product Safety Commission ("CPSC") of the danger, as the law required both it and AAI to do.  With CPSC's approval and cooperation, PM USA recalled the Flashlight, at significant expense.

1

A series of Purchase Orders govern the design and sale of the Flashlight. The Purchase Orders are identical in their terms, except for the purchase price, quantity, and shipment date. They leave no room for doubt as to where the responsibility lies. Under the Purchase Orders, AAI:

- expressly warranted that the Flashlight would be "free from defects" in design;

- "assume[d] and acknowledge[d] full and complete responsibility for the suitability, adequacy, and safety of the design" of the Flashlight; and

- agreed to indemnify PM USA "against all claims, losses, liabilities, damages, and expenses (including reasonable attorneys' fees and disbursements)" attributable to "any error, omission, or fault" of AAI.

Despite its clear contractual obligations, AAI has refused to accept responsibility for the defective Flashlight and for the damages that PM USA has incurred as a result. But AAI must now accept responsibility for the damage that it caused PM USA based on the undisputed facts and applicable law, as set forth more fully below.

## II.    UNDISPUTED MATERIAL FACTS

### A.    The 3-in-1 Flashlight

#### 1.    AAI's Development of the Flashlight Concept

In early 2013, PM USA began planning an online promotion that would include sending a free premium promotional item to participating adult smokers, 21 years of age or older. **Exs. 1**; **2** (Rick Clements Dep. 33:8-35:1).[1] On May 20, 2013, PM USA sent an email to various product suppliers, including AAI, soliciting proposals for the premium product. **Exs. 1; 3**. AAI markets itself as a leader in product ideation, design, and development, and highlights its

---

[1]    A list of the Exhibits cited herein is provided at Appendix A.

creativity in product design and development and its relationships with international factories to manufacture products. **Ex. 4**. According to its website, AAI is "a design, development, and manufacturing execution company with over 60 years' experience helping Fortune 500 companies reach their consumers with custom products." *See id.*

In response to PM USA's request, AAI's marketing team developed promotional product concepts. **Exs. 3**; **5**; **6** (Kathryn Simers Dep. 39:1-41:6, 44:10-48:14). Within two weeks, AAI sent PM USA several proposals, all of which were "custom items." **Ex. 7**. One such item was a "Flashlight and Matches Holder" that became the Flashlight that is the subject of the present lawsuit. *See id.*; *see also* **Ex. 6** (Kathryn Simers Dep. 51:13-52:13). As depicted in AAI's May 31, 2013 proposal, the "Flashlight and Matches Holder" contained a detachable compass at one end and a flashlight at the other end. **Ex. 7**. The compass unscrewed to reveal a storage compartment, which was intended to store wooden matches. *Id.*; **Exs. 8**; **9**; **10**; **6** (Kathryn Simers Dep. 58:2-59:15); **11** (David Zeanah Dep. 68:21-69:25, 157:23-158:24). Ultimately, PM USA chose the Flashlight for the promotion. **Ex. 12**.

### 2.    AAI's Development of the Flashlight Design

AAI chose a Chinese factory, Ningbo Yongtai, to manufacture the Flashlight, and AAI oversaw the manufacturing. *See* **Ex. 11** (David Zeanah Dep. 115:21-116:13). Based on input from Ningbo Yongtai, AAI redesigned the Flashlight to add a striker pad inside the match compartment. **Exs. 13**; **14**; **11** (David Zeanah Dep. 118:19-119:16). AAI's design initially did not include any barrier between the striker pad and matches. **Ex. 11** (David Zeanah Dep. 188:22-190:10). Prior to production, however, the Ningbo Commodities Bureau (a Chinese government agency) suggested that AAI include a foam insert within the match compartment to separate the matches from the striker pad during transit. **Exs. 15**; **11** (David Zeanah Dep.

3

180:17-20, 182:2-19, 196:12-197:2).  AAI accordingly added a removable foam insert between the striker pad and matches in the next prototype.  **Ex. 11** (David Zeanah Dep. 188:14-190:3).

Before this dispute arose, AAI took credit for developing and designing the Flashlight.  In July 2013, AAI sent PM USA an "Indemnity Letter" in which AAI claimed "all rights, title, and interest in the intellectual property associated" with the Flashlight.  **Ex. 16**.  Later in July 2013, AAI and Ningbo Yongtai started the application for a patent for the Flashlight in China.  **Ex. 17**. The patent application listed David Zeanah, AAI's Vice President of Marketing and Product Development, as a Flashlight "inventor."  **Ex. 18**.  Even in April 2014, after the problems with the Flashlight became clear, AAI's President stated that AAI "developed and produced" the Flashlight.  **Ex. 19**.  Not once prior to the recall did AAI ever suggest that PM USA designed and developed the Flashlight.[2]  AAI now blaming PM USA for the defective design is akin to an architect blaming a homeowner for the collapse of a poorly designed roof, when the homeowner simply provided input on how he would like the roof to look.

### 3.    AAI's Creation of the Instruction Sheet

AAI also prepared an instruction sheet to accompany the Flashlight.  On September 20, 2013, David Zeanah emailed Rick Clements, PM USA's Principal Purchasing Analyst, an initial draft of the instruction sheet.  **Ex. 20**.  The draft included instructions on how to access the matches, strike a match, and replace the striker pad, as well as three separate warnings regarding the Flashlight battery.  *See id.*  Nothing in the instructions notified consumers to keep the foam insert in place to separate the matches from the striker pad.  *See id.*  Nothing warned consumers about any risk of unintended ignition without the foam insert.  In fact, the instructions said

---

[2]     Even if PM USA designed the Flashlight, which it did not, that would not affect AAI's obligations to PM USA here.  As explained in Part II.D, AAI took responsibility for damages that resulted from a defect in the Flashlight, regardless of who designed it.

nothing about the foam insert at all.  *See id.*  The final instructions sent to consumers were substantially identical to the original instructions that AAI drafted.  *See* **Ex. 21** (Def.'s Answer to Interrog. No. 13).

### 4. AAI's Development and Approval of Pre-Production Testing Requirements

PM USA requires all of its suppliers to work with a third-party quality assurance firm to develop and approve pre-production testing requirements ("specifications") for the products it purchases.  **Ex. 22** (Diane Pinkney Dep. 92:20-95:13).  Based on AAI's own design, AAI drafted the initial specifications, proposed revisions, and approved the final specifications.  **Exs. 23**; **24** (Jill Smith Dep. 97:9-98:12, 133:24-134:25); **25** (Mary Isemann Dep. 266:14-270:3, 284:6-285:13, 305:6-8).

In following this process for the Flashlight, AAI specifically asked its own third-party vendor whether any matches-related testing was required.  **Exs. 26**; **25** (Mary Isemann Dep. 297:5-18).  AAI's vendor made a number of suggestions, including that the product be tested for the risk of spontaneous ignition.  **Exs. 26**; **25** (Mary Isemann Dep. 297:19-299:5, 301:19-21).  AAI did not share that recommendation with PM USA; nor did AAI seek to incorporate this test into the specifications.  **Ex. 25** (Mary Isemann Dep. 302:3-9).  In fact, there is no evidence that AAI ever tested the Flashlight for any type of unintended ignition prior to shipment.

AAI also never told PM USA that the foam insert was intended to protect against unintended ignition.  **Ex. 11** (David Zeanah Dep. 185:17-186:5); *see* **Ex. 25** (Mary Isemann Dep. 286:2-21).  Indeed, the specifications allowed shipments of the Flashlight to pass testing even if a certain number of the devices were missing the foam insert.  **Exs. 27**; **25** (Mary Isemann Dep. 280:12-281:21, 291:13-21).

### 5.     Consumer Reports of Ignition and AAI's Concessions of the Flashlight's Defects

Shortly after PM USA first shipped Flashlights to consumers in February 2014, it began receiving complaints of matches inside the Flashlight igniting unintentionally.  On March 4, 2014, PM USA received two such consumer complaints.  One consumer reported that, when she tried to close the Flashlight's matches holder, the matches ignited and the device exploded, causing a small burn to her right eye and damaging her carpet.  **Ex. 28**.  The second consumer, although uninjured, reported that the Flashlight "combusted" after matches unexpectedly caught fire.  *Id.*

PM USA promptly notified AAI of these complaints to help it assess the appropriate response.  *Id.*; **Ex. 29**.  AAI agreed that all further shipments should be stopped to allow time for investigation.  **Ex. 29**.  AAI contacted the consumers to learn more details, and ultimately sent both consumers money to cover any damages.  **Exs. 30; 31**.  In a letter to one of the consumers, AAI promised to "look at possible design changes in the future should the program run again."  **Ex. 30**.

In addition to gathering information from these consumers, AAI conducted its own testing.  **Ex. 32**.  AAI's testing revealed that, if the Flashlight was held so that the matches fell against the striker pad and the compass end was rotated "like a pepper grinder," unintended ignition could occur.  *Id.*  Although AAI told PM USA about what it called "an odd but perfect scenario," *id.*, it did not share with PM USA the fact that an AAI employee's tests resulted in full ignition or signs of ignition in nearly half of the samples she tested, **Ex. 33**.  PM USA also requested additional testing of the Flashlight, and unintended ignition occurred while the laboratory was preparing one of the samples for the test.  **Ex. 34**.

6

The President of AAI, Eric Zeanah, attributed the initial consumer reports to the removable foam insert.  Mr. Zeanah stated that the ignition occurred because the consumers failed to "replace the foam insert required to keep the matches away from direct contact to the striker pad."  **Ex. 35**.  For that reason, AAI "made adjustments to the instruction sheet better clarifying the importance of the foam divider," which it sent to one of the initial consumers who reported issues with the product.  **Ex. 31**; *see also* **Ex. 30** (stating that AAI is "in the process of communicating the importance of the foam insert to consumers").  Mr. Zeanah also suggested that PM USA send an email as a "reminder" to consumers to use the foam insert.  **Ex. 35**.  He suggested "reminding" consumers to use the foam insert notwithstanding the fact that the foam insert is not mentioned in any materials that they received with the Flashlight.  *See* **Ex. 11**, David Zeanah Dep. 186:15-21; *see also* **Ex. 20**; **Ex. 21** (Def.'s Answer to Interrog. No. 13).  He further proposed sending revised instruction sheets "placing more emphasis on the use of the foam insert."  **Ex. 35**.

During his deposition, Mr. Zeanah acknowledged the risk of unintended ignition and admitted it would have been reduced had the instructions warned consumers to replace the foam insert between the matches and the striker pad.  **Ex. 36** (Eric Zeanah Dep. 167:4-16, 196:24-197:5).  AAI Vice President David Zeanah similarly testified that the original instructions "could have been better" because they failed to direct consumers to use the foam insert.  **Ex. 11** (David Zeanah Dep. 186:15-187:4).  AAI's own expert witness likewise conceded that, if the foam insert was intended to prevent ignition, the instructions should have told consumers to keep the foam insert between the matches and the striker pad.  **Ex. 37** (Nancy Nord Dep. 45:9-46:4).

**B.     The Consumer Product Safety Commission**

The Consumer Product Safety Act (the "CPSA") of 1972 established CPSC to regulate companies that manufacture, import, distribute, or sell consumer products.  The CPSA applies to

most consumer goods but does not cover cigarettes, PM USA's primary line of business.  *See* 15

U.S.C. § 2052(a)(5).

The CPSA requires companies to notify CPSC immediately upon learning of a potential

safety hazard with a product, unless they have "actual knowledge" that CPSC has been

"adequately informed" of a potential hazard.  15 U.S.C. § 2064(b).  The CPSA generally gives

companies a limited time of ten business days to investigate a potential safety hazard issue.  16

C.F.R. §§ 1115.14(c), (d), and (e).  But after that time a company risks significant civil penalties

for untimely reporting if it does not promptly notify CPSC.  The CPSA authorizes CPSC to seek

civil penalties of $100,000 per violation for late reporting, to a maximum of $15.15 million for a

related series of violations.  15 U.S.C. § 2069; 76 Fed. Reg. 71554, 2011 WL 5592923 (Nov. 18,

2011).

The CPSA also provides that CPSC may order a company to conduct a recall when it

determines after opportunity for a hearing that a product presents a substantial product

hazard.  15 U.S.C. § 2064(d).  After a product enters the stream of commerce, CPSC may

consider additional safety-related communications with consumers, without prior notice to

CPSC, to be evidence that the potential hazard at issue should have been reported to CPSC.[3]  A

recall can involve refunding the price of the product, replacing the product, sending warnings or

revised instructions, or instructing consumers how to repair a product.  15 U.S.C.

§ 2064(d).  CPSC must approve the recall remedy and be satisfied that it will adequately protect

consumers.  *Id.*

---

[3]    *See, e.g.*, Perfect Fitness, Provisional Acceptance of a Settlement Agreement and Order,
CPSC Docket No. 11-C0009, 76 Fed. Reg. 49751, 49752 (Aug. 11, 2011) (available at
http://www.cpsc.gov//PageFiles/101502/perfectfitness.pdf) (civil penalty agreement reflecting
that the firm notified consumers that products were "inferior" and could result in an "accident,"
without telling CPSC).

The CPSA considers importers of products to be manufacturers.[4]   15 U.S.C.

§ 2052(a)(11).  Although all parties in the distribution chain have a duty to report safety hazards

to CPSC and conduct recalls, 15 U.S.C. § 2064(b), manufacturers are most knowledgeable about

their products and in the best position to evaluate their safety, **Ex. 37** (Nancy Nord Dep. 111:15-

112:16).  AAI President Eric Zeanah testified that he has no knowledge of CPSC requirements.

**Ex. 36** (Eric Zeanah Dep. 67:13-68:11).  He alternatively denied that AAI is regulated by CPSC

and claimed not to know whether CPSC regulated AAI.  *Id.* at 53:4-8, 67:2-12, 70:18-21,

183:21-25.

### C.     PM USA's Notification to CPSC and Recall of the Flashlight

Just weeks after receiving the two initial incident reports, PM USA received a complaint

of a more serious injury.  On April 4, 2014, a consumer reported that while he was holding a

Flashlight, the matches ignited internally, causing the Flashlight to explode.  **Ex. 38**.  The

explosion reportedly caused a deep cut and left shrapnel embedded in the consumer's hand,

requiring medical attention.  *Id.*  The consumer provided pictures of the injury and medical bills

documenting the treatment he received.  *Id.*

PM USA turned to AAI for help in addressing this new and much more serious

complaint, just as it did when it received the first two complaints.  **Ex. 39**.  AAI advised PM

USA that it should simply send revised instructions to the Flashlight's consumers.  **Ex. 40** (KC

Crosthwaite Dep. 64:9-18).  PM USA felt uneasy with AAI's advice, was concerned about

leaving the Flashlight in consumers' hands, and for the first time consulted a CPSC expert, Eric

Rubel.  *Id.* at 78:19-79:8, 80:3-9.  AAI's expert witness described Mr. Rubel as "a respected"

---

[4]     AAI also considered itself to be the manufacturer of the Flashlight.  In the e-mail
communication that it proposed sending to consumers, AAI identified itself "[a]s the
manufacturer of the 3-in-1 flashlight."  **Ex. 32**.

CPSC lawyer with "credibility" and a "good reputation" before the agency. **Ex. 37** (Nancy Nord Dep. 16:22-17:15). After consulting Mr. Rubel, PM USA concluded that it needed to change course dramatically. **Ex. 40** (KC Crosthwaite Dep. 78:19-79:8, 80:3-9).

PM USA determined that it was legally obligated to notify CPSC and retrieve the product from consumers. *Id.* Because it was at risk of a late reporting violation, PM USA decided to act quickly. Accordingly, PM USA submitted an "Initial Report" to CPSC on April 8, 2014. **Ex. 41**. In that report, PM USA proposed to conduct a voluntary recall of the Flashlight through CSPC's "Fast Track" recall program. *Id.* PM USA further proposed to contact consumers to ask them to remove the compass end of the Flashlight and return the end in a free mailer provided by PM USA. *Id.* To encourage consumers to participate in the recall, PM USA proposed to provide a premium replacement item. *Id.* CPSC accepted PM USA's plan on May 5, 2014. **Ex. 42**.

At no point during the recall process did AAI contact CPSC and suggest an alternative recall plan.[5] **Ex. 21** (Def.'s Answer to Interrog. No. 5). To the contrary, AAI admitted that a communication to consumers was needed to "adequately and correctly describe[] the potential hazard" and "avoid the risk of unintended fire." **Ex. 44**. All told, PM USA has already or will incur the following costs associated with the recall, excluding attorneys' fees:

> $3,517,174.21 in fees paid to Stericycle, a third-party vendor and an industry leader in recalls that PM USA engaged to implement the recall;
>
> $1,290,612.08 in fees paid for the cost of purchasing and shipping replacement items;
>
> $52,652.92 in fees paid to additional vendors assisting with recall efforts; and

---

[5] Nor did AAI contact CPSC to suggest that a recall was unnecessary. **Ex. 21** (Def.'s Answer to Interrog. No. 5); *see also* **Ex. 43** (Scott Edson Dep. 55:8-11).

$260,000 in estimated fees to pay for the destruction of the remaining inventory of 3-in-1 Flashlights.

KC Crosthwaite Decl. ¶¶ 6-9.[6]

Moreover, had AAI told CPSC of its proposal to send revised instructions, it would have faced significant challenges.  According to the testimony of AAI's own CPSC expert, CPSC would have expected answers to the following questions:

> Have you tested the foam insert to ensure that it adequately prevents unintended ignition?  (AAI did no such testing; in fact, the specifications for the Flashlight allowed a certain number of units to pass inspection despite missing their foam insert.)
>
> Have the warnings been tested on consumers like those who received the Flashlights?  (AAI did no such testing.)
>
> What evidence exists that consumers would follow instructions to leave the foam insert between the matches and the striker pad?  (AAI had no such evidence.)
>
> If proposed revised instructions were not on the product itself, how would other members in the household learn of them?  (They would not.)
>
> How would third parties picking up the portable Flashlight know the importance of the foam insert?  (They would not.)

**Ex. 37** (Nancy Nord Dep. 48:9-20, 48:21-49:5, 49:8-52:10).  In the end, there is no evidence that AAI tested the effectiveness of the proposed revised instructions, suggested reporting to CPSC, or consulted a CPSC expert in March 2014.

By contrast, and according to AAI's own expert witness, PM USA's recall plan was both appropriate under the circumstances and reasonable in execution:

> PM USA appropriately considered its CPSC reporting obligations and the potential civil penalties that CPSC could impose for failure to timely report.  *Id.* at

---

[6]    KC Crosthwaite's declaration is attached as Exhibit 54.  The declarations of Kim Harlowe and Paige Sharpe are attached as Exhibits 55 and 56.

93:13-96:22.

> If concerned about safety and speed, AAI's expert would propose the solution that CPSC would approve most quickly. *Id.* at 108:5-12. PM USA's proposal was the quickest. *Id.* at 107:17-108:3.

> Companies typically engage third parties to administer recalls. Stericycle, the third party that PM USA engaged to administer the recall, is a "reputable" company. AAI's expert takes no issue with PM USA for using Stericycle. *Id.* at 119:3-20.

Ultimately, AAI's expert testified that she has no criticisms of how PM USA implemented the recall or the adequacy of the recall. *Id.* at 118:17-120:11. AAI has no evidence to contradict its own expert's testimony on those issues.

### D.     The Purchase Orders

Four Purchase Orders governed PM USA's purchase of the Flashlight from AAI and allocated exposure should the product have a defect.[7] **Exs. 21** (Def.'s Answer to Interrog. No. 16); **11** (David Zeanah Dep. 35:6-12); **36** (Eric Zeanah Dep. 87:15-19). AAI acknowledged and accepted the Purchase Orders in writing. **Exs. 49**; **50**; **51**; **52**. Each Purchase Order provides that "[s]hipment of any Goods described in this Order constitutes Supplier's [AAI's] acceptance of these Terms and Conditions, regardless of whether Supplier has signed or acknowledged the Order," and [n]o other terms, whether contained in a bid, estimate, acknowledgement, confirmation or invoice given by Supplier shall in any way modify or supersede any of the terms of this Order or be binding on Buyer [PM USA]." Purchase Orders ¶ 2. The Purchase Orders further specify that Virginia law governs their terms. *Id.* ¶ 27.

---

[7]     The parties entered into four Purchase Orders to update the number of Flashlights for purchase, and to modify the delivery date and total purchase price of the Flashlights. Three such Purchase Orders are modifications to Purchase Order 530002513. The fourth Purchase Order, No. 530002629, was for an additional 50 units of the Flashlight. All four Purchase Orders are otherwise identical in their terms. *See* **Exs. 45**; **46**; **47**; **48**.

Each Purchase Order allocates responsibility for any "defects" in the design of the Flashlight to AAI:

> **Warranties**.  Supplier warrants that all Goods delivered under Order will (a) conform strictly to the . . . specifications stated in this Order or provided by Supplier and in any manufacturer warranties that accompany the Goods, (b) be free from defects in materials, workmanship, and design, and (c) be of first quality and made of new materials and components.  With respect to any Goods designed by Supplier or any of Supplier's subcontractors or suppliers, Supplier assumes and acknowledges full and complete responsibility for the suitability, adequacy, and safety of the design of such Goods.  Supplier must extend to Buyer all applicable warranties extended to Supplier with respect to all Goods not manufactured by Supplier. . . .

Purchase Orders ¶ 13.

The Purchase Orders further require AAI to indemnify PM USA "[t]o the greatest extent permitted by law":

> **Indemnity**.   To the greatest extent permitted by law, Supplier agrees to indemnify Buyer . . . against all claims, losses, liabilities, damages, and expenses (including reasonable attorneys' fees and disbursements) to the extent they arise from, or may be attributable to, any error, omission or fault of Supplier or any of its personnel in the performance under this Order.

Purchase Orders ¶ 16.

Under the Purchase Orders, AAI shipped nearly 555,000 units of the Flashlight to PM USA in early 2014.  PM USA paid for these shipments in an amount totaling $1,403,431,48.  **Ex. 36** (Eric Zeanah Dep. 279:21-280:1); *see also* **Exs. 45**; **46**; **47**; **48**.

## III.   STANDARD OF REVIEW

Summary judgment is not a "disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)

(quoting Fed. R. Civ. P. 1).  Summary judgment is appropriate "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).

A party that moves for summary judgment need demonstrate only that there is an absence

of evidence to support the non-moving party's case.  *Catrett*, 477 U.S. at 325.  Once this

showing has been made, it becomes the burden of the non-moving party to go beyond the

pleadings and come forward with concrete evidence in the form of "specific facts showing that

there is a *genuine issue for trial*."  *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986) (internal quotations omitted).  There is no genuine issue for trial when "the

record taken as a whole could not lead a rational trier of fact to find for the non-moving party."

*Matsushita*, 475 U.S. at 587; *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).  A

genuine issue exists only if the evidence is such that a reasonable jury could return a verdict for

the non-moving party.  *Anderson*, 477 U.S. at 248.

IV.     **ARGUMENT**

> A.     **PM USA Is Entitled to Summary Judgment on Its Breach of Contract Claim
> (First Cause of Action)**

Under Virginia law, a party is entitled to summary judgment on a breach of contract

claim when the undisputed facts establish (1) a legally enforceable obligation; (2) a breach of

that obligation; and (3) injury or damage to plaintiff caused by the breach.  *Vienna Metro LLC v.*

*Pulte Home Corp.*, 786 F. Supp. 2d 1076, 1081, 1084 (E.D. Va. 2011).  Each of these elements is

satisfied here.

**1.      The Purchase Orders Impose Legally Enforceable Warranties and
Indemnity Obligations on AAI.**

As AAI has conceded on multiple occasions, the Purchase Orders governed the sale of

the Flashlight.[8]  **Exs. 21** (Def.'s Answer to Interrog. No. 16); **11** (David Zeanah Dep. 35:6-12);

**36** (Eric Zeanah Dep. 87:15-19).  AAI has never disputed that the Purchase Orders contain all the

required elements of a legally enforceable contract.  Nor could it:

> AAI confirmed receipt of the original Purchase Order, as well as each subsequent
> modification to the number of units or price.  **Exs. 49**; **50**; **51**; **52**.

> AAI accepted the terms of the Purchase Orders when it shipped the product to PM
> USA.  Purchase Orders ¶ 2; *see also* Va. Code § 8.2-206.

> PM USA paid $1,403,431.48 for the Flashlights, as required by the Purchase
> Orders.  *See* **Exs. 45**; **46**; **47**; **48**.

The Purchase Orders contain warranty and indemnity provisions.  Purchase Orders ¶¶ 13,

16.  Specifically, under the Purchase Orders, AAI promised to (1) deliver to PM USA a

Flashlight "free from defects" in design; (2) take "full and complete responsibility for the

suitability, adequacy, and safety of the design" to the extent that AAI designed the Flashlight;

and (3) indemnify PM USA for losses that arise from, or may be attributable to, any error,

omission, or fault of AAI — such as by delivering a defective product and breaching the

warranty provisions.

In an effort to limit its obligations, AAI contends that additional documents, such as a

Marketing Incentives Supplier Quality & Compliance Guidelines document, form part of the

---

[8]     Although PM USA and AAI modified the original Purchase Order on three occasions, each
modification was related to the number of units sold and related cost only.  None of the
modifications related to any of the applicable terms or provisions contained within the Purchase
Orders.

parties' contractual arrangement.  **Ex. 21** (Def.'s Answer to Interrog. No. 16).  Not so.  The

Purchase Orders expressly disclaim any terms and conditions not contained therein:  "No other

terms . . . shall in any way modify or supersede any of the terms of this Order or be binding on

Buyer.  Buyer hereby expressly rejects all other such terms, unless Buyer has accepted such

other terms in a writing signed by Buyer's authorized representative."  Purchase Orders ¶ 2.  No

authorized representative of PM USA has accepted "other terms" in a signed writing.

Moreover, even if other documents were part of the parties' contractual arrangement —

and they are not — the warranty and indemnity provisions of the Purchase Orders still apply.  In

interpreting multiple documents that form an agreement, the terms of each document must be

read together so as not "to negate or nullify" any of the terms.  *See Foothill Capital Corp. v. E.*

*Coast Bldg. Supply Corp.*, 259 B.R. 840, 845 (E.D. Va. 2001).  Nothing in the additional

documents that AAI cites limits, precludes, or otherwise conflicts with the key warranty and

indemnity provisions in the Purchase Orders.[9]

### 2.    AAI Materially Breached the Express Terms of the Purchase Orders.

Under Virginia law, contract terms must be given their "plain meaning," and are

ambiguous only when they are subject to multiple reasonable interpretations.  *Verizon Virginia,*

*LLC v. XO Commc'ns, LLC*, No. 3:15-CV-171, 2015 WL 6759473, at *7 (E.D. Va. Nov. 5,

2015).  The mere fact that the parties disagree about the meaning of contractual language "does

---

[9]    During their depositions, some AAI witnesses asserted that only the purchase price, number
of units, and delivery date provisions of the Purchase Orders apply.  *See, e.g.*, **Ex. 36** (Eric
Zeanah Dep. 87:15-19).  But nothing in the Purchase Orders supports this assertion.  When
contract language is clear and unambiguous, the court must "construe contractual language
according to its plain and ordinary meaning."  *Foothill Capital Corp.*, 259 B.R. at 844.  AAI is
not entitled to submit extrinsic evidence on this point in any event.  *See Centex Constr. v. Acstar*
*Ins. Co.*, 448 F. Supp. 2d 697, 711 (E.D. Va. 2006) (refusing to consider extrinsic evidence
because an unambiguous document should be given its plain meaning); **Ex. 11** (David Zeanah
Dep. 35:25-36:4) (stating that no one from PM USA told him to ignore provisions of the
Purchase Orders).

not transform an unambiguous contract into an ambiguous one." *Foothill Capital Corp.*, 259 B.R. at 846 (citing *Dominion Savings Bank v. Costello*, 512 S.E.2d 564 (1999)).  Where the language of a contract is clear, disputes regarding contract interpretation are particularly well suited for summary judgment.  *Bala v. Commonwealth of Va. Dep't of Conservation & Recreation*, No. 3:12CV748-HEH, 2014 WL 1281235, at *2 (E.D. Va. Mar. 27, 2014).

### a.  AAI Breached Its Promise to Provide a Product Free from Defects.

AAI warranted that "*[a]ll* Goods delivered under the [Purchase] Order[s]" will be "free from defects in . . . design," without limitation.  Purchase Orders ¶ 13 (emphasis added).  Although AAI insists it is not responsible for the Flashlight's design, nothing in this provision requires proof that AAI designed the Flashlight.  Under its plain terms, as long as the Flashlight was "delivered under" the Purchase Orders, AAI's warranty applies, and there is no dispute that AAI delivered the Flashlight under the Purchase Orders.

Nor is there any dispute that the Flashlight was not "free from defects" in "design."  A product can be defective in its design because of either its actual design or its failure to carry adequate instructions.  *See* Va. Prac. Products Liability § 3:5 ("[T]he design of a product may be deemed reasonably safe with adequate warnings and instructions, but unreasonably dangerous without them.").  The Flashlight's design was defective ***both*** because of its actual design ***and*** because of its failure to carry adequate instructions.  Although in product liability cases, the question of defect is typically left for the jury, this is not a product liability case – rather, this is a case sounding in contract.  Moreover, AAI has repeatedly admitted that the Flashlight's design was defective and that consumers received the Flashlight without any instructions regarding the foam insert.  Based on these admissions, no reasonable person could conclude that the product is ***not*** defective.

**(i)      AAI has conceded the Flashlight was defective in its actual design.**

AAI has repeatedly admitted that, given its actual design — *i.e.*, the location of the striker pad within the matches compartment, without any effective way to prevent the matches from coming into contact with the striker pad — the Flashlight carried the risk of unintended ignition.

Concession 1:  AAI first made this concession after two consumers reported that the matches stored within the internal storage compartment came into contact with the striker pad and ignited unintentionally.  AAI agreed that shipments of the Flashlight should be stopped as a result.  **Ex. 29**.  According to AAI, the problem stemmed from the consumers' failure to "replace the foam insert required to keep the matches away from direct contact to the striker pad."  **Ex. 35**.  In other words, the unintended ignition resulted from a design that relied on consumers to replace the removable foam insert between uses to separate the matches from the striker pad.  For that reason, AAI promised one consumer that it would "look at possible design changes in the future should the program run again."  **Ex. 30**.

Concession 2:  AAI conceded that the Flashlight carried the risk of unintended ignition based on its own testing.  That testing confirmed that, if the foam insert was removed so that the matches could come into contact with the striker pad, it would create "an odd but perfect scenario where internal ignition could take place" if the cap is rotated "like a pepper grinder."  **Ex. 32**.

Concession 3:  During discussions regarding a potential recall, AAI further conceded that the Flashlight could cause unintended fires.  At that time, AAI agreed that a communication to consumers was needed to "adequately and correctly describe[] the potential hazard" and "avoid the risk of unintended fire."  **Ex. 44**.

Concession 4:  AAI's own design expert acknowledged that AAI was able to replicate unintended ignition, and she opined that if the foam insert were absent, she "would have a problem with the product."  **Ex. 53** (Elizabeth Buc Dep. 69:14-17, 72:6-14).  AAI's expert thus conceded a design defect.

> (ii)     **AAI has conceded that the Flashlight's design was defective because the Flashlight did not have adequate instructions.**

Independent of the defect in actual design, the Flashlight's design was also defective because it did not warn consumers about the purported importance of the foam insert.  The foam insert that AAI contends would protect against unintended ignition was not mentioned anywhere in the instructions and warnings that accompanied the Flashlight.  **Ex. 11** (David Zeanah Dep. 186:15-21); *see also* **Exs. 20**; **21** (Def.'s Answer to Interrog. No. 13).  AAI has conceded that the instructions were inadequate as a result:

> In the days following the first consumer complaints, AAI proposed sending all consumers revised instructions "placing more emphasis on the use of the foam insert."  **Ex. 35**.

> AAI thereafter "made adjustments to the instruction sheet better clarifying the importance of the foam divider," which it sent to one of the initial consumers who reported issues with the product.  **Ex. 31**.

> AAI proposed sending an email instructing consumers to "replace the foam insert."  **Ex. 35**.

> AAI's President admitted that unintended ignition would have been less likely had the instructions told consumers to replace the foam insert in between the matches and the striker pad.  **Ex. 36** (Eric Zeanah Dep. 167:4-16, 196:24-197:5).

> AAI's Vice President testified that the original instructions "could have been better" because they failed to direct consumers to use the foam insert.  **Ex. 11** (David Zeanah Dep. 186:15-187:4).

19

> AAI's expert conceded that, if the foam insert was intended to prevent ignition, the instructions should have told consumers to keep the foam insert between the matches and the striker pad.  **Ex. 37** (Nancy Nord Dep. 45:9-46:4).

These deficient instructions also constitute a design defect as a matter of law.  Indeed, in light of these concessions about the Flashlight's actual design flaws and inadequate instructions, there can be no dispute that AAI "delivered" to PM USA a defective Flashlight in violation of the Purchase Orders.

> **b.**      **AAI Breached Its Promise to Assume Responsibility for the Suitability, Adequacy, and Safety of the Design of the Flashlight.**

Apart from the warranty to deliver a Flashlight free from defects in design, AAI also breached its agreement to "assume and acknowledge full and complete responsibility for the suitability, adequacy, and safety of the design" of the Flashlight that AAI designed.  Purchase Orders ¶ 16.  AAI cannot credibly contest that it designed the Flashlight in light of the following undisputed evidence.

*First*, AAI filed a patent application in China for the Flashlight, which identified David Zeanah of AAI as one of the inventors of the product.  **Ex. 18**.  No one from PM USA was identified as an inventor.  *See id.*  AAI informed PM USA that it intended to patent the Flashlight in July 2013 because it "[felt] strongly about the compass flashlight and match holder."  **Ex. 17**.

*Second*, AAI's President and majority shareholder conceded that AAI was responsible for the design of the Flashlight.  On April 10, 2014, Eric Zeanah stated in an email to PM USA that AAI "developed and produced" the Flashlight.  **Ex. 19**.

*Third*, as part of an indemnification letter that AAI provided to PM USA, AAI stated that it maintains "all rights, title, and interest in the intellectual property associated" with the Flashlight.  **Ex. 16**.

Even beyond these express admissions, the undisputed facts demonstrate that AAI designed the Flashlight.  PM USA's request for product proposals requested a "really cool item that happens to also have a compass."  **Ex. 1**.  Other than the suggestion of a compass, PM USA's request provided no further guidance.  *See id.*  AAI responded to this proposal with an initial concept of the Flashlight, which was its own "custom item" conceptualized by the AAI marketing team.  **Ex. 7**.  AAI also took responsibility for the design of the removable foam insert and the instruction sheets that accompanied the Flashlight.  **Ex. 15**; **Ex. 20**; **Ex. 11** (David Zeanah Dep. 180:17-20, 182:2-19).

Given AAI's design of the Flashlight, there is no question that AAI committed to "assume and acknowledge full and complete responsibility for the suitability, adequacy, and safety of the design" of the Flashlight.  AAI broke this promise.  Although AAI readily took responsibility and addressed the first two consumer complaints, once PM USA realized that further steps were required for the companies to meet their legal obligations, AAI objected because the remedy far exceeded what AAI was willing to do.  To date, AAI has not assumed ***any*** responsibility for the losses associated with the Flashlight recall.

### c.   AAI's Adherence to Product Specifications Does Not Absolve It from Liability.

AAI has suggested its delivery of the Flashlight according to particular specifications as the Purchase Orders required means that it is not liable for breaching the Purchase Orders' warranty provisions.  According to AAI, it could not deliver the Flashlight with a ***different*** design to satisfy the warranty provisions because doing so would have violated the Purchase Orders' specification requirements.  This argument is baseless as a matter of law and fact.

The Purchase Orders' specifications and warranty requirements are distinct:  AAI needed to satisfy ***both*** the specification requirements of Paragraph 14 (by delivering the product

according to PM USA's "material testing requirements") ***and*** the warranty requirements of Paragraph 13 (by delivering the product free from defect in design and assuming responsibility for the safe design of the product).  Nothing in Paragraph 13 says that the warranties apply ***only if*** the specifications yield a product that satisfies those warranties.  Nor do the Purchase Orders allow AAI to ignore the warranties in Paragraph 13 simply by producing the Flashlight to specifications as required by the contract.  *See PMA Capital Ins. Co. v. US Airways, Inc.*, 271 Va. 352, 358 (2006) ("No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly.").

AAI's argument also makes no sense in light of the undisputed facts.  AAI agreed to deliver a product free from defects in design, and it was that design that dictated the contents of the specifications.  AAI took credit for that design before and after producing the Flashlight. *See, e.g.*, **Exs. 16**; **17**; **18**; **19**.  And based on AAI's own design, AAI drafted the initial specifications, proposed revisions, and approved the final specifications.  **Exs. 23**; **24** (Jill Smith Dep. 97:9-98:12, 133:24-134:25); **25** (Mary Isemann Dep. 266:14-270:3, 284:6-285:13, 305:6-8).  AAI cannot escape its warranties against a defective product simply by producing the Flashlight to specifications that followed its own flawed design.

> **d.**     **AAI Breached Its Promise to Indemnify PM USA for the Costs Associated with Delivering a Defective Product.**

Indemnity provisions must be given their ordinary and usual meaning.  *See Bell BCI Co. v. Old Dominion Demolition Corp.*, 294 F. Supp. 2d 807, 812 (E.D. Va. 2003).  Under the Purchase Orders, AAI agreed to indemnify PM USA for all losses arising from any "error, omission, or fault" of AAI in performing under the Purchase Orders.  Specifically AAI agreed to indemnify PM USA "to the greatest extent permitted by law"

> against all claims, losses, liabilities, damages, and expenses
> (including reasonable attorneys' fees and disbursements) to the
> extent they arise from, or may be attributable to, any error,
> omission, or fault of Suppliers or any of its personnel in the
> performance under this Order.

Purchase Orders ¶ 16.

This paragraph is clear:  AAI agreed to indemnify PM USA against **all** losses including reasonable attorneys' fees, as long as the losses "arose from" or "may be attributable" to an "error, omission, or fault" of AAI.  Even if an act or omission of PM USA contributed in part to the losses — and it did not — AAI's obligation to indemnify against "all" losses applies, as long as those losses also "may be attributable" to AAI.  *See Carpenter Insulation & Coatings v. Statewide Sheet Metal & Roofing*, 937 F.2d 602, 1991 WL 120315, at *3 (4th Cir. 1991) (agreement to indemnify plaintiff against "***any***" loss "arising from [defendant's] acts or omissions" does not create an exception for losses that may arise solely or in part from plaintiff's own negligence).

There is no question that PM USA incurred extensive losses that "arose from" or "may be attributable" to an "error, omission, or fault" of AAI.  AAI's breaches of warranties — *i.e.*, its failure to provide a product free from defects in design, and its refusal to assume full responsibility for the suitability, adequacy, and safety of the design of the Flashlight — constitute an "error, omission, or fault" that triggers contractual indemnity obligations.

AAI "erred" in additional ways under the indemnification provision.  Even aside from the warranties, AAI erred because it delivered a product that was defective in its actual design and failed to carry adequate instructions.  AAI also erred because it neither conducted nor suggested performing tests for unintended ignition prior to production, despite the recommendations of its own third-party firm that it test for spontaneous ignition.  And AAI erred because it failed to

23

notify PM USA of the risk of unintended ignition before delivering a product that presented that risk.

Finally, it is indisputable that PM USA incurred significant "losses," as that term is used in the Purchase Orders. PM USA paid $1,403,431.48 for a defective product. It will incur a total of $5,059,722 in costs from the recall, including fees paid to a vendor to administer the recall, costs to purchase and ship replacement items, and costs to destroy the remaining inventory of Flashlights. PM USA also is entitled to all reasonable attorneys' fees that arise from or may be attributable to the defective Flashlight. This includes both attorneys' fees associated with the recall and attorneys' fees associated with the instant litigation. *See Am. Sales Corp. v. Adventure Travel, Inc.*, 867 F. Supp. 378, 379-80 (E.D. Va. 1994) (indemnity clause providing for attorneys' fees "arising out of or resulting from" performance under the contract include an award of attorneys' fees in a suit between the contracting parties).

### 3.      AAI Is Responsible for the Full Extent of PM USA's Losses.

AAI has suggested that, even if it breached the warranties in the Purchase Order, it does not need to pay for the entire costs of the recall because PM USA devised the recall plan and purportedly could have taken steps short of the recall that PM USA conducted. As noted, however, AAI had the opportunity to challenge PM USA's proposed recall plan with CPSC. At no point during the recall process did AAI contact CPSC to suggest an alternate recall plan or to suggest that a recall was unnecessary. Given AAI's inaction, it is estopped from now challenging the scope of PM USA's recall. *See In re Stokes*, 198 B.R. 168, 177-78 (E.D. Va. 1996) ("[I]t is settled in Virginia law that silence and passive acquiescence can operate as estoppel."); *Nat'l Airlines, Inc. v. Shea*, 292 S.E.2d 308, 311 (Va. 1982) (per curiam) ("One who has been silent when he should have spoken will not be permitted to speak when he should be silent." (internal quotation marks omitted)).

24

Perhaps more importantly, AAI's own CPSC expert conceded that PM USA's recall plan was appropriate and reasonable under the circumstances. **Ex. 37** (Nancy Nord. Dep. 93:13-96:22, 107:17-108:3, 118:17-120:11).  AAI has no contrary evidence.  AAI therefore cannot argue the recall was inappropriate or unreasonable.  *See Allstate Fin. Corp. v. Financorp, Inc.*, 934 F.2d 55, 58 (4th Cir. 1991) ("[T]he party opposing a properly supported motion for summary judgment may not rest upon the mere allegations in his pleading but must set forth specific facts that show there is a genuine issue for trial.").

    **B.**    **PM USA Is Entitled to Summary Judgment on Its Claims for Breach of Express Warranty and Breach of Implied Warranty of Merchantability**

Based on the same undisputed facts as underlying the breach of contract claim, PM USA is also entitled to summary judgment on its claims for AAI's breaches of express warranty and implied warranty of merchantability.

    **1.**    **AAI Breached Express Warranties as a Matter of Law (Second Cause of Action)**

Under Virginia law, any "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."  Va. Code § 8.2-313. Courts have repeatedly held that express affirmations like the ones in Paragraph 13 and 16 of the Purchase Orders create express warranties.  *See, e.g.*, *Hubbard v. Dresser, Inc.*, 271 Va. 117, 123 (2006); *Yates v. Pitman Mfg., Inc.*, 257 Va. 601, 606-07 (1999).  AAI violated those express warranties as a matter of law for the same reasons it breached the Purchase Orders as described above.

### 2.    AAI Breached an Implied Warranty of Merchantability as a Matter of Law (Third Cause of Action)

Virginia has adopted the U.C.C.'s implied warranty of merchantability, under which "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Va. Code § 8.2-314.[10] For goods to be merchantable, they must "pass without objection in the trade under the contract description" and be "fit for the ordinary purposes for which such goods are used." *Id.* To "pass without objection in the trade," the goods must be such that a "significant segment" of consumers would not object to buying the goods. *Bayliner Marine Corp. v. Crow*, 257 Va. 121, 128 (1999) (internal quotations omitted). Whether goods are "fit for the ordinary purposes for which such goods are used" concerns whether the goods are "reasonably capable of performing their ordinary functions." *Id.* (internal quotations omitted).

Here, the Flashlight does not satisfy either of these standards as a matter of law given its risk of unintended ignition. No reasonable juror could conclude that the "buying public" would not object to receiving the Flashlight, which could explode upon use. Nor could any reasonable person conclude that the Flashlight is reasonably capable of performing their ordinary functions in light of that same risk. *See, e.g.*, *Twin Lakes Mfg. Co. v. Coffey*, 222 Va. 467, 472-73 (1981) (affirming breach of implied warranty of merchantability where home was "habitable" but contained "extensive and substantial" defects).

---

[10]    Implied warranties are not disclaimed simply by the inclusion of an express warranty in the contract, unless the warranties cover the same subject matter and thus may conflict. *Fournier Furniture, Inc. v. Waltz-Holst Blow Pipe Co.*, 980 F. Supp. 187, 190 (W.D. Va. 1997). Here, the Purchase Orders' express warranty simply states that the products will be free from defects in design, materials, and workmanship; that is not inconsistent with the implied warranty that the product also be "fit for the ordinary purposes for which such goods are used" or fit for the particular purpose that PM USA required.

## V.      CONCLUSION

For the foregoing reasons, PM USA respectfully requests that this Court enter summary judgment in its favor on PM USA's First, Second, and Third Causes of Action; award PM USA the $1,403,431.48 purchase price of the Flashlight and $5,120,439.21 in costs associated with the recall of the Flashlight[11]; and set a schedule by which PM USA may submit its application for reasonable attorneys' fees.

Date:  June 2, 2016

                                        /s/
                              Turner Broughton (VSB # 42627)
                              tbroughton@williamsmullen.com
                              WILLIAMS MULLEN
                              A Professional Corporation
                              200 South 10th Street
                              Richmond, VA  23219
                              Phone: (804) 420-6000
                              Fax:    (804) 420-6507

                              Anand Agneshwar (*pro hac vice*)
                              anand.agneshwar@aporter.com
                              ARNOLD & PORTER LLP
                              399 Park Avenue
                              New York, NY  10022
                              Phone: (804) 420-6000
                              Fax:    (804) 420-6507

                              Paige Sharpe (VSB # 88883)
                              paige.sharpe@aporter.com
                              Jocelyn Wiesner (*pro hac vice*)
                              Jocelyn.wiesner@aporter.com
                              Emily May (*pro hac vice*)
                              emily.may@aporter.com
                              ARNOLD & PORTER LLP
                              601 Massachusetts Avenue NW
                              Washington, DC  20001
                              Phone: (202) 942-5000
                              Fax:    (202) 942-5999

                              *Counsel for Plaintiff Philip Morris USA Inc.*

---

[11]    PM USA will continue to incur costs until it destroys the remaining Flashlight units.

## **CERTIFICATE OF SERVICE**

I certify that on the 2nd day of June 2016, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

following, as well as a copy via email and hand delivery to:

F. Douglas Ross
Douglas.Ross@ofplaw.com
Bruce M. Blanchard
Bruce.Blanchard@ofplaw.com
Luke J. Archer
Luke.Archer@ofplaw.com
ODIN, FELDMAN & PITTLEMAN, P.C.
1775 Wiehle Avenue, Suite 400
Reston, Virginia 20190

R. Bradford Brittian
bbrittian@merchantgould.com
John T. Winemiller
jwinemiller@merchantgould.com
MERCHANT & GOULD P.C.
9717 Cogdill Road, Suite 101
Knoxville, TN 37932

*Counsel for Defendant*
*American Accessories International, L.L.C.*


                            _____/s/_____
                            Turner Broughton
                            *Counsel for Plaintiff Philip Morris USA Inc.*