**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| PHILIP MORRIS USA INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:15-cv-577 |
| | ) | |
| AMERICAN ACCESSORIES | ) | |
| INTERNATIONAL, L.L.C., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

    A.    PM's Mandatory Process for Product Development. ............................................. 3

    B.    The Development of the 3-in-1 Flashlight. ............................................................ 4

    C.    AAI's Swift Response to the Customer Incidents. ............................................... 5

    D.    PM's Voluntary Recall. ........................................................................................ 6

    E.    The Purchase Orders. ............................................................................................ 7

STATEMENT OF FACTS AS TO WHICH THERE IS A GENUINE ISSUE ............................. 7

ARGUMENT ......................................................................................................................... 13

I.    PM Has Not Established That the Flashlight Was Defective as a Matter of
Law. ........................................................................................................................ 14

    A.    The Issue of Design Defect Must Be Decided by the Jury. ................................ 15

    B.    There is a Factual Dispute Whether the Product Is Defective. ........................... 16

    C.    PM's Evidence of Alleged Defect Is Not Admissible. ....................................... 17

II.    Even If the Flashlight Were Defective, PM Is Not Entitled to Summary
Judgment. ............................................................................................................... 18

    A.    AAI Did Not Breach the Warranty Clause. ........................................................ 18

        1.    AAI Is Not Liable for Any Defects Because the Flashlight Was
Designed According to PM's Specifications. ........................................... 19

            a.    AAI Did Not Breach the First Sentence of the Warranty
Clause Based on an Alleged Design Defect. ............................... 20

            b.    AAI Did Not Breach the First Sentence of the Warranty
Clause Based on Allegedly Inadequate Instructions.................... 22

            c.    AAI Did Not Breach the Second Sentence of the
Warranty Clause......................................................................... 23

    B.    AAI Did Not Breach the Indemnity Clause......................................................... 24

    C.    AAI Did Not Breach the Implied Warranty of Merchantability.......................... 26

    D.    PM Fails To Prove Proximate Causation as a Matter Of Law............................. 27

III.    PM Is Not Entitled to The Damages It Seeks. .................................................... 28

CONCLUSION..................................................................................................................... 30

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Abbot by Abbot v. Am. Cyanamid Co.*, 844 F.2d 1108 (4th Cir. 1988) .........................................23

*Austin v. Clark Equip. Co.*, 48 F.3d 833 (4th Cir. 1995) ................................................................19

*Burgess v. Bowen*, 466 F. App'x 272 (4th Cir. 2012).....................................................................14

*Davis v. Simon-Telelect, Inc.*, 48 F.3d 1215 (4th Cir. 1995) .........................................................27

*E. Gas & Fuel Assocs. v. Midwest-Raleigh, Inc.*, 374 F.2d 451 (4th Cir. 1967) ..........................25

*Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954 (4th Cir. 1996) ......................................13

*First S. Bank v. Bank of the Ozarks*, 542 F. App'x 280 (4th Cir. 2013)........................................21

*Fox Group, Inc. v. Cree, Inc.*, 819 F. Supp. 2d 520 (E.D. Va. 2011) ............................................14

*Gordon v. Pete's Auto Serv. of Denbigh, Inc.*, 837 F. Supp. 2d 581 (E.D. Va. 2011) ...............................................................................................................................14

*Hall v. Int'l Paper Co.*, No. 3:07-CV-064, 2007 WL 2965054 (E.D. Va. Oct. 9, 2007) ...............................................................................................................................19

*In re Stokes*, 198 B.R. 168 (E.D. Va. 1996)...................................................................................30

*Karnette v. Wolpoff & Abramson, L.L.P.*, 444 F. Supp. 2d 640 (E.D. Va. 2006).........................24

*Level 3 Commc'ns, LLC v. Limelight Networks, Inc.*, 630 F. Supp. 2d 654 (E.D. Va. 2008).............................................................................................................................13

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995) ..........................................22

*PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161 (4th Cir. 2013).......................24

*RMA Lumber, Inc. v. Pioneer Mach., LLC*, No. 6:08-00023, 2009 WL 4015928 (W.D. Va. Nov. 19, 2009).....................................................................................................22

*S. Ry. Co. v. Coca Cola Bottling Co.*, 145 F.2d 304 (4th Cir. 1944).......................................22, 24

*Singleton v. Int'l Harvester Co.*, 685 F.2d 112 (4th Cir. 1981) ....................................................15

*Spangler v. Kranco, Inc.,* 481 F.2d 373 (4th Cir.1973) ................................................................19

*Sprouse v. Am. Tire Distribs., Inc.*, No. 3:08-CV-491, 2009 WL 1404735 (E.D. Va. May 15, 2009) ...............................................................................................................22

*Todd Marine Enters, Inc. v. Carter Mach. Co.*, 898 F. Supp. 341 (E.D. Va. 1995) ..................... 14

*Vienna Metro LLC v. Pulte Home Corp*, 786 F. Supp. 2d 1076 (E.D. Va. 2011) ......................... 27

*Wellmore Coal Co. v. Powell Constr. Co.*, 600 F. Supp. 1042 (W.D. Va. 1984) ......................... 21

*Werner v. Upjohn Co., Inc.*, 628 F.2d 848 (4th Cir. 1980) ............................................................ 18

*Wingo v. Celotex Corp.*, 834 F.2d 375 (4th Cir. 1987) ................................................................. 25

*Young v. J.I. Case Co.*, No. 3:90CV00630, 1994 WL 506403 (E.D. Va. June 3, 1991) ............................................................................................................................... 15, 26

## STATE CASES

*Featherall v. Firestone Tire & Rubber Co.*, 219 Va. 949 (1979) .................................................. 22

*Forbes v. Rapp*, 269 Va. 374 (2005) ............................................................................................. 29

*Logan v. Montgomery Ward & Co.*, 216 Va. 425 (1975) ............................................................. 27

*McClanahan v. Cal. Spray-Chem. Corp.*, 194 Va. 842 (1953) .................................................... 22

*Morgen Indus., Inc. v. Vaughan*, 252 Va. 60 (1996) ................................................................... 15

*Nat'l Airlines, Inc. v. Shea*, 223 Va. 578 (1982) ......................................................................... 30

*Online Res. Corp. v. Lawlor*, 285 Va. 40 (2013) ......................................................................... 21

*RGR, LLC v. Settle*, 288 Va. 260 (2014) ..................................................................................... 27

*Saks Fifth Ave., Inc. v. James, Ltd.*, 272 Va. 177 (2006) ............................................................ 30

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 56(a) .......................................................................................... 13

Federal Rule of Civil Procedure 56(c)(2) ..................................................................................... 17

Federal Rule of Civil Procedure 56(f) .......................................................................................... 14

Federal Rule of Evidence 407 ................................................................................................. 17, 18

Robert Draim, *Virginia Practice: Products Liability* ................................................. 15, 22, 23, 25

VA Code Ann. § 8.2-316, UCC cmt. 9 .......................................................................................... 26

VA Code Ann. § 8.2-317(c) ........................................................................................................... 26

Va. Code Ann. § 8.2-314, UCC cmt. 13 ........................................................................................ 27

## **INTRODUCTION**

PM seeks to require its supplier, American Accessories International, L.L.C., to pay millions of dollars in costs for PM's voluntary recall of its 3-in-1 Flashlight after it received four reports that the matches in the product had ignited unintentionally.[1]  But PM—not AAI— dictated the design of the Flashlight through its own specifications.  AAI is thus not liable for any alleged design defect.  Nor is AAI liable for PM's unilateral decision to implement a voluntary product replacement recall.  PM implemented this recall based on concerns about *its own* failure to timely report the consumer incidents to the Consumer Product Safety Commission.  And it rejected, with no valid reason, AAI's more effective, quicker, and less expensive proposal to provide consumers with instructions on how to prevent unintended ignitions.  Each of PM's claims fails as matter of law.  At a minimum, PM is not entitled to summary judgment because each of the elements of its claims depends on disputed issues of material fact.

As a threshold matter, all of PM's claims are based on its contention that the Flashlight was defective.  But whether a product is defective is a quintessential question of fact for the jury to decide.  Here, the jury will need to wrestle with the contradiction between the central premise of PM's entire case (that the Flashlight was defective) and the statements of PM's key witness. According to Rick Clements, the PM buyer who dictated the product design, ████████████████ ███████████████████████████  Ex. 1 (emphasis in original).  In light of the conflict between PM's current litigation position and the pre-litigation statements of *its own witness* (not to mention abundant evidence and expert opinion that the Flashlight is not unreasonably dangerous), the Court simply cannot decide this threshold, factual issue as a matter of law.  This alone requires denial of PM's motion.

---

[1] Although PM USA is the Plaintiff, AAI dealt with other Altria entities in the project: Altria Client Services, Inc. and Altria Group Distribution Company. Unless otherwise indicated, we refer to them collectively as "PM."

Moreover, even if the Flashlight were defective, PM is not entitled to summary judgment because AAI did not breach any contractual provisions or implied warranty. *First*, AAI did not breach the express warranties in the Purchase Orders because it manufactured the product according to PM's precise specifications. Under Virginia law, AAI cannot be held liable for design defects in a custom product made to PM's own specifications. PM drafted and controlled the specifications and required AAI to follow them. AAI should be entitled to judgment as a matter of law on this basis. At a minimum, PM's assertion that AAI did not follow PM's specifications is an issue of fact for the jury to decide.

*Second,* PM's claim that AAI breached the Indemnity Clause of the Purchase Order fails as a matter of law because that clause does not apply. It is displaced by the more-specific express warranties in the Purchase Orders, which set forth specific conditions regarding the liability of the parties based on alleged product defects and provide exclusive remedies for any violations. Even if the Indemnity Clause did apply, PM cannot establish breach as a matter of law because it depends on the disputed factual issues of which party was at fault and the extent to which each party's conduct caused the harm.

*Third,* PM's implied warranty of merchantability claim fails as a matter of law because the express warranty conflicts with and displaces any potential implied warranty. And even if an implied warranty did apply, there is a fact-intensive question of whether the Flashlight is not fit for its ordinary purpose because it is defective, an issue that the jury must decide.

*Fourth*, even if PM could establish a breach of contract or implied warranty, it cannot demonstrate as a matter of law that the breach proximately caused PM's claimed losses.

*Finally*, PM is not entitled to the damages that it is seeking as a matter of law. PM is seeking to recover *both* a refund of the price it paid for the Flashlight and reimbursement for the cost of replacement, but the contract provides for those remedies as alternative remedies and does not permit such a double recovery. Moreover, there is ample evidence that PM breached its duty to mitigate damages.

Thus, for the reasons stated herein, and in AAI's motion for summary judgment and supporting memorandum, the Court should deny PM's motion for summary judgment and grant summary judgment in favor of AAI.

## BACKGROUND

### A.      PM's Mandatory Process for Product Development.

AAI manufactures and delivers custom products for PM, in accordance with PM's detailed specifications, for PM to distribute to its customers.  Because AAI has close relationships with leading manufacturing factories in China, it can deliver products to PM efficiently and in compliance with PM's strict specifications and quality assurance standards. Over the course of the last 20 years, AAI has worked with PM on hundreds of projects and has always received the highest marks from PM for its service, quality, and compliance with PM's policies and product specifications.

PM requires its suppliers to follow strict specifications in manufacturing a product.  PM required AAI to agree to PM's Marketing Incentives Quality Assurance Guidelines for Suppliers ("Supplier Guidelines"), which are designed to provide PM ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████      Ex. 2; Ex. 3.  The Supplier Guidelines made it clear that PM, through its own third party Quality Assurance firm, was responsible for the product specifications, and specifically for product safety: ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████      Ex. 2 (emphasis added).  PM hired Underwriters Laboratories ("UL"), an industry leader in consumer product safety, to serve as its third-party QA firm.  Ex. 4 (Isemann Dep. 28:18-29:17; 33:2-18; 46:16-47:1).  UL's representative, Mary Isemann, worked full-time at PM's facilities, and her office was in close proximity with Rick Clements, PM's project leader for the 3-in-1 Flashlight.  Ex. 4 (Isemann Dep. 38:9-21).

**B.      The Development of the 3-in-1 Flashlight.**

In response to a request from PM for product ideas for its outdoor marketing theme, AAI

proposed a product with three related functions:  a flashlight, a compass, and a storage

compartment for matches (or other items).  Notably, AAI's proposal was *not* for matches to be

included with the product. Ex. 5; Ex. 6 (D. Zeanah Dep. 85:23-86:7).  Rather, under AAI's

proposal, consumers could supply their own matches, if they so chose.  PM insisted, however,

that matches be included with the flashlight.  Ex. 7 (Simers Dep. 34:1-35:13). PM also made

multiple rounds of design modifications to the Flashlight to suit its preferences, including the

location of the striker pad.  Ex. 8 (AAI's Answers to PM's Interrogatory Nos. 12 & 13).

In accordance with the Supplier Guidelines, Ms. Isemann prepared and revised the

specifications for the 3-in-1 Flashlight.  Her specifications enumerated the various types of

testing that AAI was required to perform on the Flashlight, including testing on the matches.  Ex.

9; Ex. 4 (Isemann Dep. 158:3-16).  AAI signed and approved the final specifications, indicating

that it would provide the Flashlight in accordance with them.  Ex. 9.  There is no dispute that

AAI met all of PM's and UL's specifications for the Flashlight.

PM was also intricately involved in the preparation of the instruction sheet that

accompanied the flashlight when it was sent to consumers.  PM made specific changes to the

instruction sheet, including deleting a safety warning proposed by AAI and directing AAI to

move a warning about the flashlight battery: "I think all the warnings should go in the back . . .

would prefer that the 1st thing a consumer sees is not a warning . . . ."  Ex. 11; Ex. 10; Ex. 12

(Clements Dep. 147:17-150:5).  At no point did PM tell AAI that there should be any warning

about the risk of unintended ignition or any instructions regarding the use of the foam barrier.

UL did not do any safety testing on the Flashlight.  Ex. 4 (Isemann Dep., 28:3-6; 90:21-

91:8).  Although Ms. Isemann asked PM for a complete sample of the flashlight, and AAI had

provided PM with samples of the flashlight that included matches, PM did not provide Isemann

with samples that included matches.  Ex. 4 (Isemann Dep. 145:8-21).

- 4 -

**C.     AAI's Swift Response to the Customer Incidents.**

PM distributed 3-in-1 Flashlights to its customers who specifically requested them.  On March 4, 2014, PM received two reports from consumers of unintended ignitions of matches in the storage compartment.  PM notified AAI of the incidents.  At PM's request, AAI immediately contacted the consumers to obtain details about what had occurred.  AAI then conducted its own testing to see whether it could recreate the unintended ignition.  AAI was able to recreate the unintended ignition under the following, limited scenario: if the match container had a certain number of matches; the foam barrier was not included in the compartment; and the Flashlight was held upside down such that the matchheads would fall to the end of the compartment where the striker pad was located; and the compass cap was then screwed on and off the Flashlight "like a pepper grinder."  Ex. 13.  AAI promptly reported these results to PM in writing on March 9, 2014.  Ex. 13.

Notwithstanding the fact that AAI had told PM and UL that it had replicated the ignition—and exactly how—UL (a leading QA firm) *was unable to do so* in two rounds of testing, and PM reported the "good news" back to AAI.  Ex. 14; Ex. 12 (Clements Dep. 181:11-182:16).  Unbeknownst to AAI, UL had experienced an unintended ignition when one of the flashlight samples was being prepped for testing.  Ex. 15; Ex. 4 (Isemann Dep. 216:19-218:9; 222:19-226:6).  But PM did not report this incident to AAI.  Moreover, PM also failed to advise AAI of a third reported incident, which PM received on March 14, 2014.  Ex. 8 (AAI's Answers to PM's Interrogatory No. 3).

Nonetheless, based on these two reports and AAI's testing, AAI suggested on March 7, 2014 (just two days after receiving notice of the incidents) sending consumers a follow-up notice advising them that the foam barrier should be kept in place between the matchheads and the striker pad.  Ex. 16; Ex. 17 (E. Zeanah Dep. 107:22-111:18).  Two days later, AAI again recommended instructing consumers that, if they had discarded their foam barrier, AAI would provide a replacement foam barrier at no cost to the consumer.  Ex. 13; Ex. 17 (E. Zeanah Dep. 137:5-138:4).  PM, including its in-house attorney, Michael Sieja, as well as at least one outside

counsel, agreed with this approach and participated extensively in the drafting of the notice that would be sent to consumers. Ex. 18 (Sieja Dep. 40:10-41:20; 45:7-51:8). Mr. Sieja acknowledged that during this period AAI was working collaboratively with PM, was following PM's protocol and was making proposals to help the consumers. Ex. 18 (Sieja Dep. 65:8-21). By March 14, 2014, PM's Brand, Compliance, and Legal departments had all approved the mass email plan. *See* Ex. 19.

### D.      PM's Voluntary Recall.

Although PM agreed with the approach recommended by AAI, PM allowed several weeks to pass and had not sent out the notice by Friday, April 4, 2014, when PM received notice of a fourth reported incident. Ex. 18 (Sieja Dep. 89:2-90:1). In this incident, Mr. Lowes claimed that the 20 matches in the Flashlight had caused the heavy, metallic flashlight to "explode," causing a deep cut and left "shrapnel" imbedded in his hand, and demanded that PM pay him $18,000. Ex. 20. PM decided not to investigate the Lowes incident. Ex. 21 (Crosthwaite Dep. 79:17-80:2).

At this point, PM consulted with Mr. Eric Rubel, an attorney at Arnold & Porter who specializes in Consumer Product Safety Commission issues. The CPSC's regulations provide that a company can be fined up to $15.15 million if it does not notify the CPSC of a safety hazard within ten business days after receiving notice of the incident. PM Mem. at 8. As of April 4, 2014, PM had been sitting on the first two consumer reports for more than ten days. Then, during a 72-hour period over the weekend of Friday, April 4, to Monday, April 7, PM and its counsel hatched a preemptive plan to inform the CSPC of the incidents and recall the Flashlight. PM reported the incidents to the CPSC on April 8, 2014, and proposed a "fast-track" recall where consumers would return the compass cap in exchange for a premium replacement product. Ex. 22 (Edson Dep. 60:2-63:1). PM did not consult AAI about its proposal; AAI learned of PM's plan after PM had already contacted the CPSC. Ex. 22 (Edson Dep. 52:3-53:24).

**E.      The Purchase Orders.**

PM claims that the Purchase Orders for the Flashlight require AAI to pay PM at least

$6.5 million (plus attorneys' fees) for costs associated with its recall and this litigation.  The

Purchase Orders contain the following three provisions at issue here.

> **13.      Warranties.** Supplier warrants that all Goods delivered under Order will (a) conform strictly to the general description, model number or specifications stated in this Order or provided by Supplier and in any manufacturer warranties that accompany the Goods, (b) be free from defects in materials, workmanship, and design, and (c) be of first quality and made of new materials and components. *With respect to any Goods designed by Supplier or any of Supplier's subcontractors or suppliers*, Supplier assumes and acknowledges full and complete responsibility for the suitability, adequacy, and safety of the design of such Goods.

> **14.      Quality Control.** *Supplier must comply with Buyer's Quality Assurance Guidelines in effect as of the date of this Order.* Buyer has the right (but not the obligation) to audit Supplier's quality control through an independent quality assurance agent. Buyer, or it [sic] designee has the right to pre-inspect and pre-approve each plant in which Goods are produced. Material testing, by an accredited testing company at Supplier's expense, is required on all components of Goods produced by Supplier for off-shore shipments. Buyer will provide the material testing requirements for each such component to Supplier under separate cover. Supplier must provide the test results to Buyer and its quality assurance agent before production begins.

> **16. Indemnity.** To the greatest extent permitted by law, Supplier agrees to indemnify Buyer, its affiliates, and their respective officers, employees, directors, and agents against all claims, losses, liabilities, damages, and expenses (including reasonable attorneys' fees and disbursements) to the extent they arise from, or may be attributable to, any error, omission or fault of Supplier or any of its personnel in the performance under this Order.

Ex. 23 (emphasis added).

## STATEMENT OF FACTS AS TO WHICH THERE IS A GENUINE ISSUE

AAI herein responds to the "Undisputed Material Facts" (UMFs) set forth in PM's

Memorandum.  PM Mem. at 2–13.  AAI specifically denies each and every heading appearing

within the UMFs, as well as all assertions not expressly deemed "undisputed."  Furthermore,

AAI incorporates by reference the Undisputed Material Facts set forth in its own Motion for

Summary Judgment.  *See* ECF No. 44, pp. 2–8.  The paragraphs below correspond to the section headings set forth in PM's UMFs.

**A-1. Disputed.**  AAI did not "develop[] promotional product concepts."  AAI researched existing survival products to create a set of proposed item concepts, each of which would have been a "custom" item created to PM's own specifications.  *See* Ex. 7 (Simers Dep. 34:1-20; 40:20-23; 42:18-21); Ex. 12 (Clements Dep. 35:13-22).

**A-2. Disputed.**  AAI did not design the Flashlight—this was a custom product created to PM's own specifications.  Ex. 12 (Clements Dep. 35:13-22); Ex. 17 (E. Zeanah Deposition 94:9-96:22).  Diane Pinkney admitted that a custom item such as the Flashlight was one that PM either completely designed or modified based on a request. Ex. 24 (Pinkney Dep. 46:11-14).  AAI did not "redesign[] the Flashlight to add a striker pad inside the match compartment" based on input from its Chinese manufacturer.  AAI's original proposal did not include matches, let alone a striker pad.  Ex. 5; Ex. 6 (D. Zeanah Dep. 85:23-86:7); Ex. 7 (Simers Dep. 43:23-44:2; 55:4-56:3).  PM dictated that matches be included in the product.  Ex. 7 (Simers Dep. 34:1-35:17; 55:1-3).  When AAI advised PM that it had not previously been involved with products that included matches, PM responded that it had done so previously and assured AAI that it would be fine because PM's legal team had approved.  Ex. 25.  PM also dictated the location of the striker pad.  After PM insisted that standard safety matches (not "strike anywhere" matches) be included, AAI recommended that the flashlight include striker sheets in poly bags, separated from the matches, or that a striker pad be placed on the outside of the flashlight.  Ex. 8 (AAI's Answers to PM's Interrogatory Nos. 12 & 13).  But PM rejected these proposals, and instead required that the striker pad be affixed inside the flashlight.  *Id.*  The only place the striker pad could be affixed was on the underside of the compass end, which is where it was placed.  *Id.*

PM further controlled the design of the flashlight because the specifications were provided by UL on PM's behalf.  *See* Ex. 9.  AAI further disputes that it "took credit for developing and designing the Flashlight."  AAI never once stated that it was responsible for the "design" of the Flashlight.  Rather, AAI worked with PM to develop a custom product based on

- 8 -

PM's own specifications and directions.  Ex. 12 (Clements Dep. 35:13-22); Ex. 17 (E. Zeanah Dep. 38:4-10; 94:9-96:22); Ex. 24 (Pinkney Dep. 46:11-14).

**A-3.  Disputed.**  AAI was not the "creator" of the instruction sheet.  The instruction sheet was reviewed and altered by PM.  Ex. 26; Ex. 11.  PM provided specific directives and retained ultimate control and approval.  *See* Ex. 26; Ex. 11.  PM made extensive edits and changes to the instruction sheet, including deleting an optional match warning proposed by AAI, and directing AAI to move a warning about the flashlight battery.  *See* Ex. 26; Ex. 11.

**A-4.  Disputed**.  PM dictated all the pre-production specifications and testing requirements relating to the Flashlight product.  In its Supplier Guidelines, PM represented to AAI that PM ██████████████████████████████████████

████████████████████████████████████████████████

Ex. 2; Ex. 4 (Isemann Dep. 46:16-47:1).  PM's Supplier Guidelines provided that PM and the QA firm would determine the specifications for the products—including any appropriate testing:



Ex. 2.  The specifications were mandatory: ████████████████████████

████████████████████████  *Id.*  PM hired UL, an industry leader in consumer product safety, as the QA firm.  Ex. 4 (Isemann Dep. 28:18-29:17; 33:2-18; 46:16-47:1).  UL's representative was Mary Isemann.  Ex. 4 (Isemann Dep. 38:9-21).

AAI also disputes that it "drafted the initial specifications."  Ms. Isemann had previously prepared specifications for another flashlight supplied by AAI to PM a couple of years earlier (the prior flashlight did not involve matches).  Ex. 27 (Smith Dep. 95:22-97:14).  Accordingly, at the request of Mr. Clements, AAI sent Ms. Isemann a first draft of Concept Specification Analysis ("CSA").  Ex. 27 (Smith Dep. 76:3-77:12; 82:5-21).  This draft was based entirely on the specifications for the previous flashlight, which Ms. Isemann drafted.  Ex. 27 (Smith Dep.

76:3-77:12); Ex. 28. *AAI's draft did not include specifications for matches or any required testing for matches*.[2] Ms. Isemann prepared the specifications for the 3-in-1 Flashlight, adding in the new specifications and testing requirements that the flashlight and the matches had to meet. Ex. 4 (Isemann Dep. 158:3-16). The Specifications Analysis (SA) went through six revisions before it was finalized. Ex. 9; Ex. 4 (Isemann Dep. 156:8-158:16; 161:10-13). In those six revisions, Ms. Isemann, not AAI, added numerous specifications, including labeling requirements, performance testing requirements, and inspection checklists. Ex. 9. One of the performance testing requirements Ms. Isemann added in the very first revision was "testing for matches." Ex. 29; Ex. 4 (Isemann Dep., 128:1-129:7). Ms. Isemann also added to the SA's pre-shipment inspection checklist whether the "match-barrier sponge" was present. Ex. 29; Ex. 4 (Isemann Dep. 132:21-134:14). Moreover, the SA is prepared under ALCS's logo, not AAI's, and is a PM/Altria document. Ex. 9; Ex. 4 (Isemann Dep. 156:8-158:2; 161:10-13).

PM criticizes the fact that the CSA and SA characterized a potentially missing match barrier sponge as a major defect, rather than a critical defect. PM Mem. at 5. However, the characterization of a missing match barrier sponge as a major defect, rather than as a critical defect, was made by UL, not AAI. Ex. 4 (Isemann Dep. 138:6-20). Although PM asserts that AAI never told PM that the foam insert was intended to protect against unintended ignition, PM Mem. at 5, Ms. Isemann testified that *she* knew the foam insert prevented the matchheads from coming in contact with the striker pad. Ex. 4 (Isemann Dep. 130:12-19).

PM also asserts that SGS, a third party testing company that AAI used to test whether the Flashlight met all the tests required by PM's SA, made testing suggestions that were not shared with PM, nor incorporated into the specifications prepared by UL on behalf of PM. PM Mem. at 5. This is incorrect. The two "unintended ignition" tests—(1) a heating test, and (2) a drop test—were required by the CSA and SA prepared by UL on behalf of PM. Ex. 9; Ex. 30.

---

[2] When AAI sent the draft specifications on August 27, 2013, PM had already dictated that matches be included. The draft specs thus stated "matches," but did not contain any particular specifications for the matches or testing that must be performed on the matches. Ex. 31.

Although the product passed both these pre-shipment tests, Ex. 4 (Isemann Dep. 70:8-72:19), neither test would have uncovered the problem of intended ignition from removing the foam barrier and twisting the product upside down like a pepper grinder.  *See* Ex. 13.

A-5.  **Disputed.**  AAI does not dispute that two consumer reports were received on March 4, 2014, and that AAI took prompt action to help resolve the reported issues.  However, PM is the party that decided to halt all further shipments of the Flashlight product and pursue a fast-track recall.  Ex. 8 (AAI's Answers to PM's Interrogatory No. 9).  Contrary to PM's assertions, AAI never once "conceded" that the Flashlight product was defective.  PM fails to provide in its UMFs any specific factual support for their assertions of concessions.  Later on in its Memorandum, PM points to the actions that AAI undertook in the wake of the initial consumer complaints as proof of "concessions" of defect.  *See* PM Mem. at 18–20.  But, as discussed in detail below, these are not, in fact, "concessions," and evidence of AAI's subsequent remedial measures is inadmissible to prove a defect in the product's design. Moreover, as Rick Clements stated: ████████████████████████████████████

████████         Ex. 1.  AAI disputes that its CPSC expert, Nancy Nord, made any "concessions" regarding what the product instructions "should have" included.  The deposition testimony PM cites in its UMFs does not demonstrate—and the testimony immediately following PM's selected excerpts refutes—any such "concession."  *See* Ex. 32 (Nord Dep. 46:5-48:4).

B.  **Undisputed.**

C.  **Disputed.**  AAI does not dispute that PM received the three cited incident reports, but AAI disputes the truth of the alleged injuries and causes contained within the reports.  PM never investigated the claims included in the April 4, 2014 incident report.  Ex. 21 (Crosthwaite Dep. 79:17-80:2).  AAI also disputes PM's statement that AAI advised that PM should "simply send revised instructions."  By the time PM received this April 4, 2014 incident report, AAI had spent the past month attempting to get PM to email a notice to consumers to address the unintentional ignitions.  Ex. 33; Ex. 13; Ex. 8 (AAI's Answers to PM's Interrogatory No. 9).  AAI could not send out the mass email itself, as PM had all of the consumers' email addresses and wanted to

send the email from a PM-brand email address.  Ex. 34.  Mr. Sieja acknowledged that during this period AAI was working collaboratively with PM, was following PM's protocol, and was making proposals to help the consumers.  Ex. 18 (Sieja Dep. 65:8-21).

On April 4, 2014, PM received notice of a purported incident reported by Mr. J.D. Lowes.  Ex. 20.  That day, PM asked Eric Zeanah to participate that afternoon in a conference call to discuss the incident.  *See* Ex. 18 (Sieja Dep. 80:5-22).  When PM asked Mr. Zeanah what he intended to do in response to the incident report, Mr. Zeanah responded that he thought the notice he had proposed a month earlier should be sent out and asked whether PM had given final approval to the much-discussed notice.  Ex. 18 (Sieja Dep. 86:5-87:21; 94:19-96:2).  PM responded that it was thinking about it, and would let AAI know its position.  Ex. 18 (Sieja Dep. 101:6-17).

PM did not, however, get back to AAI.  Ex. 18 (Sieja Dep. 101:18-21).  Instead, just four days later (with two of those days being the intervening weekend), PM reported the four incidents to the CPSC on April 8, 2014.  Ex. 22 (Edson Dep. 52:3-53:24).  AAI learned of PM's report only after it had been completed.  *Id*.  The report did not just advise of the four incidents, but also proposed that the flashlight be recalled and that consumers receive a premium replacement product.  Ex. 22 (Edson Dep. 60:2-63:1).

After learning of PM's report, AAI's counsel spoke with PM's in-house counsel and expressed AAI's position that the Flashlight did not need to be rendered useless and returned, because the issue could be addressed through a quicker and more effective follow-up notice advising consumers they needed to use the foam barrier.  Ex. 22 (Edson Dep. 167:1-171:3); *see also* Ex. 35; Ex. 36; Ex. 37.  PM rejected that approach.  Ex. 22 (Edson Dep. 167:1-171:3).  AAI then followed up with an email to PM, reiterating AAI's position that a full recall of the flashlight was unnecessary and reserving AAI's rights on this issue. Ex. 37; *see also* Ex. 35.

AAI disputes that its proposed plan to send consumers revised instructions "would have faced significant challenges."  Nancy Nord, a former Commissioner of the CPSC, concluded that it would have been appropriate for PM to include either a revised instruction sheet that reminded

consumers of the need to keep the foam barrier between the matchheads and the striker pad, or alternatively, by providing the consumers with a video explaining how to remove the striker pad from the underside of the compass cap, just as AAI has proposed.  Ex. 38.

AAI also disputes that PM's recall plan "was both appropriate under the circumstances and reasonable in execution."  PM attempts to suggest there is no factual dispute on the issue of the recall because Ms. Nord purportedly testified in her deposition that she did not have an issue with how PM's recall was conducted.  PM Mem. at 12.  This is a misstatement of Ms. Nord's testimony.  Ms. Nord was asked whether, *if she put aside her opinion* that PM should have pursued an instruction or repair approach, she might have any criticism of how PM conducted the recall.  Ex. 32 (Nord Dep. 118:12-120:11).  Ms. Nord testified that, *if* she accepted the premise of taking the route chosen by PM, she did not have any criticisms of how the recall was conducted.  *Id.*  Nevertheless, her opinion was and remained that PM could have gone forward with a quicker, more effective, and far less expensive route of a revised instruction sheet and/or a video, both of which were suggested by AAI.

**D.  Disputed.**  AAI does not dispute that the Purchase Orders were part of the operative contract documents.  AAI does dispute, however, that the Purchase Orders were the sole governing documents—the Purchase Orders explicitly incorporate by reference PM's Supplier Guidelines, which (i) specified that its QA firm (here, UL) would review the product design for product safety, and (ii) required AAI to adhere rigorously to PM's product specifications. Ex. 23.

## ARGUMENT

Under Federal Rule of Civil Procedure 56(a), summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (a).  "If, after reviewing the record, it appears that 'a reasonable jury could return a verdict for [the non-movant], then a genuine factual dispute exists and summary judgment is improper.'"  *Level 3 Commc'ns, LLC v. Limelight Networks, Inc.*, 630 F. Supp. 2d 654, 657 (E.D. Va. 2008) (alteration in original) (quoting *Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 958-59 (4th Cir. 1996)).  "In other words, the moving

party's submission must foreclose the possibility of the existence of facts from which a jury could make inferences favorable to the non-movant." *Todd Marine Enters, Inc. v. Carter Mach. Co.*, 898 F. Supp. 341, 343-44 (E.D. Va. 1995).  Further, "[e]ven if the basic facts are not in dispute, the parties may nevertheless disagree as to the inferences that reasonably may be drawn from them, in which case summary judgment may be inappropriate . . . ." *Gordon v. Pete's Auto Serv. of Denbigh, Inc.*, 837 F. Supp. 2d 581, 584 (E.D. Va. 2011).  "A district court considering a motion for summary judgment must view the evidence in the light most favorable to the nonmoving party and draw all inferences in favor of the nonmovant." *Burgess v. Bowen*, 466 F. App'x 272, 276 (4th Cir. 2012) (citation omitted).

Moreover, "[a]fter giving notice and a reasonable time to respond, the court may (1) grant summary judgment for a nonmovant; [and] (2) grant the motion on grounds not raised by a party."  Fed. R. Civ. P. 56(f); *see also Fox Group, Inc. v. Cree, Inc.*, 819 F. Supp. 2d 520, 522 (E.D. Va. 2011) ("[T]he court can enter judgment in favor of the nonmovant, as long as the court gives 'notice and a reasonable time to respond'" pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.") (internal citations removed).

I.       **PM Has Not Established That the Flashlight Was Defective as a Matter of Law.**

All of the claims on which PM has moved for summary judgment (breach of contract, breach of express warranty, and breach of implied warranty) hinge on a disputed factual issue: whether the Flashlight is unreasonably dangerous and thus defective.  PM's two alleged breaches of the Warranty Clause are both predicated on a purported design defect.  PM alleges that AAI breached the first sentence of the Warranty Clause because the Flashlight was not "free from defects" in "*design*."  PM Mem. at 17 (emphasis added).  Plaintiff also alleges that AAI breached the second sentence of the Warranty Clause because it failed to "assume and acknowledge full and complete responsibility for the suitability, adequacy, and safety *of the design*" of the Flashlight.  PM Mem. at 20 (emphasis added).  Likewise, PM's alleged breach of the Indemnity Clause depends on the same alleged breach of the Warranty Clause and an allegation that AAI "delivered a product that was defective in its actual design."  PM Mem. at 23.  Finally, PM

alleges that the Flashlight breached the implied warranty of merchantability because it contained the risk that it could "explode upon use."  PM Mem. at 26.

Virginia law is unequivocal that the issue of defect should be decided by the jury. Indeed, *"[n]o reported Virginia case* has found a product design unreasonably dangerous and thus defective as a matter of law."  Robert Draim, *Virginia Practice: Products Liability* § 3:4 n.2 (emphasis added).  The Court should deny PM's motion on this threshold basis alone.

### A.   The Issue of Design Defect Must Be Decided by the Jury.

In addressing whether a product is defective in design, Virginia employs a "reasonably safe/unreasonably dangerous" standard.  *Va. Prac. Products Liability* § 3:4.  The Virginia Supreme Court has made it clear that "[t]he issue whether a product is unreasonably dangerous is a question of fact."  *Morgen Indus., Inc. v. Vaughan*, 252 Va. 60, 65-66 (1996) (citing *Singleton v. Int'l Harvester Co.*, 685 F.2d 112, 115 (4th Cir. 1981)).  Moreover, just because a product could be safer does not mean that the product is unreasonably dangerous and defective as a matter of law.  *Young v. J.I. Case Co.*, No. 3:90CV00630, 1994 WL 506403, at *5 (E.D. Va. June 3, 1991) ("Academically, it may be argued that all products are defective because they can be made more safe.  However, it does not automatically follow that the products are deemed unreasonably dangerous.").

PM itself concedes that "in product liability cases, the question of defect is typically left for the jury . . . ."  PM Mem. at 17.  PM attempts to evade this well-settled principle of law by claiming that "this is not a product liability case" and is "a case sounding in contract."  PM Mem. at 17.  Yet PM does not offer a shred of legal or logical support for why this established definition of defect under Virginia law would not apply here.  Nor could it, because PM itself cites to Virginia products liability law to define this concept.  *See, e.g.*, *id.* (citing Va. Prac. Products Liability § 3:5).  Thus, by PM's own admission, the question of defect is one for the jury to decide and is not appropriate for summary judgment.

**B.       There is a Factual Dispute Whether the Product Is Defective.**

There is a clear factual dispute whether the Flashlight is defective.  PM's own project

manager for the Flashlight, Rick Clements, admitted *after* PM had received the two initial

consumer reports and *after* AAI investigated and reported on those two incidents: ███████

████████████████████████████████████  Ex. 1.  PM is plainly not entitled to judgement

as a matter of law on this issue.

AAI's product design expert, Dr. Elizabeth Buc, also examined the Flashlight and

concluded that the product was not defective:  "The multi-party data, analyses and inspection

reports support the conclusion that *the product as manufactured and delivered to the consumer*

*was safe for consumer use*."  Ex. 39 at 3 (emphasis added).  Dr. Buc testified that the Flashlight,

"as manufactured," contained an effective foam barrier between the matches and the striker pad.

Ex. 40 (Buc Dep. 80:12-80:16).  As Dr. Buc elaborated:

> [T]he foam insert in the product matchstick compartment is effective in
> preventing the contact of one or more matchsticks with the striker pad when
> inserted in the housing.  The foam is not likely to exhibit set (permanent
> deformation) overtime reducing its ability to isolate the matchsticks from the
> abrasive strike pad.  The utility of the foam barrier is an added safety feature to
> the device under normal conditions of use.

Ex. 39 at 3.

Dr. Buc's conclusion that the product was safe for consumer use comports with the

results of the extensive testing on the Flashlight before it was produced and delivered to

consumers.  *See supra* at 9-11.  None of these tests revealed any unintended ignitions or other

potential defects in the product's design.  *Id.*

The tests that PM (through UL) conducted following the initial consumer incident reports

are further proof that the Flashlight was not "unreasonably dangerous" and was safe for

consumer use.  Following the March 4, 2014 incident reports, UL conducted two separate sets of

tests to attempt to trigger unintended ignitions.  UL's first set of tests—"vibration testing" with

the foam barrier removed—did not result in any ignitions.  Ex. 14.  UL's second set of tests— a

"pepper grinder" style test with the foam barrier removed, which replicated the circumstances of

the two reported consumer incidents, *see* Ex. 13, similarly did not result in ignitions during testing. Ex. 15. Thus, UL was *unable* to replicate an unintended ignition, even when utilizing the same "pepper grinder" technique described by the two consumers. If the product in fact contained a serious design defect and was subject to dangerous "explosions," as PM claims, PM should have uncovered such defect in its product testing.

Rather, the evidence demonstrates that the few instances of unintended ignition only occurred when (a) a consumer removed the foam insert, and (b) a consumer tilted and twisted the Flashlight product in a particular, unexpected manner. As PM's product design expert, Richard Stern, recognizes: "[J]ust because a product fails doesn't mean it's defective. Just because a product is defective doesn't mean it presents a risk of injury. Just because it presents a risk of injury doesn't mean it's an unreasonable risk of injury." Ex. 41 (Stern Dep. 215:14-215:19). These isolated product failures do not establish that the Flashlight was "unreasonably dangerous" as a matter of law.

### C. PM's Evidence of Alleged Defect Is Not Admissible.

Further, nearly *all* the facts that PM cites in its Memorandum to demonstrate that the product was defective are inadmissible under Rule 407 as subsequent remedial measures. For the purpose of summary judgment, "material [that is] cited to support . . . a fact" must "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Evidence that would be inadmissible at trial cannot support a party's motion for summary judgment.

PM repeatedly alleges that AAI "conceded" that the Flashlight product is defective based on the actions that AAI undertook in the wake of the initial consumer complaints of unintended ignition. *See* PM Mem. at 18–20. But PM's attempt to use AAI's subsequent conduct to prove a defect in the product's design or instructions violates Rule 407 of the Federal Rules of Evidence. Rule 407 provides that "[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction." Fed. R. Evid. 407. "Rule 407 promotes an important policy of encouraging

subsequent remedial measures." *Werner v. Upjohn Co., Inc.*, 628 F.2d 848, 856 (4th Cir. 1980). Particularly relevant here, Rule 407 protects "[t]he manufacturer who undertakes precautionary measures" from facing "risk of liability for an injury caused by the earlier non-defective version of the product based on evidence of his subsequent act which made the product safer but in no way supports an inference that the initial version of the product was defective." *Id.* at 857.

PM's purported "admissions" of defect are textbook examples of an attempt to use subsequent remedial measures for the improper purpose of proving AAI's negligence or culpable conduct or to prove defects in the product's design or instructions. PM cites evidence of AAI's steps taken to mitigate risk after receiving complaints, PM Mem. at 6–7, 18–19; AAI's proposals for how AAI or PM might mitigate risk, *id.* at 7, 10, 18–19; and examples of information gathering and testing undertaken by AAI to investigate the veracity of the consumer complaints, *id.* at 6–7, 18. These actions by AAI are all inadmissible under Rule 407 for the purpose of proving the existence of a design defect. This evidence therefore cannot support PM's motion for partial summary judgment. Moreover, even if these remedial measures, or alleged "concessions," were deemed admissible, they are at best probative and certainly are not dispositive on the issue of design defect, particularly when Mr. Clements admitted that the product was not defective. There is a disputed factual issue of whether the product is defective. The Court should deny PM's motion for summary judgment on this basis alone.

II.     **Even If the Flashlight Were Defective, PM Is Not Entitled to Summary Judgment.**

Even if PM could prove as a matter of law that the product contained a design defect, PM cannot establish that it is entitled to summary judgment on its claims. First, AAI did not breach any warranties or contractual provisions. At the very least, PM's allegations of breach depend on material issues of disputed fact. Second, there are disputed issues as to whether any alleged breach was the proximate cause of any damages.

A.     **AAI Did Not Breach the Warranty Clause.**

PM's claim that AAI breached the express terms of the Warranty Clause of the Purchase Order fails as a matter of law because the product was made to PM's own design specifications.

Under well-established Virginia law, a supplier cannot be liable for making a product to a buyer's own specifications.  The Warranty Clause reflects this established rule, and PM's attempt to reinterpret the contractual language to avoid the established legal principle fails as a matter of law.  At a minimum, this issue depends on disputed factual issues that cannot be decided at summary judgment.

> 1. **AAI Is Not Liable for Any Defects Because the Flashlight Was Designed According to PM's Specifications.**

AAI cannot be held liable for design defects in a custom product made to PM's own specifications.  When a product is built or manufactured to a customer's own specifications, the manufacturer *is not* liable for any defects in the customer's specified design "unless those specifications are obviously dangerous and should not be followed."  *Hall v. Int'l Paper Co.*, No. 3:07-CV-064, 2007 WL 2965054, at *3 (E.D. Va. Oct. 9, 2007); *see also Austin v. Clark Equip. Co.*, 48 F.3d 833, 837 (4th Cir. 1995); *Spangler v. Kranco, Inc.*, 481 F.2d 373, 375 (4th Cir.1973).

AAI has offered ample evidence showing that it developed the Flashlight according to design specifications dictated by PM.  PM insisted that the Flashlight include matches, insisted that a striker pad be placed in the interior compartment of the product (rejecting AAI's alternative placement recommendations), and developed and approved the product specifications and testing requirements.  *See supra* at 4, 9-10.  The Flashlight was a "custom" product made to PM's explicit specifications.  Ex. 17 (E. Zeanah Dep. 37:15-19; 38:4-10); Ex. 7 (Simers Dep. 17:5-19:14).  PM recognizes that a "custom" product—as opposed to an "off-the-shelf" product that is "currently available retail"—is "an item that [PM] either design[ed] completely" or "modif[ied] based on a request."  Ex. 24 (Pinkney Dep. 46:11-14).

PM's extensive control of the design process comports with AAI's contractual obligations to produce a product made to PM's own specifications.  The Supplier Guidelines explicitly outlined this requirement: ███████████████████████████████████████ ███████████████████████████████████████ Ex. 2.  They provide that pre-production

samples were "required for every item" and were subject to approval by PM.  Ex. 2.  Thus, because AAI complied with its contractual obligations and followed PM's specifications, AAI should be entitled to judgment as a matter of law.  At a minimum, PM assertion that AAI did not develop the product according to its specifications will be an issue for the jury to decide.  Accordingly, PM is not entitled to summary judgment on this basis.

PM incorrectly asserts that, even if AAI developed the Flashlight in accordance with PM's specifications, AAI is nevertheless liable for any defects in the product's design.  PM Mem. at 21-22.  Not only is this completely contrary to the established Virginia law, but the Purchase Order between PM and AAI cannot reasonably be read to require AAI to expressly warrant that customer-designed products will be free from design defects.

The first and second sentences of the Warranty Clause contain two separate and distinct warranties.  The first sentence addresses custom products designed according to PM's specifications:

> Supplier warrants that all Goods delivered under Order will (a) conform strictly to the general description, model number or specifications stated in this Order or provided by Supplier and in any manufacturer warranties that accompany the Goods, (b) be free from defects in materials, workmanship, and design, and (c) be of first quality and made of new materials and components.

The second sentence of the warranty clause applies to products designed by AAI:

> *With respect to any Goods designed by Supplier or any of Supplier's subcontractors or suppliers*, Supplier assumes and acknowledges full and complete responsibility for the suitability, adequacy, and safety of the design of such Goods.

Ex. 23 (emphasis added).  Thus, the contractual language drafted by PM reflects the distinction under Virginia law between products designed by AAI and products designed according to PM's specifications.  PM has not shown that AAI is liable as a matter of law under either sentence.

### a.    AAI Did Not Breach the First Sentence of the Warranty Clause Based on an Alleged Design Defect.

Contrary to PM's argument, the first sentence of the Warranty Clause cannot reasonably be interpreted to mean that AAI warranted that products developed according to PM's design

specifications would be "'free from defects . . . in design,' without limitation." PM Mem. at 17.

AAI was *obligated* to produce a product that met PM's design specifications. Part (a) of the

sentence clearly warrants that all items will "conform strictly to . . . specifications . . . ." *See*

Ex. 23. Further, the Supplier Guidelines *require* that AAI adhere to PM's specifications. *See*

Ex. 2. To adopt PM's reading of the contract would create an untenable situation for AAI—

when presented with PM's own design specifications, AAI would be forced to choose between

its contractual obligations to both (i) ensure that AAI produces a product true to PM's design

specifications, and (ii) guarantee that those specifications would be free from defect. The law

does not require such an inequitable and impossible result.

PM strains to justify its interpretation of the Purchase Orders by erroneously arguing that

the Purchase Orders alone make up the contract between PM and AAI and that the Supplier

Guidelines do not apply. PM Mem. at 16. *But the Purchase Orders explicitly incorporate by*

*reference the Supplier Guidelines*: "14. Quality Control. Supplier must comply with Buyer's

Quality Assurance Guidelines in effect as of the date of this Order." Ex. 23. And the Supplier

Guidelines require AAI to follow PM's specifications. *See supra* at 3, 13. Thus, both the

Purchase Orders and the Supplier Guidelines must be considered in determining the contractual

relationship between the parties and whether there was any breach. *See Wellmore Coal Co. v.*

*Powell Constr. Co.*, 600 F. Supp. 1042, 1046 (W.D. Va. 1984) ("It is clear under Virginia law

that when more than one document makes up a contract, those documents should be interpreted

together, each one assisting and determining the meaning intended to be expressed by the

others.").

Moreover, to the extent that the meaning of the first sentence of the Warranty Clause is

ambiguous, its meaning is an issue for the jury to decide. *See Online Res. Corp. v. Lawlor*, 285

Va. 40, 55 (2013) ("[T]o the extent that the contractual provisions are ambiguous, it is proper to

submit the question to the jury for consideration."). "A contract may be ambiguous because of

indefiniteness of expression, internal inconsistency, or inclusion of words that have a double

meaning." *First S. Bank v. Bank of the Ozarks*, 542 F. App'x 280, 283 (4th Cir. 2013) (internal

quotation marks omitted).  And because it is undisputed that PM drafted the Purchase Orders, any ambiguities or inconsistencies must be resolved in AAI's favor.  When the language of a contract is ambiguous or unclear, "a court should construe ambiguous language against the interest of the party that drafted it."  *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995); *see also S. Ry. Co. v. Coca Cola Bottling Co.*, 145 F.2d 304, 307 (4th Cir. 1944) ("When the words of a contract are ambiguous,  . . .  such ambiguities should be resolved against the party that drew the contract and selected its terminology and nomenclature.").

Finally, even if PM's interpretation of the first sentence of the Warranty Clause were correct, there are genuine issues of material fact as to whether AAI breached the first sentence of the Warranty Clause because the question of whether there was any "defect" in the product is an issue of fact for the jury under Virginia law.  *See supra* at 15.  Thus, PM cannot establish that AAI breached this provision as a matter of law.

> **b.**     **AAI Did Not Breach the First Sentence of the Warranty Clause Based on Allegedly Inadequate Instructions.**

The Warranty Clause does not cover any alleged failure to warn–nowhere does it mention instructions or warnings of any kind.  PM does not point to any contractual language regarding a failure to provide adequate instructions or warnings.  Instead, PM attempts to create an additional "instructions and warnings" warranty based on the "defect . . . in design" portion of the Warranty Clause.  PM Mem. at 17, 19-20.  PM asserts that, in the products liability context, failure to warn is a type of design defect.  *Id.*  That is a clear misstatement of law.  In Virginia, the adequacy of warnings or instructions is an independent question, wholly separate from any alleged defect in design.  *See, e.g.*, *RMA Lumber, Inc. v. Pioneer Mach., LLC*, No. 6:08-00023, 2009 WL 4015928, at *9 (W.D. Va. Nov. 19, 2009); *Sprouse v. Am. Tire Distribs., Inc.*, No. 3:08-CV-491, 2009 WL 1404735, at *2 (E.D. Va. May 15, 2009); *Featherall v. Firestone Tire & Rubber Co.*, 219 Va. 949, 961-64 (1979); *McClanahan v. Cal. Spray-Chem. Corp.*, 194 Va. 842, 842, 853-54 (1953); *compare* Va. Prac. Products Liability § 3.1 ("Chapter 3. Design Defect) *with id.* § 5.1 ("Chapter 5. Defective Warnings and Instructions).  PM points to no case holding that, under

Virginia law, a failure to warn constitutes a defect in design. Rather, it relies solely on a portion of a footnote from a treatise, *see* PM Mem. at 17 (citing Va. Prac. Products Liability § 3:5)—but that footnote recognizes the two *distinct concepts* of design defect and the failure to warn. *See* Va. Prac. Products Liability § 3:5 n.22 ("In the balancing process there is interplay between the concepts of design defect and defects in warnings and instructions.") Thus, PM's argument that a failure to carry adequate warnings or instructions constitutes a "defect . . . in design" is contrary to both the explicit language of the contract and established products liability law.

Even if it the Warranty Clause did cover an alleged failure to warn, there would be disputed issues of fact for the same reasons as the design defect allegation discussed above. PM dictated the content of the instructions sheet and specifically told AAI to change certain warnings. *See supra* at 4, 9. AAI cannot be held liable for failing to provide adequate instructions when PM ultimately controlled their content. Moreover, the question of whether a warning is adequate, like the question of design defect, is a question of fact for the jury to decide. *See Abbot by Abbot v. Am. Cyanamid Co.*, 844 F.2d 1108, 1115 (4th Cir. 1988) ("The adequacy of a warning is a question of fact for the jury."). Thus, there was no breach of warranty based on allegedly inadequate instructions.

   **c.**  **AAI Did Not Breach the Second Sentence of the Warranty Clause.**

The second sentence of the Warranty Clause does not apply because the Flashlight was not designed by AAI. Contrary to PM's argument, AAI did not warrant the suitability, adequacy, and safety of *all* products (regardless of the source for a product's design). Rather, by its express terms, the second sentence only applies "[w]ith respect to any Goods designed by Supplier or any of Supplier's subcontractors or suppliers." Ex. 23. The Flashlight is not a product that AAI designed, but rather a custom product designed according to PM's own specifications. Thus, the second sentence of the warranty clause does not apply as a matter of law, and PM's claim based on it should be dismissed.

Moreover, at a minimum, whether the second sentence applies is an issue of fact for the jury to decide.  As explained above, AAI has offered evidence showing that the Flashlight was not "designed by Supplier or any of Supplier's subcontractors or suppliers."  Rather, it was designed by PM according to its product specifications.  Because AAI's liability is limited to products that AAI designs, and there exists a genuine factual dispute over whether PM or AAI designed the Flashlight, PM cannot demonstrate that it is entitled to judgment as a matter of law.

### B.       AAI Did Not Breach the Indemnity Clause.

PM's claim that AAI breached the Indemnity Clause fails because it is displaced by the more-specific Warranty Clause.  And even if the Indemnity Clause did apply, PM cannot establish breach as a matter of law because it depends on a finding as to the extent to which each party was at fault and caused the harm—issues of fact for the jury to decide.

*First*, PM's claim fails as a matter of law because the specific provisions of the Warranty Clause, and its exclusive remedies, control over the general Indemnity Clause.  "When a particular occurrence falls within a general clause of a contract, and also within the precise terms of a specific provision of the same contract, a presumption arises that the specific . . . provision, rather than the general, is controlling."  *S. Ry. Co.*, 145 F.2d at 307; *see also PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 174 (4th Cir. 2013); *Karnette v. Wolpoff & Abramson, L.L.P.*, 444 F. Supp. 2d 640, 646 (E.D. Va. 2006).  The Indemnity Clause contains a general provision allowing for the recovery of certain damages "to the extent they arise from, or may be attributable to, any error, omission or fault of" AAI.  But the only "error, omission, or fault" alleged by PM is "AAI's breaches of warranties."  PM Mem. at 23.[3]

As discussed above, the Warranty Clause specifically addresses the conditions under which AAI can be liable for allegedly defective products.  Moreover, it provides two exclusive,

---

[3] PM argues that AAI erred "aside from the warranties," but they are just re-packaged versions of the warranty claims.  For example, PM alleged that the product was "defective in its actual design and failed to carry adequate instructions"—exactly the same allegations that it makes for the warranty clam.  PM Mem. at 23; *see also id.* at 23-24 (alleging that AAI failed to test and failed to notify PM of the alleged defect).

alternative remedies for a breach of the Warranty Clause:  either (i) a refund of the price it paid

for the original product, or (ii) reimbursement for the cost of replacement.  Ex. 23.  Because

PM's indemnification claims is based on an alleged breach of the warranties due to a product

defect, the Warranty Clause and its specific, agreed-upon remedy for breach apply.  PM cannot

invoke the broader indemnification provision to seek additional recovery for claims

contemplated in the Warranty Clause's remedial scheme because that would render the exclusive

remedies in the Warranty Clause superfluous.  *E. Gas & Fuel Assocs. v. Midwest-Raleigh, Inc.*,

374 F.2d 451, 454 (4th Cir. 1967) ("It is a general tenet of contract law that a construction which

gives meaning to all words and provisions of a contract is favored.").  Thus, PM's breach of

contract claim based on the Indemnity Clause fails as a matter of law.

      *Second,* even if the Indemnity Clause applied, PM has not shown that AAI breached it as

a matter of law.  Under the Indemnity Clause, AAI is obligated to indemnify only for losses "to

the extent they arise from, or may be attributable to" AAI's errors, omissions or fault.  Ex. 23.

Moreover, indemnity is generally precluded if a buyer commits "independent acts of negligence"

that contribute to its alleged losses.  *See Wingo v. Celotex Corp.*, 834 F.2d 375, 379 (4th Cir.

1987); *see also* Va. Prac. Products Liability § 6:8 ("Indemnity of all kinds is also precluded . . .

where the party seeking indemnity has been guilty of an independent act of negligence which

also is a cause of the user's injury.").

      There are significant disputed issues of material fact about the extent to whether AAI

committed any "errors, omissions, or fault" and whether they caused the losses at issue.  For

example, AAI has offered evidence that PM designed the product according to its own

specifications, that it failed to conduct safety testing on the Flashlight, as it was contractually

required to do, and that it declined to act upon AAI's suggestions in the wake of the first two

consumer complaints to send out a mass email to PM's customers regarding the proper use of the

foam insert.  *See supra* at 4-6, 8-11.  Because these disputed issues will need to be resolved by

the jury, PM has not established that AAI breached the Indemnity Clause and that such breach

caused PM's claimed losses as a matter of law.

### C.      AAI Did Not Breach the Implied Warranty of Merchantability.

PM cannot establish that it is entitled to summary judgment on its implied warranty of merchantability claim, because (i) PM is not contractually entitled to this implied warranty, and (ii) PM cannot demonstrate that, as a matter of law, the product is not fit for its ordinary purpose.

*First,* PM is not entitled to an implied warranty of merchantability because the express warranty conflicts with and displaces any potential implied warranty.  An express warranty included in a contract may displace an inconsistent implied warranty of merchantability.  *See* VA Code Ann. § 8.2-317(c).  Under the Virginia Code, "in case of such an inconsistency the implied warranty of merchantability is displaced by the express warranty that the goods will comply with the specifications." *Id.* § 8.2-316, UCC cmt. 9.  Thus, where a buyer "gives detailed specifications as to the goods" to be produced, the implied warranty of merchantability will normally not apply. *Id.*  As explained above, AAI made an express warranty to manufacture the Flashlight in accordance with PM's detailed specifications.  Finding that AAI breached an implied warranty, even though it manufactured the Flashlight in accordance with those specifications, would conflict with this express warranty.  Thus, PM's express warranty that it would comply with PM's specifications displaces any claim by PM that AAI's breached an implied warranty, and PM's implied warranty of merchantability claim fails as a matter of law.

*Second*, PM is not entitled to an implied warranty of merchantability because it is a sophisticated purchaser of products involving matches.  "[W]hen a skilled purchaser knows or reasonably should be expected to know of the dangerous propensities or characteristics of a product, no implied warranty of merchantability arises." *Young v. J. I. Case Co.*, 1994 WL 506403, at *6.  A buyer's sophisticated knowledge of the "dangerous propensities or characteristics" of a product presents, at minimum, a genuine issue of material fact. *Id.*  PM is not a novice or first-time purchaser of products involving matches—in fact, when AAI expressed concerns because AAI had never before worked on a product that included matches, PM responded that everything was "fine" because PM had matches experience. *See* Ex. 25.  Thus, PM is not entitled to an implied warranty of merchantability.

*Finally*, even if PM could establish that it is entitled to an implied warranty of merchantability, it cannot demonstrate a warranty violation as a matter of law.  The implied warranty of merchantability requires a product to be reasonably capable of performing its ordinary function, or "fit for the ordinary purposes for which those goods are used."  *Davis v. Simon-Telelect, Inc.*, 48 F.3d 1215 (4th Cir. 1995).  To succeed on its implied warranty claim, PM "must show, (1) that the goods were unreasonably dangerous either for the use to which they would ordinarily be put or for some other reasonably foreseeable purpose, and (2) that the unreasonably dangerous condition existed when the goods left [AAI]'s hands."  *Logan v. Montgomery Ward & Co.*, 216 Va. 425, 428 (1975). As explained above, there is a genuine factual dispute over whether the Flashlight product was "unreasonably dangerous" when it left AAI's hands.  *See supra* at 16-17.  Thus, PM is not entitled to summary judgment on this claim.

      **D.**      **PM Fails To Prove Proximate Causation as a Matter Of Law.**

Even if PM could demonstrate that AAI breached a contractual provision, PM cannot establish as a matter of law that such breach proximately caused PM's claimed losses.  To establish liability for a breach of contract or a breach of warranty, PM must prove that the breach itself proximately caused the losses alleged.  *Vienna Metro LLC v. Pulte Home Corp*, 786 F. Supp. 2d 1076, 1086 (E.D. Va. 2011); Va. Code Ann. § 8.2-314, UCC cmt. 13.  "Generally, the issue of proximate causation is a question of fact to be resolved by a jury."  *RGR, LLC v. Settle*, 288 Va. 260, 292-93 (2014).

There are disputed factual issues regarding causation.  *First*, PM dictated not only the product specifications, but all of the testing requirements, including safety testing.  It did not discover any alleged defect or safety issues.  Thus, even if AAI breached its contractual obligations (it did not), there is, at a minimum, a factual issue as to whether PM's failures to perform its own contractual obligations caused any defect.  *Second*, there is significant evidence that had PM acted promptly when it received the first two consumer complaints and adopted the action plan that AAI suggested on March 7, 2014, the losses at issue would not exist—there would have been no need for a product recall, and therefore no recall costs.  Upon receiving the

first two consumer complaints, AAI promptly investigated the circumstances surrounding the alleged unintentional ignitions and concluded that both resulted when the consumers failed to replace the foam safety barrier.  *See* Ex. 13.  Within days, AAI proposed an action plan—AAI would draft a mass email to all PM customers who had received the product reminding consumers to always replace the foam safety barrier.  *Id.*  AAI was also prepared to send replacement foam barriers to any customers needing a replacement.  By March 14, 2014, PM's Brand, Compliance, and Legal departments had all signed off on the mass email plan.  *See* Ex. 19.  AAI *could not* send out the mass email on its own; PM had all of the customers' contact information and insisted on sending the email from one of its own addresses.  Ex. 34.  PM never sent the email to consumers.  Thus, there is a question of fact as to whether any alleged recall would have been necessary had PM implemented this proposal.

Thus, PM itself willingly took on the losses it now seeks to recover—expenses that were not "caused" by any alleged product defect, but by PM's own failures in testing the Flashlight and implementing AAI's proposed remedial plan.  Because there is a dispute over whether AAI's alleged breaches caused PM's alleged losses, or whether PM's own actions were the cause of its alleged losses, PM is not entitled to summary judgment on any of its claims.

**III.     PM Is Not Entitled to The Damages It Seeks.**

Even if PM could prevail on liability at the summary judgment stage, PM is not entitled as a matter of law to the damages it seeks.  PM is seeking $1,403,431.48 for the purchase price of the Flashlight product, plus $5,120,439.21 "in [previously undisclosed] costs associated with the recall" of the product, plus attorneys' fees.  PM Mem. at 27.  It appears that those previously undisclosed costs include, in part, the cost of the "replacement" gifts sent by PM to its customers.  *See* PM Mem. at 10.

*First,* PM's damages claim violates the express terms of the Warranty Clause outlining the proper remedy for breach.  When there has been a breach of an express warranty, PM is entitled to choose *either* 1) a refund of the price it paid for the original product, *or* 2) reimbursement for the cost of replacement—but not both.  Ex. 23.  PM has not previously

elected which remedy it would prefer, but now seeks a double recovery.  Permitting PM to recover both remedies would be contrary to the explicit text of the contract.

*Second,* PM is not entitled to those damages because there is a factual issue as to whether it breached its duty to mitigate damages.  A party injured under a contract has an obligation to mitigate its damages.  *Forbes v. Rapp*, 269 Va. 374, 380 (2005).  The evidence shows that PM did not act to mitigate its losses by choosing an action plan that would be the most effective and the least expensive.  As explained above, it failed to implement AAI's proposed remedial plan of sending a mass email.  There is also significant evidence that PM chose a fast track recall because it was concerned about the CPSC taking enforcement action because PM had not reported the prior customer incidents.  Ex. 22 (Edson Dep. 75:18-76:24).  AAI offered to work with PM to remove the striker pads from the remaining product inventory, which would have left PM with a perfectly usable 3-in-1 flashlight, compass, and matches container.  Ex. 17 (E. Zeanah Dep. 215:22-216:21).  PM also purchased premium replacement items that were *more than twice as expensive* as the Flashlight product.  Ex. 21 (Crosthwaite Dep. 173:14-19; 174:17-21).

*Third,* PM's argument that AAI is "estopped" from challenging the scope of the recall because AAI allegedly remained "silent" is contrary to law and fact.  PM Mem. at 24.  AAI did not remain silent on the appropriate response to the unintended ignitions—rather, AAI repeatedly objected to PM's recall plan.  In the wake of the first two consumer complaints, AAI immediately proposed a mass email to alleviate the risk of future unintended ignitions.  Ex. 33. In the four weeks between the initial consumer complaints and the Lowes complaint, AAI continued to advocate for a mass email to consumers.  Ex. 36.  AAI also proposed to PM other possible plans to alleviate the risk of unintended ignition, including instructing consumers how to remove the stick-on striker pad, Ex. 37.  After PM notified AAI that it had independently decided to undertake a full-scale recall, AAI again voiced its concerned and proposed alternatives.  Ex. 42; Ex. 43.  AAI specifically informed PM that AAI did not think the full recall was necessary, that there were other, more effective options available, and that AAI reserved any rights to challenge PM's independent recall decision.  Ex. 35.

Further, the two cases that PM cites to support its "estoppel" argument are completely inapplicable because they involve allegations of deception.  *Nat'l Airlines, Inc. v. Shea*, 223 Va. 578, 583 (1982) ("a person is required to speak only when common honesty or fair dealing demand that he do so, and in order that a party may be estopped by silence, there must be on his part an intent to mislead, or at least a willingness that others should be deceived."); *In re Stokes*, 198 B.R. 168, 178 (E.D. Va. 1996) (applying estoppel where a party stayed silent and allowed a settlement closing date to lapse, allowed the opposing party to perform under the settlement agreement for several months, and then tried to claim it did not have to perform because the settlement agreement had lapsed).  PM does not allege any intent to mislead on the part of AAI. To the contrary, AAI was vocal and transparent in its objections to the recall process.

*Fourth*, PM fails to present sufficient evidence of the damages it seeks.  "A plaintiff [] must prove two primary factors relating to damages.  First, a plaintiff must show a causal connection between the defendant's wrongful conduct and the damages asserted.  Second, a plaintiff must prove the amount of those damages by using a proper method and factual foundation for calculating damages." *Saks Fifth Ave., Inc. v. James, Ltd.*, 272 Va. 177, 189 (2006) (internal citations omitted).  In its Memorandum, PM fails to provide a breakdown of its alleged recall expenses.  Thus, PM is not entitled to recover the damages it seeks.

## CONCLUSION

For the foregoing reasons, and those stated in AAI's motion for summary judgment, and supporting memorandum, AAI respectfully requests that the Court deny Plaintiff PM's Motion for Partial Summary Judgment and enter judgment in favor of AAI.

Dated:  June 16, 2016                         Respectfully submitted,


                                      _____/s/ J. Andrew Keyes_____
                                      J. Andrew Keyes (VSB No. 37972)
                                              Email:  akeyes@wc.com
                                      Richmond T. Moore (*pro hac vice*)
                                              Email:  rmoore@wc.com
                                      Shauna M. Kramer (*pro hac vice*)
                                              Email:  skramer@wc.com

                                      WILLIAMS & CONNOLLY LLP
                                      725 12th Street, N.W.
                                      Washington, D.C. 20005
                                      Tel:  (202) 434-5000
                                      Fax: (202) 434-5029

                                      - AND -

                                      F. Douglas Ross (VSB No. 23070)
                                              Email:  douglas.ross@ofplaw.com
                                      Luke J. Archer (VSB No. 81815)
                                              Email: luke.archer@ofplaw.com

                                      ODIN, FELDMAN & PITTLEMAN, PC
                                      1775 Wiehle Avenue
                                      Suite 400
                                      Reston, VA 20190
                                      Tel:  (703) 218-2100

                                      *Attorneys for American Accessories International,*
                                      *L.L.C.*

## CERTIFICATE OF SERVICE

I hereby certify that on the sixteenth day of June, 2016, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Anand Agneshwar
    Email:  anand.agneshwar@aporter.com

ARNOLD & PORTER LLP
399 Park Ave
New York, NY 10222-4690
Tel:  212.715.1107

Turner A. Broughton
    Email:  tbroughton@williamsmullen.com

WILLIAMS MULLEN (RICHMOND)
200 South 10th St, 16th Floor (23219)
P. O. Box 1320
Richmond, VA 23218-1320
Tel:  804.420.6588
Fax:  804.420.6507

Emily Muriel May
    Email:  email.may@aporter.com
Jocelyn Wiesner
    Email:  jocelyn.wiesner@aporter.com
Michael Erich Kientzle
    Email:  michael.kientzle@aporter.com
Paige Hester Sharpe
    Email:  paige.sharpe@aporter.com

ARNOLD & PORTER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel:  202.942.5000
Fax:  202.942.5999

*Attorneys for Plaintiff PM*

        /s/ J. Andrew Keyes
J. Andrew Keyes
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005
Tel:  (202) 434-5000
Fax: (202) 434-5029
Email:  akeyes@wc.com

*Attorney for American Accessories
International, L.L.C.*