UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| PHILIP MORRIS USA INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 3:15-cv-577 |
| ) | |
| AMERICAN ACCESSORIES ) | |
| INTERNATIONAL, L.L.C., ) | |
| ) | |
| Defendant. ) | |
| ) | |

**AMERICAN ACCESSORIES INTERNATIONAL, L.L.C.'S MEMORANDUM IN
SUPPORT OF ITS MOTION FOR SANCTIONS FOR SPOLIATION**

PM has failed to preserve critical evidence from a key trial witness.[1] One of AAI's main defenses is that PM was responsible for the design and safety of the 3-in-1 Flashlight because it hired Underwriters Laboratories ("UL"), a "third party Quality Assurance Firm[]," to "review the design and material specifications in areas of compliance, *product safety* and performance." Ex. 1 (emphasis added). Mary Isemann was UL's full-time, on-site representative for the 3-in-1 Flashlight project. Her office was down the hall from Rick Clements, PM's project manager for the Flashlight. *All of Ms. Isemann's emails were stored on PM's corporate servers*. Nonetheless, PM has admitted that it inexplicably failed to preserve *any* of Ms. Isemann's electronic documents. And Ms. Isemann admitted in her deposition that she "purged" all her

---

[1] Philip Morris USA, the sole Plaintiff in this action, is a wholly-owned subsidiary of Altria Group, Inc. ("Altria"). PM USA has brought this case on behalf of its two affiliates, Altria Client Services Inc. ("ALCS") and Altria Group Distribution Company ("AGDC"). ALCS provides corporate services, including purchasing and procurement, legal, and customer marketplace and insight services to the Altria family of companies. ADGC provides sales, marketing, distribution and customer care services to the operating companies of Altria. Unless otherwise indicated, AAI refers to all the relevant PM/Altria entities collectively as "PM."

emails and could find only *12 documents* relating to the 3-in-1 Flashlight.  Ex. 2 (Isemann Dep. 18:9–15, 21:18–20).

PM's failure to preserve this critical trial evidence is highly prejudicial to AAI and its defenses.  Throughout this case, PM and Ms. Isemann have attempted to downplay her role in the development of the Flashlight, even going so far as to say that she was nothing more than a "proof-reader."  *See id.* (Isemann Dep. 125:10–126:9, 127:3–10).  Because PM permitted Ms. Isemann to destroy her documents, AAI is largely deprived of its ability to test these assertions and prove through documentation the scope of Ms. Isemann's role and what really happened in the 3-in-1 Flashlight design, development, and testing processes.

The Court should exercise its authority under Federal Rule of Civil Procedure 37(e) and impose significant sanctions on PM for this blatant discovery violation.  *First*, the Court should find that PM acted with the intent to deprive AAI of the use of this information and, as a result, instruct the jury that it must presume that the destroyed information was unfavorable to PM.  PM and its counsel are highly-sophisticated and experienced in litigation.  It is entirely implausible that they simply forgot to preserve Ms. Isemann's documents, given her obviously crucial role in the case.  Thus, the only plausible explanation for this admitted failure is that PM did not want this evidence to be available for AAI to use.  Accordingly, the Court should enter an adverse inference instruction under Rule 37(e)(2).

*Second*, at a minimum, the Court should impose sanctions under Rule 37(e)(1) to remedy the prejudice that AAI has suffered.  Specifically, the Court should bar PM from offering any testimony or argument that Ms. Isemann was not responsible for determining what safety testing to perform on the Flashlight.

## BACKGROUND

### A. Ms. Isemann's Role in the Development and Testing of the 3-in-1 Flashlight.

PM's Marketing Incentives Quality Assurance Guidelines for Suppliers ("Supplier Guidelines") state that PM "has hired independent third party Quality Assurance Firms (QA Firm). These QA firms will review the design and material specifications in areas of compliance, product safety and performance." Ex. 1. Ms. Isemann testified that PM provided the Supplier Guidelines as "a guideline for marketing incentive suppliers to help understand [PM's] quality processes for marketing incentives." Ex. 2 (Isemann Dep. 44:19–45:2). The Purchase Orders incorporate by reference the Supplier Guidelines. Ex. 3.

PM designated UL as its QA Firm for its marketing incentives program. Ex. 2 (Isemann Dep. 46:16–47:1). Specifically, PM hired Ms. Isemann, a UL employee, to be a full-time, contracted employee at ALCS to work on PM's marketing incentives. *See* Ex. 1. PM paid UL an amount to cover Ms. Isemann's full salary. *See* Ex. 4. Ms. Isemann oversaw the quality process for all of PM's marketing incentives programs and was the only person from UL on site who dealt with marketing incentive programs. Ex. 2 (Isemann Dep. 112:11–113:1, 167:13–21). According to her Scope of Services contract, Ms. Isemann "will perform the following services at [PM's] facilities as requested by [PM]":

- "Work with Supplier's global offices to ensure all [PM] testing, inspection and procedures are met";

- "Manage the coordination, development and revisions of Concept Specifications Analysis and Specification Analysis documents";

- "Communicate all relevant regulatory, safety, and quality performance requirements and issues (e.g., recalls, new regulations) to [PM]";

- "Assist [PM] on technical, safety, quality and compliance initiatives as requested"; and

- "Coordinate and attend [PM] product line reviews and participate in product development meetings to identify potential issues and make technical recommendations as requested."

Ex. 4.

Ms. Isemann worked in the [PM] offices, in the same building and on the same floor as PM's buyer (Rick Clements) who dictated the design of the 3-in-1 Flashlight. Ex. 2 (Isemann Dep. 38:9–21). She had an email account (Mary.F.Isemann.Contractor@altria.com) on the Altria server.[2] As UL's Associate General Counsel stated, "she works in and on Altria's [email] system for the work that she performs for Altria." Ex. 5.

Before being employed by UL, Ms. Isemann was employed by Intertek. Ex. 2 (Isemann Dep. 37:15–21). In this capacity, she also "worked on-site with Altria in their marketing incentives department." *Id.* (Isemann Dep. 38:2–5). Ms. Isemann testified that she had the same responsibilities for Altria when working for UL as she did when working for Intertek. *Id.* (Isemann Dep. 39:20–40:1). Her resume lists those responsibilities as:

- "Oversee[ing] numerous projects, at various stages of the supply chain, to ensure incentive items meet both client expectations and industry safety, regulatory, quality, and performance standards";

- "Develop[ing] and maintain[ing] testing protocols to ensure compliance with federal and state safety regulations";

- "Maintain[ing]" department communication on all current, relevant regulatory requirements, health and safety standards, product recalls, industry trends, and social responsibility activities."

Ex. 6.[3]

---

[2] As discussed above, *supra* at n.1, PM USA is a wholly owned subsidiary of Altria and brought the instant litigation on behalf of Altria. Thus, all of Ms. Isemann's work with Altria is work done for the Plaintiff, PM USA.

[3] During her deposition, Ms. Isemann claimed that this description of her responsibilities is "an overembellishment . . . as people do on their resumes." Ex. 2 (Isemann Dep. 116:5–7).

Ms. Isemann played the central role in drafting the detailed specifications—called the Specifications Analysis ("SA") for the 3-in-1 Flashlight. In 2011, she prepared the SA for a different flashlight that AAI produced for PM USA. Importantly, the 2011 flashlight *did not* contain any matches. Jill Smith of AAI cut and pasted the specifications from the SA for the 2011 flashlight into a first-draft "Concept Specifications Analysis" for the 3-in-1 Flashlight. *See* Exs. 7, 8 (Smith Dep. 76:3–77:14, 82:5–23, 95:22–97:14). Although Ms. Isemann testified that she couldn't "say one way or the other" whether that happened, Ex. 2 (Isemann Dep. 144:18), she acknowledged that it would make sense to use information in the prior SA to prepare the first-draft for the 3-in-1 Flashlight. *Id.* (Isemann Dep. 144:20–145:4).

Because Mr. Clements had instructed AAI to include matches in the 3-in-1 Flashlight, Ms. Isemann revised the SA for 3-in-1 Flashlight to include specifications for the matches, including testing requirements. *Id.* (Isemann Dep. 153:2–154:7); *see also* Ex. 9. Ms. Isemann claimed that she could not recall who determined the match testing, only that she was "told it would be a component," perhaps by Mr. Clements. Ex. 2 (Isemann Dep. 153:2–154:7).

In March 2014, after PM received two customer complaints of accidental ignition in the Flashlight, Ms. Isemann arranged for UL's testing lab to conduct two different types of testing (vibration testing and "pepper grinder" testing). *See* Ex. 10. UL, however, was unable to replicate the accidental ignition in either round of testing. *See id.* UL conveyed that "good news" to Ms. Isemann, and she passed it on to PM. Ex. 11.

**B.     PM Failed to Preserve Any of Ms. Isemann's Documents.**

Notwithstanding her critical role in the development of the 3-in-1 Flashlight, PM did not preserve or produce *any* of Ms. Isemann's documents. PM's privilege log shows that no later than April 8, 2014, it was formulating a litigation strategy for a claim against AAI. *See* Ex. 12 (asserting privilege and work product as to documents "regarding legal advice and litigation

- 5 -

strategy concerning the preservation of electronically stored information, documents and/or objects *in anticipation of AAI litigation*") (emphasis added).  Accordingly, on April 14, 2014, ALCS issued a "Legal Hold Notice" to relevant personnel at PM USA, ALCS, and AGDC.  Ex. 13.  The Legal Hold Notice apprised each addressee that she must read the notice and directed her to preserve categories of information that "your company considers subject to Legal Hold in connection with a pending or anticipated legal proceeding, audit or investigation."  *Id.*  It emphasized that each recipient "must preserve them . . . until the records are released through Legal Hold Release Notices."  *Id.*  The Legal Hold also admonished that "[e]ach recipient of this Notice is responsible for considering whether further distribution to other persons may be necessary," and "[i]f you believe others are likely to have, create, receive, distribute or maintain any Company Records that relate to the topics listed in this Notice, please notify" Senior Counsel at ALCS.  *Id.*  Despite her intimate involvement with the 3-in-1 Flashlight, *PM never sent the Legal Hold Notice to Ms. Isemann.*

Before her deposition, AAI served a document subpoena on UL requesting Ms. Isemann's documents.  Ms. Isemann testified that she produced *12 documents* in response, which she self-selected from PM's document repository.  Ex. 2 (Isemann Dep. 15:17–20:22).  None of these documents came from Ms. Isemann's email.

Moreover, Ms. Isemann admitted that she had "purged" her emails.  *Id.* (Isemann Dep. 21:10–22:16).  She claimed that she did this annually because "[i]f I was searching for something, it made it easier to search and not have to go through *thousands* of emails."  *Id.* (Isemann Dep. 22:2–6) (emphasis added).  As a result, PM has not produced *any* e-mails from Ms. Isemann's files.

### C. PM Has Admitted That It Did Not Preserve Ms. Isemann's Documents.

AAI's counsel raised the spoliation issue with PM's counsel, asking three specific questions:

1. Did PM USA take any steps to preserve Ms. Isemann's documents and ESI? If so, what were they?

2. Did PM USA ever include Ms. Isemann on any litigation hold?

3. As indicated by the "altria.com" domain name in her email address (Mary.F.Isemann.Contractor@altria.com), Ms. Isemann's emails were stored on an Altria server, correct?

Ex. 14. PM's response implicitly confirmed that (1) PM did not take any steps to preserve Ms. Isemann's documents or ESI, and (2) PM never included Ms. Isemann on any litigation hold, (3) even though Ms. Isemann's emails were stored on an Altria server. *See* Ex. 15. Although PM's counsel confirmed that PM "made decisions on preservation and production with the full understanding of what the federal rules require," *id.*, it did not offer any explanation for its failure to preserve documents.

### D. There is Evidence of Missing Documents.

PM has attempted to rationalize its failure to preserve any of Ms. Isemann's documents with the "bottom line" that "there is no spoliation issue here" because there is no "evidence of missing documents." *Id.* As explained above, however, there is ample evidence from the sworn testimony of Ms. Isemann herself. Because PM did not preserve *any* of the "thousands of emails" that were in her files before she purged them, many important emails regarding development of the 3-in-1 Flashlight are permanently lost. *See id.*; Ex. 2 (Isemann Dep. 22:2–6).

Moreover, although it is difficult to prove missing documents—i.e., to prove that something once existed but was destroyed, as opposed to never existed in the first place— there

is such evidence here.  AAI is aware of specific communications involving Ms. Isemann that PM never produced.

For example, a key trial exhibit is an exchange between Ms. Isemann and Mr. Clements regarding his request to use "strike-anywhere matches" (i.e., no striker pad required) in the 3-in-1 Flashlight.  Ex. 16.  Although AAI has the final email in the chain, Ms. Isemann's original email exchange with Mr. Clements (as indicated by the Re: line) has never been produced.  Thus, AAI does not know what underlying e-mail correspondence she and Mr. Clements had on this subject.

Likewise, AAI is aware of Ms. Isemann's communications regarding UL's post-complaint testing of the 3-in-1 Flashlight only because of UL's production in response to the document subpoena.  *See* Ex. 17.  Although PM now attempts to trivialize the role of the foam barrier in preventing unintentional ignition, upon learning of customer complaints, Ms. Isemann herself was "trying to understand how this could happen" and speculated that the accidental ignition reported by two customers may have resulted from a missing "sponge-like barrier [in between] the matches and strike plate."  *Id.*  Ms. Isemann asked a UL lab to test samples of the Flashlight and record the testing.  After being told that testing would be "$100 extra," Ms. Isemann stated that her "client [PM] has decided it will not be necessary to record the testing." *Id.*[4]  Although these emails were sent to and from Ms. Isemann's Altria email account, PM did not produce them.  They are available for use at trial only because UL produced them pursuant to a subpoena.

---

[4] UL conducted two separate rounds of testing (vibration testing and "pepper grinder" testing). *See* Ex. 10.  In both rounds, UL could not replicate the unintended ignition reported by the two customer complaints.  *See id.*

**ARGUMENT**

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001). "The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Id.* at 591.

Under Federal Rule of Civil Procedure 37(e), the Court has the authority to impose sanctions for spoliation based on the failure to preserve electronically stored information ("ESI"). *See* Fed. R. Civ. P. 37(e). Rule 37(e) provides the following comprehensive scheme for sanctions for ESI-related spoliation:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> > (A) presume that the lost information was unfavorable to the party;
> > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> > (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e); *see also* Fed. R. Civ. P. 37 (e) advisory committee's note to 2015 amendment.

### A. PM Failed To Preserve the ESI of a Known, Critical Witness Within Its Possession and Control.

PM's failure to preserve the ESI of Ms. Isemann—a known, critical witness in this case—violated its preservation obligations. As a threshold matter, Rule 37(e) provides that a court may impose appropriate sanctions on a party for failure to preserve ESI when four factors

are present: "(1) there must have been a duty to preserve the ESI; (2) a party must have failed to take reasonable steps to preserve the ESI; (3) the ESI must have been lost as a result of the failure to take reasonable steps to preserve it; and (4) the ESI must not be recoverable through additional discovery." *O'Berry v. Turner*, No. 7:15-CV-00064-HL, 2016 WL 1700403, at *3 (M.D. Ga. Apr. 27, 2016).

Each factor is plainly met here. *First*, PM had a duty to preserve Isemann's ESI. "The duty to preserve ESI arises when the party reasonably anticipates litigation." *Id.* PM's own privilege log demonstrates that it was formulating litigation strategy for a claim against AAI no later than April 8, 2014. Ex. 12. Six days later, PM issued a "Legal Hold Notice." Ex. 13.

*Second*, PM failed to take reasonable steps to preserve Isemann's ESI. Ms. Isemann's ESI was plainly within the possession, custody, and control of PM, as Ms. Isemann used an Altria email address for her work on the 3-in-1 Flashlight, and the ESI was on PM/Altria's server. *Supra* at 4. Yet PM did not take *any steps* to preserve Ms. Isemann's documents. Although PM issued its Legal Hold to dozens of custodians, it did not include Ms. Isemann. *See supra* at 5–6. Moreover, PM did not preserve her email on the Altria server to prevent it from being lost.

*Third*, Ms. Isemann's ESI was lost as a result of PM's failure to take reasonable steps to preserve it. Ms. Isemann admitted in her deposition that she "purged" her emails. *Supra* at 6. If PM had sent the Legal Hold to Ms. Isemann and taken its own steps to preserve her emails on the server, they would not have been purged.

*Fourth*, because Ms. Isemann has destroyed her email, it is lost and unrecoverable through additional discovery.

Because PM failed to take reasonable steps to preserve Ms. Isemann's ESI after it reasonably anticipated litigation, and because that ESI has been lost and is not recoverable, the Court should impose appropriate sanctions under Rule 37(e).

### B.     The Court Should Issue an Adverse Inference Instruction.

The Court should issue an adverse inference jury instruction because PM "acted with the intent to deprive" AAI of the use of Ms. Isemann's ESI in this litigation. *See* Fed. R. Civ. P. 37(e)(2). Under Rule 37(e)(2), when a party intentionally deprives another of the use of ESI, the Court may "instruct the jury that it may or must presume the information was unfavorable to the party." *Id.* The "intent to deprive another party of the information's use" requirement does not "require a showing of bad faith," but simply that there was "intentional destruction" of ESI. *DVComm, LLC v. Hotwire Communc'ns, LLC*, No. 14-5543, 2016 U.S. Dist. LEXIS 13661, at *17–18 (E.D. Pa. Feb. 3, 2016).

The evidence shows that PM acted with the requisite intent to deprive AAI of this crucial evidence. There can be no serious dispute that PM knew Ms. Isemann would be a critical witness in this matter. As the UL representative assigned to the 3-in-1 Flashlight project, she played a crucial role in the product's development and testing. Yet PM took *no* steps to preserve her ESI. This conscious inaction is exactly the type of "irresponsible and shiftless behavior [that] can only lead to one conclusion—that [PM] acted with the intent to deprive [AAI] of the use of this information at trial." *O'Berry*, 2016 WL 1700403, at *4.

PM's failure to preserve Ms. Isemann's ESI is particularly egregious given that PM is a sophisticated party that is no stranger to litigation. *See DVComm*, 2016 U.S. Dist. LEXIS 13661, at *14 ("Sophisticated parties are expected to have a higher degree of awareness of preservation obligations."); *see also Living Color Enters., Inc. v. New Era Aquaculture, Ltd.*, No. 14-CV-62216, 2016 WL 1105297, at *6 (S.D. Fla. Mar. 22, 2016) (noting that the nonmovant should not

be subject to sanctions in part because he was "an individual" and "a relatively unsophisticated litigant").

Further, when AAI raised the issue of spoliation of Ms. Isemann's ESI by letter to PM's counsel, PM offered no explanation for its failure to preserve and produce these critical documents. Exs. 14, 15. Under these circumstances, there is no legitimate explanation for PM's failure to preserve Ms. Isemann's ESI other than an intent to deprive AAI of it. Because it was "beyond the result of mere negligence" for PM to fail to preserve a crucial witness's ESI, *O'Berry*, 2016 WL 1700403, at \*4—particularly when PM and its lawyers *did* sent Legal Hold Notices to numerous other (non-crucial) witnesses—an adverse jury instruction is appropriate. *See id.* at \*4–5.

Accordingly, AAI respectfully requests that the Court instruct the jury that it *must* presume that the destroyed ESI was unfavorable to PM's position in this case. The Court should at least instruct the jury that it *may* presume that the missing ESI was unfavorable to PM's position.

    **C.    In The Alternative, the Court Should Exclude PM From Offering Contrary Evidence.**

Even if the Court were to find that PM did not act with the intent to deprive AAI of the use of Ms. Isemann's ESI, it should still impose sanctions under Rule 37(e)(1) to cure the prejudice caused to AAI. "To impose sanctions under Rule 37(e)(1), the court must find that the opposing party was prejudiced by the loss of the ESI. If the court finds that a party is prejudiced by the failure to preserve, the court has broad discretion to impose sanctions, but 'may order measures no greater than necessary to cure the prejudice.'" *Id.*, at \*3 (quoting Fed. R. Civ. P. 37(e)(1) and Fed. R. Civ. P. 37(e) advisory committee's notes to 2015 amendment).

AAI has been severely prejudiced by the missing Isemann ESI. PM is taking the position that UL and Ms. Isemann had only minimal responsibilities related to the 3-in-1 Flashlight. For example, PM has argued that Ms. Isemann's specifications only related to regulatory requirements and did not cover product safety. *See, e.g.*, PM's Memorandum of Law in Opposition to AAI's Motion for Summary Judgment, ECF No. 66 at 3–4 ("In addition, the purpose of the Specification Analysis was to ensure that the Flashlight components met minimum regulatory requirements and that individual units were free from manufacturing defects as they came off the factory line."). PM's position is contradicted by both the Supplier Guidelines and the Statement of Work for the UL/PM contract. *See* Exs. 1, 4. Had Ms. Isemann's ESI not been destroyed due to PM's failure to take reasonable steps to preserve this information, AAI would also have access to real-time electronic evidence of Ms. Isemann's actual involvement with the Flashlight's development, including product safety. Yet AAI has been deprived of access to this critical discovery.

Ms. Isemann's deposition testimony illustrates this prejudice. Ms. Isemann admitted that when she learned that the Flashlight would include matches, she added testing requirements for matches to the SA. Ex. 2 (Isemann Dep. 152:20–153:3). She agreed that AAI did not ask her to add this testing and that it "may have been" Rick Clements from PM, but she could not recall:

> Q. And the addition of testing for matches as it appears on the first page of Exhibit 190 was something that you entered; is that correct?
>
> A. I entered into this document, yes.
>
> Q. Okay. And who determined that there should be that testing?
>
> A. *I don't remember*.
>
> Q. Okay. So even though you did not have a product sample at the time of Exhibit 190 that included matches, you were able to add the requirements for testing for matches into Exhibit 190?

    A.  I was told it would be a component.

    Q.  Okay.  And you were told that by whom?

    A.  It was listed on AAI's specification document.

    Q.   So the -- so is it your testimony you put it there because they told you to?

    A.  Who told me to?

    Q.  AAI.

    A.  No.

    Q.  Okay.  So why did you put it in Exhibit 190?

    A.  I don't recall.  *It may have been a buyer request.*

    Q.  Okay.  And by "buyer" you mean Rick Clements?

    *A.  Rick Clements, yes*.

(Isemann Dep. 153:2–154:7) (emphasis added).

Because her ESI was not preserved, however, AAI does not have the documents about Mr. Clements's request.  The missing ESI would shed light on a number of crucial facts, including (i) whether Mr. Clements made a request to add match testing requirements; (ii) what he specifically requested; (iii) whether Mr. Clements told Ms. Isemann to look for safety testing; (iv) what Ms. Isemann did to carry out the request; (v) to whom she talked; and (vi) what she said or learned about safety testing of matches.  This information would show that PM—through Ms. Isemann, UL, and Mr. Clements—was responsible for product safety, not AAI.  The loss of this critical information thus severely prejudices AAI.

The Court should therefore bar PM from introducing any evidence or argument that PM/UL was not responsible for choosing what safety testing should be done regarding the matches.  For example, PM should not be able to offer testimony or argument that PM was focused only on match performance (*i.e.*, how good the matches are).  This sanction would be appropriate and consistent with Rule 37(e)(1). The Advisory Committee's Notes to the 2015 Amendment provide several examples of possible sanctions, including "(1) not allow the party

responsible for the destruction of the ESI to introduce any evidence about that data; (2) allow the party prejudiced to introduce evidence or make an argument to the jury regarding the effect of the loss of the ESI; or (3) give instructions to the jury to assist them in evaluating the evidence introduced or arguments made regarding the ESI." *O'Berry*, 2016 WL 1700403, at *3 (citing Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment).

This sanction would also be consistent with those imposed by other district courts under the new Rule 37(e)(1). In *Matthew Enterprise, Inc. v. Chrysler Grp. LLC*, No. 13-cv-04236, 2016 U.S. Dist. LEXIS 67561, for example, the Court ordered sanctions under Rule 37(e)(1) when the defendant automobile dealership "made no effort to preserve communications from customers or internal emails," allowing an "outside vendor storing the customer communications" to delete most of the relevant emails subject to an automatic deletion policy "without complaint" from the dealership. *See id.*, at *2. A few surviving customer emails contained written price quotes and other useful information, so the "lost emails could have shed some light on the negotiating process itself," the circumstances of which were disputed, and thus their absence was prejudicial. *Id.* at *13. The court therefore constructed a multi-part sanctions remedy under Rule 37(e)(1): (1) allowing Chrysler to use communications post-dating the relevant period as further evidence of its points; (2) allowing Chrysler to respond to testimony about diversion of customers or about customer negotiations with evidence and argument about the spoliation; (3) the possibility, if necessary, of a jury instruction "to assist [the jury's] evaluation of such evidence or argument"; and (4) reasonable attorneys' fees related to the spoliation claim. *Id.* at *15–16. Here, PM similarly made no effort to preserve Ms. Isemann's emails and prejudiced AAI by allowing crucial data to be destroyed.

responsible for the destruction of the ESI to introduce any evidence about that data; (2) allow the party prejudiced to introduce evidence or make an argument to the jury regarding the effect of the loss of the ESI; or (3) give instructions to the jury to assist them in evaluating the evidence introduced or arguments made regarding the ESI." *O'Berry*, 2016 WL 1700403, at *3 (citing Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment).

This sanction would also be consistent with those imposed by other district courts under the new Rule 37(e)(1). In *Matthew Enterprise, Inc. v. Chrysler Grp. LLC*, No. 13-cv-04236, 2016 U.S. Dist. LEXIS 67561, for example, the Court ordered sanctions under Rule 37(e)(1) when the defendant automobile dealership "made no effort to preserve communications from customers or internal emails," allowing an "outside vendor storing the customer communications" to delete most of the relevant emails subject to an automatic deletion policy "without complaint" from the dealership. *See id.*, at *2. A few surviving customer emails contained written price quotes and other useful information, so the "lost emails could have shed some light on the negotiating process itself," the circumstances of which were disputed, and thus their absence was prejudicial. *Id.* at *13. The court therefore constructed a multi-part sanctions remedy under Rule 37(e)(1): (1) allowing Chrysler to use communications post-dating the relevant period as further evidence of its points; (2) allowing Chrysler to respond to testimony about diversion of customers or about customer negotiations with evidence and argument about the spoliation; (3) the possibility, if necessary, of a jury instruction "to assist [the jury's] evaluation of such evidence or argument"; and (4) reasonable attorneys' fees related to the spoliation claim. *Id.* at *15–16. Here, PM similarly made no effort to preserve Ms. Isemann's emails and prejudiced AAI by allowing crucial data to be destroyed.

**CONCLUSION**

For the reasons stated above, AAI respectfully requests that the Court impose under Federal Rule of Civil Procedure 37(e) appropriate sanctions on PM for failure to preserve ESI, including instructing the jury that it must presume that the destroyed information was unfavorable to PM, or, at a minimum, barring PM from introducing any testimony or argument that Ms. Isemann was not responsible for determining what safety testing to perform on the Flashlight, and any other relief that the Court finds appropriate.

Dated:  June 28, 2016                                       Respectfully submitted,

                                                              /s/ J. Andrew Keyes
J. Andrew Keyes (VSB No. 37972)
       Email:  akeyes@wc.com
Richmond T. Moore (*pro hac vice*)
       Email:  rmoore@wc.com
Shauna M. Kramer (*pro hac vice*)
       Email:  skramer@wc.com

WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005
Tel:  (202) 434-5000
Fax: (202) 434-5029

- AND -

F. Douglas Ross (VSB No. 23070)
       Email:  douglas.ross@ofplaw.com
Luke J. Archer (VSB No. 81815)
       Email:  luke.archer@ofplaw.com

ODIN, FELDMAN & PITTLEMAN, PC
1775 Wiehle Avenue
Suite 400
Reston, VA 20190
Tel:  (703) 218-2100

*Attorneys for American Accessories International, L.L.C.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the twenty-eighth day of June, 2016, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Anand Agneshwar
 Email:  anand.agneshwar@aporter.com

ARNOLD & PORTER LLP
399 Park Ave
New York, NY 10222-4690
Tel:  212.715.1107

Turner A. Broughton
 Email: tbroughton@williamsmullen.com

WILLIAMS MULLEN (RICHMOND)
200 South 10th St, 16th Floor (23219)
P. O. Box 1320
Richmond, VA 23218-1320
Tel:  804.420.6588
Fax:  804.420.6507

Emily Muriel May
 Email:  email.may@aporter.com
Jocelyn Wiesner
 Email:  jocelyn.wiesner@aporter.com
Michael Erich Kientzle
 Email:  michael.kientzle@aporter.com
Paige Hester Sharpe
 Email:  paige.sharpe@aporter.com

ARNOLD & PORTER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel:  202.942.5000
Fax:  202.942.5999


*Attorneys for Plaintiff PM USA*


  /s/ J. Andrew Keyes
J. Andrew Keyes

*Attorney for American Accessories International, L.L.C.*