IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| PHILIP MORRIS USA INC., <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN ACCESSORIES INTERNATIONAL, L.L.C., <br><br> Defendant. | Civil Action No. 3:15cv00577 |

**MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTORY STATEMENT**

This is an attempt by the plaintiff, Philip Morris USA Inc. ("PM USA"), a subsidiary of Altria Group, to shift responsibility for one of its cigarette promotional products to its supplier, the defendant, American Accessories International, LLC ("AAI"). As part of its outdoor-themed marketing campaign for the Marlboro cigarette brand, PM USA distributed to its customers a combination flashlight, compass, and storage compartment (the "Flashlight"). The storage compartment contained matches and a striker pad, which were separated by a foam barrier. After distributing the Flashlight, PM USA received reports that matches in certain Flashlights had ignited because the users had discarded the foam barrier, thus allowing the matchheads to come into contact with the striker pad. Based on four such reports, PM USA unilaterally determined that the product was defective and initiated a voluntary recall that was far more expansive and expensive than necessary. It now seeks to hold AAI liable for millions of dollars in costs.

AAI is entitled to judgment as a matter of law because the undisputed facts establish that PM USA not only knew about the features it contends make the Flashlight defective, but also issued the specifications for the Flashlight and dictated its features. The undisputed facts also establish that PM USA failed to meet its contractual responsibility to perform a safety inspection of the Flashlight before shipment. PM USA represented it would engage an "independent third party Quality Assurance Firm[]" – Underwriters Laboratories ("UL"), an industry leader in consumer product safety – to review the Flashlight's "design" for "product safety." But, unbeknownst to AAI, UL did not perform any product safety investigation or testing on the Flashlight. Indeed, PM USA failed to provide UL with a complete sample of the Flashlight because the sample it provided did not include matches, making it impossible for UL to evaluate the risk of unintended ignition. Under these circumstances, and based on the undisputed facts enumerated below, PM USA's claims fail as a matter of law. The Court should enter judgment for AAI and dismiss this lawsuit.

## II. UNDISPUTED MATERIAL FACTS

1. For purposes of this lawsuit, PM USA claims to stand in the shoes of its corporate affiliates, including Altria Client Services (ALCS) and Altria Group Distribution Company (AGDC). *See* [Doc. 16].

2. On or about May 20, 2013, Altria Client Services ("ALCS") issued a request for information seeking ideas for promotional items to be used in connection with the Marlboro cigarette brand. *See* **Exhibit 1** (email from Clements to undisclosed recipient group of May 20, 2013).

3. On or about May 31, 2013, AAI sent ALCS a number of "item concepts" for the Marlboro promotion, including one titled "Flashlight and Matches Holder." *See* **Exhibit 2** (email from Zeanah to Clement of May 31, 2013).

2

4. Over the following weeks, the "Flashlight and Matches Holder" concept was reduced to the actual design of the Flashlight. *See* **Exhibit 3** (email from Clements to Zeanah of June 21, 2013); **Exhibit 4** (email from Zeanah to Clements of June 25, 2013); **Exhibit 5** (email from Clements to Zeanah of June 25, 2013); **Exhibit 6** (email from Zeanah to Clements of July 1, 2013); **Exhibit 7** (email from Zeanah to Clements of July 8, 2013); **Exhibit 8** (email from Clements to Pope of July 9, 2013); **Exhibit 9** (email from Zeanah to Clements of July 10, 2013); **Collective Exhibit 10** (email from Zeanah to Clements of July 22, 2013, and translation); **Exhibit 11** (email from Clements to Zeanah of July 26, 2013).

5. Throughout the ideation process for the Flashlight, PM USA and its corporate affiliates were represented by Rick Clements, who is a professional buyer with approximately 26 years of procurement experience. *See* **Exhibit 12** (Deposition of Rick L. Clements ("Clements Dep.")), at 20:7-10, 12, 17-22.

6. When it first proposed the concept titled "Flashlight and Matches Holder," AAI did not intend to supply matches with the item. *See* **Exhibit 13** (Deposition of Katie Simers ("Simers Dep.")), at 55:4-14, 21-25; 56:1-2.

7. PM USA expected and asked for matches to be provided with the Flashlight. *See* **Exhibit 12** (Clements Dep.), at 67:19-68:10.

8. No later than July 8, 2013, Mr. Clements knew that the Flashlight would include safety matches and a striker pad adhered to the inside of the end cap. *See* **Exhibits 7-8**.

9. No later than July 16, 2013, PM USA had samples of the Flashlight to review. *See* **Exhibit 9**; **Exhibit 11**.

10. No later than July 22, 2013, the design for the Flashlight was substantially complete. *See* **Collective Exhibit 10**.

11. In early August 2013, AAI provided PM USA with a preproduction sample of the Flashlight. *See* **Exhibit 12** (Clements Dep.), at 123:20-22; **Exhibit 14** (email from Zeanah to Clements of July 30, 2013); **Exhibit 15** (email from Zeanah to Clements of August 1, 2013).

12. UL, on behalf of PM USA, issued a concept specifications analysis for the Flashlight on August 27, 2013, and subsequent revisions dated September 4, 2013, September 11, 2013, September 20, 2013, October 24, 2013, and November 6, 2013 (collectively, the "Specification Analysis"). *See* **Exhibit 16** (Specification Analysis dated November 6, 2013).

13. AAI accepted the Specification Analysis on November 7, 2013. *See id.*

14. The Specification Analysis outlines "required testing of all materials, inspection criteria, and transportation testing requirement." *See* **Exhibit 17** (Quality Assurance Guidelines), ¶ 7.

15. The Flashlights supplied to PM USA by AAI conform to both the Specification Analysis and the samples AAI provided to PM USA. *See* **Exhibit 12** (Clements Dep.), at 124:1-5, 13-18; 125:2-5, 8-10.

16. AGDC submitted purchase orders No. 530002513, as twice modified, and No. 530002629 (collectively, the "Purchase Orders"), to AAI for the purchase of custom designed flashlights. *See* Dkt. 1 (Compl.), ¶ 19.

17. PM USA signed the original Purchase Order on or about September 25, 2013. *See* **Exhibit 18** (email trail among Zeanah, Clements, and Pinkney dated Sept. 25, 2013).

18. In the section titled "Warranties," Orders provides that the supplier warrants that "all Goods delivered under Order will (a) conform strictly to the general description, model number or specifications …." **Exhibit 19** (purchase order), ¶ 13.

19. The same section states,

4

> If Buyer discovers that any Goods delivered under this Order do not conform to the above warranties, then, provided that Buyer has given written notice to Supplier within a reasonable time after Buyer discovers the non-conformity, Supplier must, at Buyer's option but at no charge to Buyer, either (a) replace such Goods and deliver them to the destination designated by Buyer, or (b) refund the compensation paid by Buyer for such Goods.

*Id.*

20. The Purchase Orders incorporate the Quality Assurance Guidelines in effect as of the date of the Purchase Order. *Id.* ¶ 14.

21. The Purchase Orders provide that they are "governed by and construed [sic] the laws of the Commonwealth of Virginia, U.S.A., without regard to its conflicts of laws rules." *Id.* ¶ 27.

22. The version of the Quality Assurance Guidelines in effect as of the date of the Purchase Order is rev. 11, dated April 14, 2011. **Exhibit 17**; *see also* **Exhibit 20** (signature page).

23. The Quality Assurance Guidelines set forth procedures "for a structured Quality Assurance program covering ... product safety," which included ALCS's hiring a third party "Quality Assurance Firm[]" to "review the design" to verify "product safety":

> The following guidelines address the Quality Assurance expectations of the Marketing Purchasing Department of Altria Client Services (ALCS). Procedures for a structured Quality Assurance program covering compliance, product safety, functionality and aesthetics are set forth below. It is a planned and systematic process, providing ALCS with the confidence that products will be delivered to receiving locations according to approved specifications and quality expectations.
>
> In support of the process, ALCS has hired independent third party Quality Assurance Firms (QA Firm). These QA firms will review the design and material specifications in areas of compliance, product safety and performance. Additionally, they will evaluate the manufacturing location(s) for adequate capacity and capability

5

as well as inspect production to identify defective product prior to shipment.

*See* **Exhibit 17**, at 2.

24. PM USA's independent third party quality assurance firm for the Flashlight project was UL. *See* **Exhibit 12** (Clements Dep.), at 137:17-138:2; **Exhibit 21** (Deposition of Diane Jones Pinkney ("Pinkney Dep.")), at 66:12-14.

25. In early August 2013, Mr. Clements provided one or more samples of the Flashlight to UL; however, the sample(s) he provided to UL did not include matches. *See* **Exhibit 22** (Deposition of Mary Isemann ("Isemann Dep.")), at 145:13-21; 155:14-20.

26. The Quality Assurance Guidelines set forth the following agreed procedure for handling consumer complaints:

> When a consumer complaint is received through our Consumer Response Center, the complaint is forwarded to the ALCS Marketing Purchasing department. From this point the appropriate supplier will be determined and contacted regarding the compliant. The supplier will be provided with the consumers' name, contact information and the nature of the complaint. The supplier is requested to contact the consumer within two business days to settle the complaint. Once the complaint has been settled, the supplier must notify Marketing Purchasing.
>
> Notification can be a written statement on company letter head or an e-mail stating the complaint has been settled and how it was settled. Once the settlement letter has been received from the supplier the case will be officially closed.

**Exhibit 17**, ¶ 7.

27. Between March 4, 2014, and April 4, 2014, PM USA received four consumer complaints about the Flashlight. *See* **Exhibit 23** (PM USA's report to CPSC).

28. On or about March 5, 2014, PM USA asked AAI to investigate the first two consumer complaints. *See* **Exhibit 24** (email trail between Clements and Zeanah of March 5, 2014).

29. On April 8, 2014, PM USA contacted the Consumer Product Safety Commission ("CPSC") to report the four consumer complaints and propose a recall. *See* **Exhibit 23**.

30. There is no record evidence showing that anyone investigated the facts and circumstances of the third and fourth consumer complaints prior to PM USA's contacting the CPSC. *See* **Exhibit 25** (Deposition of K.C. Crosthwaite ("Crosthwaite Dep.")), at 79:17-80:2; 80:10-14; *see also* **Exhibit 23**, at 3134366608.

31. PM USA did not share any draft of its April 8, 2014 report to the CPSC with AAI before submitting the report. *See* **Exhibit 26** (Deposition of Eric Zeanah ("Zeanah Dep.")), at 193:1-4; *see also* **Exhibit 27** (Deposition of Scott Edson ("Edson Dep.")), at 52:13-53:1.

32. PM USA's April 8. 2014 report sought permission to proceed with a "fast track" recall, which would include having consumers mail back part of the flashlight in exchange for a "premium replace item" worth more than the flashlight. *See* **Exhibit 23** (PM USA's report to CPSC).

33. PM USA paid AAI for the full cost of the Flashlights. *See* **Exhibit 28** (annotated invoices).

### III. STANDARD OF DECISION

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

7

> showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).
>
> In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir.1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (citation omitted). " '[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party ... upon whom the onus of proof is imposed.'" *Id.* (quoting *Munson*, 81 U.S. at 448)….

*Davis v. Sample*, No. 3:13CV272, 2015 WL 3946648, at *1 (E.D. Va. June 26, 2015).

## IV. ARGUMENT

AAI is entitled to summary judgment on PM USA's breach of contract and breach of express warranty claims because PM USA breached its representation that it would have UL review the design and material specifications for "compliance and product safety" and because PM USA breached its obligations in the alleged contract as to how any consumer incidents would be handled. Most notably, PM USA provided UL Flashlights to review that did not include matches, making it impossible for UL to perform the task PM USA represented it would perform – test the "design" for "compliance" and "product safety." PM USA's breach of these warranties precludes it from recovering in this case.

AAI is also entitled to summary judgment on the two implied warranty claims because the alleged defect – the removability of the foam barrier allowing the matches to contact the striker pad – was obvious from the pre-shipment inspection conducted by UL for PM USA. AAI is also entitled to summary judgment on the implied warranty claims because the Flashlight conforms to the specifications it was provided and, with respect to the implied warrant of fitness for a particular purpose, because the Flashlight was intended to be used for its ordinary purpose,

8

not for a different particular purpose. Finally, AAI is also entitled to summary judgment on the unjust enrichment claim because Virginia law is clear that PM USA cannot pursue a quasi-contractual claim where there is an alleged express contract, as alleged here.

> **A. The breach of contract claim fails as a matter of law because PM USA did not perform its obligations under the alleged contract.**

PM USA claims that AAI breached the warranty and indemnification provisions of Purchase Orders because of an alleged defect in the "design" of the Flashlight. Compl., ¶¶ 46, 47, 53. PM USA claims that the Flashlight was "defective in design in that matches inside the flashlight's match holder could ignite when in contact with the striker pad beneath the compass cap, posing burn and injury hazards to consumers." *Id.* This claim fails as a matter of law because the undisputed fact is that PM USA's own failure to perform its contractual obligations precludes any claim by PM USA.

It is a well-settled principle of contract law that material breach by one party to a contract excuses the other party from further performance. *Matthews et al. v. PHH Mortgage Corp.*, 724 S.E.2d 196, 198-99 (Va. 2012). Here, PM USA breached its contractual obligations in two material respects, either of which was sufficient to excuse AAI's further performance.

First, before AAI delivered any Flashlights, PM USA breached its obligation to provide the Flashlight to its "Quality Assurance Firm[]" to "review the design" to determine "compliance" and "product safety." *See* **Exhibit 17**, at 2. The Purchase Orders that form the basis of PM USA's claims expressly incorporate the Quality Assurance Guidelines. *See* **Exhibit 19**, ¶ 14. Those Guidelines explicitly set forth "[p]rocedures for a structured Quality Assurance program covering . . . product safety." *See* **Exhibit 17**, at 2. And as part of those procedures, the Guidelines provide that ALCS (PM's corporate affiliate and alter ego for purposes of this

9

litigation) warranted that it would hire a "third party Quality Assurance Firm[]" that would "review the design … in [the] area[] of … compliance [and] product safety …." *Id.*

In this instance, PM USA hired UL to perform the testing function. *See* **Exhibit 12** (Clements Dep.), at 137:17-138:2; **Exhibit 21** (Pinkney Dep.), at 66:12-14. Yet PM USA never provided UL with samples of the Flashlight to test that included the most obvious safety issue – matches. This inexplicable failing by PM USA ensured that UL could not do any proper testing for any risk of unintended ignition. This failure goes directly to the gravamen of each of PM USA's claims—the allegation that the flashlight had a risk of unintended ignition because it had a fixed striker pad inside an air tight chamber adjacent to the match heads. *See* Compl., ¶ 46. Thus, PM USA's breach of its warranty to have a Quality Assurance Firm review the design for compliance and product safety proximately caused the breach by AAI that PM USA alleges. This breach by PM USA predates AAI's delivery of any finished units, and precludes each of PM USA's claims premised on an alleged warranty to deliver goods "free from defects in … design." *See* **Exhibit 19**, ¶ 13.

Second, PM USA breached the agreed procedure to be followed in the event of consumer complaints. *See* **Exhibit 17**, ¶ 7. That consumer-complaint procedure obligated PM USA to provide AAI with the consumer's name, the consumer's contact information, and the nature of the consumer's complaint. *Id.* The protocol further gave AAI two days to investigate and resolve the consumer complaint. *Id.* PM USA followed the consumer complaint protocol in response to the first two consumer complaints related to the flashlight. *See* **Exhibit 24**. But it did not follow the agreed procedure for the consumer complaint that was the impetus for the recall. *See* **Exhibit 23**. As a consequence, PM USA deprived AAI of any opportunity to investigate the consumer complaint to determine its merits. Instead, ***without any investigation of the consumer***

10

*complaint*, it unilaterally determined that it would initiate a fast-track recall of the flashlight costing millions of dollars. And now, after the fact, PM USA demands that AAI pay the bill for that recall.

> **B. The breach of contract and breach of warranty claims fail as a matter of law because PM USA did not perform its obligations under the alleged contract.**

PM USA claims also fail because it did not avail itself of the express contractual remedies provided. Compl., ¶¶ 46, 53. As stated above, material breach by one party to a contract excuses the other party from further performance. *Matthews*, 724 S.E.2d at 198-99. Here, PM USA materially breached its contractual obligation to elect its remedy for the alleged defective design.

In relevant part, the warranty provision states:

> If Buyer discovers that any Goods delivered under this Order do not conform to the above warranties, then, provided that Buyer has given written notice to Supplier within a reasonable time after Buyer discovers the non-conformity, Supplier must, at Buyer's option but at no charge to Buyer, either (a) replace such Goods and deliver them to the destination designated by Buyer, or (b) refund the compensation paid by Buyer for such Goods.

*See* **Exhibit 19**, ¶ 13. The undisputed record evidence is that PM USA failed to comply with the warranty provision of the Purchase Orders. No record evidence shows that PM USA ever made the election identified in the warranty provision, under which it was entitled either to replacement of the flashlights or a refund of the compensation paid for the flashlights. On the contrary, the record evidence is that PM USA paid AAI's invoices *after* receiving consumer complaints of unintended ignition. *See* **Exhibit 28**.

Instead of performing according to the terms of the Purchase Orders, PM USA charted its own massively expensive course. In so-doing, it acted as a volunteer. The consequence of its

action was to relieve AAI of any further contractual obligation related to the flashlights. Because PM USA did not pursue its contractual remedy under the warranty provision, its claim must fail.

### C. Both implied warranty claims fail as a matter of law because PM USA examined the Flashlight before the Purchase Orders were executed.

PM USA claims that AAI breached its implied warranties of merchantability and fitness for a particular purpose because the Flashlight was unfit for the ordinary purposes for which such goods are used and because the flashlight was unfit for its alleged particular purpose as a consumer product. Compl., ¶¶ 59, 66. These claims fail as a matter of law because the undisputed fact is that PM USA examined the flashlight prior to the execution of the Purchase Orders.

Under the UCC, "when a buyer before entering into the contract has examined the goods or the sample or model as fully as he desired *or has refused to examine the goods* there is no implied warranty with regard to defects which an examination out in the circumstances to have revealed to him." Va. Code Ann. § 8.2-316(3)(b) (emphasis added). Under the circumstances addressed in this exclusion, a buyer that examines goods (or could have examined goods) is deemed to have relied on its own business judgment in determining whether the goods were merchantable or fit for a particular purpose: "The concept of this section is that when a buyer examines a product fully, the buyer is on notice that he bears the risk of loss as to defects that ought to have been revealed." *Henry Heide, Inc. v. WRH Prods. Co.*, 766 F.2d 105, 110-11 (3d Cir. N.J. 1985); *see also Budnick Converting, Inc. v. Nebula Glass Int'l, Inc.*, 866 F. Supp. 2d 976, 998-1000 (S.D. Ill. 2012) (applying 2-316(3)(b)); *Trans-Aire Int'l, Inc. v. N. Adhesive Co.*, 882 F.2d 1254, 1258-59 (7th Cir. Ill. 1989) (same); *Virginia Transformer Corp. v. P.D. George Co.*, 932 F. Supp. 156, 160-61 (W.D. Va. 1996) (same).

*Trans-Aire Int'l* illustrates the proper analysis. 882 F.2d at 1258-59. There, the buyer made and sold conversion vans. It required an adhesive sufficient to withstand heat. Dissatisfied with the product it had been using, it approached the seller about alternative products. It received several samples from the seller and tested one but only under cool conditions, not under the hot conditions that had caused the other adhesive to fail. The buyer then sued after the new adhesive failed to withstand heat. The court held that the buyer's actions excluded any implied warranties. The facts showed the buyer had tested the adhesive "as fully as it desired." *Id*. Thus, by opting not to test the new adhesive under hot conditions, the buyer waived any reliance on any implied warranties by the seller: "A professional buyer examining a product in his field will be held to have assumed the risk as to all defects which a professional in the field ought to observe." *Id*.

As in *Trans-Aire Int'l*, the undisputed facts show that PM USA examined the Flashlight "as fully as it desired" and waived any reliance on AAI's alleged implied warranties. Indeed, PM USA represented to AAI that it would engage UL to fully examine the "design" for "compliance" and "product safety." And the undisputed facts show that PM USA was fully aware that the flashlight design incorporated a striker pad inside the end cap, next to match heads, at least as early as July 8, 2013. *See* **Exhibit 12** (Clements Dep.), at 75:10-22, 78:3-10, 79:2-15; **Exhibits 7-8**. By mid-July 2013, PM USA had prototypes for the Flashlight to examine. **Exhibits 9, 11, 14, 15**; *see also* **Exhibit 12** (Clements Dep.), at 123:20-22; **Exhibit 22** (Isemann Dep.), at 146:13-21; 155:14-20. And during the preparation of the Specification Analysis, PM USA sent samples of the flashlight to UL, its third-party quality assurance firm. But, as explained, the samples PM USA sent to UL were inexplicably missing the most dangerous element – the matches. **Exhibit 22** (Isemann Dep.), at 145:13-21.

Whatever the reason PM USA decided against testing the Flashlight with matches in it, undisputed facts establish that PM USA had every opportunity to test the Flashlight however it wished. It thus relied on its own business judgment in purchasing the flashlight. It did not rely on AAI, and it could not as a matter of law rely on any implied warranty. Thus, neither implied warranty applies to the transaction. AAI is entitled to judgment as a matter of law with respect to PM USA's implied warranty claims.

### D. Both implied warranty claims fail as a matter of law because the flashlights conform to the Specification Analysis furnished by PM USA.

The implied warranty claims also fail as a matter of law because the flashlights fully conform to the Specification Analysis. UCC 2-316(3)(b), Comment 9 explains that implied warranties may be excluded where the buyer gives precise and complete specifications to the seller: "When goods are provided according to plans and specifications furnished by the buyer, the seller does not impliedly warrant their fitness for a particular purpose, and no implied warranty of merchantability arises." *Cumberland Farms, Inc. v. Drehmann Paving Flooring Co.*, 520 N.E. 2d 1321, 1325 (Mass. App. Ct. 1988) (citing *Rust Engr. Co. v. Lawrence Pumps, Inc.*, 401 F. Supp. 328, 333 (D. Mass. 1975)); *see also N.J. Transit Corp. v. Harsco Corp.*, 497 F.3d 323, 329-30 (3d Cir. N.J. 2007) (analyzing Comment 9).

*Cumberland Farms* illustrates the analysis. There, a buyer of an acid-proof brick floor sued the seller for breach of the implied warranties of merchantability and fitness for a particular purpose. The buyer had provided the seller with plans and specifications for the floor and had rejected the seller's recommendation to include expansion joints. The seller then fulfilled its obligation to install the floor according to the specifications because it "did not possess any degree of discretion" in the installation. 520 N.E.2d at 1325. Because the floor was to

14

specification, "there was no reliance on its expertise by [the buyer]." *Id.* Thus, no implied warranty arose. *Id.*

Here, the Purchase Orders are explicit – in the very provision that PM USA relies on – that the Flashlights delivered had to "conform strictly to the . . . specifications." **Exhibit 19**, ¶ 13. They also incorporate the Quality Assurance Guidelines, *id.* ¶ 14, which set forth PM USA's expectations for its suppliers like AAI relating to compliance, product safety, functionality, and aesthetics, **Exhibit 12** (Clements Dep.), at 113:10-12; **Exhibit 17**. In Mr. Clements' words, the guidelines serve to "make sure we get a product that we ordered." **Exhibit 12** (Clements Dep.), at 113:17-20; 116:6-10. The guidelines provide, "In the time frame of the bid, the supplier will receive a concept specification analysis (CSA) outlining required testing of all materials, inspection criteria, and transportation testing requirements." *Id.* at 116:21-117:3; **Exhibit 17**, at 7. In particular, suppliers like AAI receive the specification analysis from PM USA or UL, its third-party quality assurance firm. **Exhibit 12** (Clements Dep.), at 117:4-6. The expectation was that suppliers like AAI would provide goods that conform to the specification analysis. *Id.* at 118:15-20. The undisputed fact is that the Flashlight conformed to the Specification Analysis. *See id.* at 124:1-5, 13-18; 125:2-5, 8-10. Thus, PM USA received exactly what it had ordered.

PM USA got the product it ordered. Maybe it should have provided the matches to UL or ordered a different product. But those issues are not AAI's fault. PM USA did not and could not as a matter of law rely on AAI. Neither implied warranty applies to the transaction. AAI is entitled to judgment as a matter of law with respect to PM USA's implied warranty claims.

### E. PM USA's claim for breach of the implied warranty of fitness for a particular purpose also fails as a matter of law because the alleged defect was in the Flashlight's ordinary use.

The Court should also dismiss PM USA's breach of implied warranty of fitness for a particular purpose because the alleged defect was in the Flashlight's ordinary purpose. PM USA's intention to distribute the Flashlight to consumers is not a "particular purpose," *see* Compl. ¶ 63; it is the Flashlight's only purpose. This claim is meritless and should be dismissed.

Under well-established Virginia law, there can be no breach of the implied warranty of fitness for a particular purpose where the buyer's intended use of the goods is the ordinary use of the goods. *See Ingrid Sanders v. Medtronic, Inc., et al.*, Civil Action No. 4:06cv57, 2006 U.S. Dist. Lexis 45516, *31-32 (E.D. Va. 2006).

> UCC 2-315 provides:
>
>> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified . . . an implied warranty that the goods shall be fit for such purpose.

Va. Code Ann. § 8.2-315. The comments explain that the rule does not apply where the buyer's intended use is the ordinary use for the goods: "A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business where the ordinary purpose for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question." Va. Code Ann. § 8.2-315(comment 2).

The court applied 2-315 and comment 2 in *Medtronic*, 2006 U.S. Dist. Lexis 45516. That case involved an alleged defect in a medical device. The buyer sued for breach of the implied warranty of fitness for a particular purpose. The Court held there is no such implied warranty because the buyer's intended use of the device was its ordinary use. Accordingly, the buyer

could not show that the seller had any reason to know any particular use for the device or that the buyer had relied on the seller in selecting suitable goods. *Medtronic*, 2006 U.S. Dist. Lexis 45516 at *31-32.

*Medtronic* dictates the outcome here. It is undisputed that the Flashlight is a custom product. There is no record evidence that PM USA intended it to be used as anything other than a combination flashlight, compass, and matches holder. Likewise, there is no record evidence that AAI had any reason to know any particular purpose for the Flashlight or that PM USA intended the use of the Flashlight to be anything other than the ordinary use for such devices. Just as a hardware store's intent to sell a screwdriver to consumers is not a "particular purpose," PM USA's desire to give Flashlights to consumers is not a "particular purpose." Accordingly, PM USA has not established facts sufficient to prove breach of the implied warranty of fitness of a particular purpose. Claim Four must be dismissed.

    **F. The unjust enrichment claim fails as a matter of law because of the existence of the Purchase Orders.**

Under well-settled Virginia law, "an unjust enrichment claim cannot be brought in the face of an express contract." *Middle East Broadcasting Networks, Inc. v. MBI Global, LLC*, Case No.: 1:14-cv-01207-GBL-IDD, 2015 U.S. Dist. LEXIS 98484, *13-14 (E.D. Va. July 28, 2015) (citing *Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir. 1988). PM USA has alleged the existence of an express contract between the parties. Compl., ¶ 19. Under these circumstances, AAI is entitled to summary judgment as a matter of law with respect to PM USA's unjust enrichment claim.

## V. CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to AAI as a matter of law and dismiss this lawsuit.

DATED: June 2, 2016     s/ F. Douglas Ross
F. Douglas Ross, Esquire (VSB No. 23070)
Luke J. Archer, Esquire (VSB No. 81815)
ODIN, FELDMAN & PITTLEMAN, P.C.
1775 Wiehle Avenue
Reston, Virginia 20190
Telephone: (703) 218-2100
Facsimile: (703) 218-2160
Douglas.Ross@ofplaw.com
Bruce.Blanchard@ofplaw.com
Luke.Archer@ofplaw.com

R. Bradford Brittian* (TSB No. 007130)
John T. Winemiller* (TSB No. 021084)
MERCHANT & GOULD P.C.
9717 Cogdill Road, Suite 101
Knoxville, TN 37932
Telephone: (865) 380-5960
Facsimile: (865) 380-5999
BBrittian@merchantgould.com
JWinemiller@merchantgould.com

*Admitted pro hac vice

*Counsel for Defendant American Accessories International L.L.C.*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on the 2nd day of June, 2016, I electronically filed the foregoing, MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Turner Broughton, Esquire
**Williams Mullen**
200 South 10th Street
Richmond, VA 23219
tbroughton@williamsmullen.com

Anand Agneshwar, Esquire
**Arnold & Porter LLP**
399 Park Avenue
New York, NY 10022
Anand.agneshwar@aporter.com

Paige Sharpe, Esquire
Michael Kientzle, Esquire
**Arnold & Porter LLP**
601 Massachusetts Avenue NW
Washington, DC 20001
Paige.sharpe@aporter.com
Michael.kientzle@aporter.com

                                            s/ F. Douglas Ross
                                          F. Douglas Ross, Esquire (VSB No. 23070)
                                          Luke J. Archer, Esquire (VSB No. 81815)
                                          ODIN, FELDMAN & PITTLEMAN, P.C.
                                          1775 Wiehle Avenue
                                          Reston, Virginia  20190
                                          Telephone: (703) 218-2100
                                          Facsimile:  (703) 218-2160
                                          Douglas.Ross@ofplaw.com
                                          Luke.Archer@ofplaw.com

#3116263v1  083001/000004