**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| PHILIP MORRIS USA INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 3:15-cv-577 |
| | ) |
| AMERICAN ACCESSORIES | ) |
| INTERNATIONAL, L.L.C., | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT'S REPLY IN SUPPORT OF ITS**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

I. PM's Claim for Breach of the Indemnity Clause Fails Because The Indemnity Clause is Displaced by the Warranty Clause. .................................................................. 2

II. PM's Claim for Breach of the Warranty Clause Fails Because PM Breached Its Obligation to Elect a Remedy. ................................................................................ 3

III. PM's Claim for Breach of the Warranty Clause Fails Because AAI Manufactured the Flashlight According to PM's Design Specifications. ........................... 6
    A. PM is Responsible for Product Safety Under Its Supplier Guidelines. ................. 7
    B. PM Dictated the Design Specifications for the Flashlight. .................................. 10

IV. PM's Claim for Breach of the Implied Warranty of Merchantability Fails. ...................... 12

V. PM's Claim for Breach of the Implied Warranty of Fitness for a Particular Purpose Fails. ............................................................................................................... 13

VI. PM's Unjust Enrichment Claim Fails. ............................................................................ 14

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

*AAF-McQuay, Inc. v. MJC, Inc.*, No. CIV.A 5:00CV00039, 2002 WL 172442 (W.D. Va. Jan. 10, 2002) ..................................................................................................10

*Austin v. Clark Equip. Co.*, 48 F.3d 833 (4th Cir. 1995) ................................................................7

*E. Gas & Fuel Assocs. v. Midwest-Raleigh, Inc.*, 374 F.2d 451 (4th Cir. 1967) ......................3, 7, 8

*Foothill Capital Corp. v. E. Coast Bldg. Supply Corp.*, 259 B.R. 840 (E.D. Va. 2001) ...........................................................................................................................4, 8

*Hall v. Int'l Paper Co.*, No. 3:07-CV-064, 2007 WL 2965054 (E.D. Va. Oct. 9, 2007) ..................................................................................................................................7

*Sanders v. Medtronic, Inc.*, No. 4:06cv57, 2006 U.S. Dist. LEXIS 45516 (E.D. Va. June 26, 2006) ..................................................................................................................13

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995) ............................................8

*Middle E. Broad. Networks, Inc. v. MBI Global, LLC*, No. 1:14-cv-01207-GBL-IDD, 2015 U.S. Dist. LEXIS 98484 (E.D. Va. July 28, 2015) ..................................14

*S. Ry. Co. v. Coca Cola Bottling Co.*, 145 F.2d 304 (4th Cir. 1944) ..........................................2, 8

*Spangler v. Kranco, Inc.,* 481 F.2d 373 (4th Cir.1973) ...................................................................7

*Va. Transformer Corp. v. P.D. George Co.*, 932 F. Supp. 156 (W.D. Va. 1996) ........................13

*Wellmore Coal Co. v. Powell Constr. Co.*, 600 F. Supp. 1042 (W.D. Va. 1984) ...........................8

### **STATE CASES**

*Bender-Miller Co. v. Thomwood Farms, Inc.*, 211 Va. 585 (1971) .................................................4

*Twin Lakes Mfg. Co. v. Coffey*, 222 Va. 467 (1981) ....................................................................13

### **OTHER AUTHORITIES**

Va. Code Ann. § 8.2-315, cmt. 2 ...................................................................................................14

Va. Code Ann. § 8.2-316, UCC cmt. 9 ...................................................................................12, 13

Va. Code Ann. § 8.2-317(c) ..........................................................................................................12

PM's Opposition further confirms that the Court should grant summary judgment in favor of AAI and dismiss all of PM's claims.[1]

*First*, PM's claim that AAI breached the Indemnity Clause of the Purchase Orders is based on a misinterpretation of the contractual language. Under bedrock rules of contractual interpretation, the specific provisions of the Warranty Clause—which govern alleged product defects and provide particular remedies for any breach—trump the general provisions of the Indemnity Clause. The Court need not resolve any disputed issues of fact to grant AAI's motion on this basis. Thus, the Court should dismiss PM's claim that AAI breached the Indemnity Clause as a matter of law.

*Second*, PM's claim that AAI breached the Warranty Clause should be dismissed as a matter of law because PM admits that it failed to comply with its contractual obligations to elect a remedy. Again, there is no factual dispute on this issue. PM simply misinterprets the terms of the Purchase Order and its obligations. Thus, the Court should dismiss the Warranty Claims for this threshold reason.

*Third*, all of PM's claims fail for a singular reason: AAI cannot be liable for designing an allegedly defective product because PM dictated the design of the Flashlight through its own specifications. PM seeks to avoid this dispositive flaw in its claims by attempting to distance itself from its own Supplier Guidelines (which assigned PM responsibility for safety) and its own specifications. But PM cannot escape the fact that it was responsible for the safety and design of the Flashlight, thereby absolving AAI of liability as a matter of law for any potential defects.

*Finally*, PM does not even attempt to defend its purported claim for breach of the implied warranty of fitness for a particular purpose, so that claim should be dismissed. And the unjust enrichment claim should be dismissed because the parties' relationship was governed by a contract.

---

[1] Although PM USA is the Plaintiff, AAI dealt with other Altria entities in the project: Altria Client Services, Inc. and Altria Group Distribution Company. Unless otherwise indicated, we refer to them collectively as "PM."

Thus, each of PM's claims fails as matter of law, and the Court should enter summary judgment in favor of AAI.

## ARGUMENT

**I.      PM's Claim for Breach of the Indemnity Clause Fails Because The Indemnity Clause is Displaced by the Warranty Clause.**

PM's claim that AAI breached the Indemnity Clause fails as a matter of law because the specific, exclusive remedies in the Warranty Clause control over the general Indemnity Clause. "When a particular occurrence falls within a general clause of a contract, and also within the precise terms of a specific provision of the same contract, a presumption arises that the specific . . . provision, rather than the general, is controlling." *S. Ry. Co. v. Coca Cola Bottling Co.*, 145 F.2d 304, 307 (4th Cir. 1944). Here, the Indemnity Clause contains a general provision allowing for the recovery of certain damages "to the extent they arise from, or may be attributable to, any error, omission or fault of" AAI. AAI's Mem. in Supp. of Mot. for Summ. J., ECF No. 45 ("AAI's MSJ"), Ex. 19. The only "error, omission or fault" that PM alleges is a design defect—an alleged breach of the Warranty Clause. *See* Def.'s Opp'n to Pl.'s Mot. for Partial Summ. J., ECF No. 76 ("AAI's Opp'n to PM's MSJ") at 24. The Warranty Clause's specific remedial scheme thus provides the exclusive remedy for such a breach and displaces all other general remedy provisions. *Id.* at 24–25.

PM mistakenly argues that the Indemnity Clause must apply because if the remedial scheme in the Warranty Clause were the sole remedy for a breach of warranty, it would render the Indemnity Clause "meaningless." *See* PM USA's Mem. of Law in Opp'n to AAI's Mot. for Summ. J., ECF No. 66 ("PM's Opp'n to AAI's MSJ") at 8–9. Not so. It is perfectly sensible that the Purchase Order was drafted so that the remedies outlined in the Warranty and Indemnity Clauses do not overlap. The Warranty Clause covers breaches of warranty (including for certain design defects), while the catch-all Indemnity Clause covers other losses that were not caused by a product defect, but were attributable to a separate "error, omission or fault of the supplier." AAI's MSJ, Ex. 19. The Indemnity Clause says *nothing* about defective products and never

mentions product design—rather, it speaks to those contractual breaches that are not covered by, and are wholly separate from, the Warranty Clause. This understanding of the two Clauses comports with both the text of the Purchase Orders and first principles of contractual interpretation.

Indeed, it is *PM's reading* of the Purchase Order that renders part of it meaningless. If the Court were to accept PM's position that, in the case of a breach of warranty, PM could opt-out of the Warranty Clause and seek to recover all its alleged costs through the Indemnity Clause, that would render the remedial scheme outlined in the Warranty Clause entirely superfluous. If the Indemnity Clause had such a wide, expansive reach that it could cover PM's claimed damages, there would be no reason for the parties to explicitly outline a remedy for a breach of warranty. "It is a general tenet of contract law that a construction which gives meaning to all words and provisions of a contract is favored." *E. Gas & Fuel Assocs. v. Midwest-Raleigh, Inc.*, 374 F.2d 451, 454 (4th Cir. 1967). To give meaning to both the remedial scheme outlined in the Warranty Clause *and* the separate remedies covered by the Indemnity Clause, PM's right to recovery for any design defect must be limited to the remedies provided in the Warranty Clause.

Thus, because the Indemnity Clause is displaced by the specific remedial provisions in the Warranty Clause, the Court should grant summary judgment for AAI on PM's claim for breach of the Indemnity Clause of the contract (Count I, in part).[2]

## II. PM's Claim for Breach of the Warranty Clause Fails Because PM Breached Its Obligation to Elect a Remedy.

PM does not dispute that the Warranty Clause provides specific, alternate remedies in the event of a breach: refund or replacement. PM's Opp'n to AAI's MSJ at 8 (the Warranty Clause "requires the supplier to provide a refund or replacement . . . .") Nor does PM dispute that it failed to elect either of those contractual remedies and instead chose to unilaterally implement a

---

[2] Count I (breach of contract) alleges two breaches: a breach of the Indemnity Clause and a breach of the Warranty Clause.

product recall. *See id.* Nonetheless, PM argues that it is not bound by the Warranty Clause's exclusive remedies. *Id.* at 8–9. PM's arguments are erroneous as a matter of law and should be rejected.

The Warranty Clause lays out an explicit remedial scheme addressing PM's right to recovery in the event of a breach of warranty:

- "If Buyer [PM] discovers that any Goods . . . do not conform to the above warranties," then PM must give "written notice to Supplier [AAI] within a reasonable time after [PM] discovers the non-conformity."

- "[P]rovided that [PM] has given written notice," AAI must then, "at [PM's] option . . . , *either* (a) replace such Goods and deliver them to the destination designated by [PM], *or* (b) refund the compensation paid by [PM] for such Goods." This is the exclusive pair of possible remedies for breach outlined in the Warranty Provision—replacement or refund.

- *If* AAI is unable to "perform its remedial obligations"—to remedy the non-conformity through either (a) replacement, or (b) refund—"in a timely manner consistent with [PM's] reasonable requirements," *then* "[PM] may undertake to remedy the nonconformity" itself (in other words, to find replacement Goods). In that case, "[AAI] must reimburse [PM] for any reasonable costs incurred by [PM]" in PM's replacement of the goods.

AAI's MSJ, Ex. 19 (emphases added).

*First,* PM erroneously argues that even though the Warranty Clause "requires the supplier to provide a refund or replacement if *that is what the buyer chooses to demand*," it does not "limit the buyer's remedies to either a replacement or a refund . . . ." PM's Opp'n to AAI's MSJ at 8 (emphasis added). In other words, according to PM, the enumerated remedies in the Warranty Clause are purely optional suggestions, and PM can choose to ignore them and pursue other remedies. PM's interpretation is once again contrary to basic rules of contractual interpretation. "[T]he cardinal rule in any action involving contract interpretation is that courts uphold the intent of the contracting parties as expressed through contractual language." *Foothill Capital Corp. v. E. Coast Bldg. Supply Corp.*, 259 B.R. 840, 844 (E.D. Va. 2001) (citing *Bender-Miller Co. v. Thomwood Farms, Inc.*, 211 Va. 585, 588 (1971)). Further, "no word or provision can be rendered meaningless when a reasonable interpretation exists that gives effect to and is

consistent with all parts of the contract." *Id.* at 845. The remedies in the Warranty Clause were put there for a reason—to specify the remedies that the parties are required to pursue if there is a breach of warranty. To interpret this provision as permitting PM to opt-out of these contractual remedies, at its discretion, would contradict the plain language of the contract and render the contractual remedies provisions meaningless. The Court should give effect to the terms of the Purchase Orders and limit PM to the contracted-for remedies.

*Second*, PM argues that because "AAI could not cure [the] non-conformity through a refund or replacement," PM was "fully within its rights under the Purchase Orders to remedy the problem itself and then seek reimbursement from AAI." PM's Opp'n to AAI's MSJ at 9. Again, this argument is contrary to the plain language of the Purchase Orders. Although the remedial scheme provides that, under limited circumstances, PM may itself "remedy the nonconformity" by securing replacement goods, this third alternative does not permit PM to bypass the refund and replacement remedies. AAI's MSJ, Ex. 19. Rather, the text of the remedial scheme dictates that PM must—at a bare minimum—inform AAI of PM's desired remedy *and give AAI an opportunity to effect the remedy*. If—and only if—AAI is unable to provide a refund or replacement "in a timely manner consistent with [PM]'s reasonable requirements," PM may then purchase its own replacement goods and later seek reimbursement from AAI.

The problem is that PM skipped the first two steps of the remedial scheme altogether. PM never provided AAI with any notice (let alone written notice) of a possible breach of warranty before instituting its unilateral recall. Not once during any of the parties' discussions in the weeks following the initial consumer complaints did PM mention a possible breach of warranty. That is because PM's contemporaneous documents indicate that it believed that "the 3-in-1 flashlight is not defective." *See* AAI's Opp'n to PM's MSJ, Ex. 1. Instead, both PM and AAI treated the consumer complaints and the possibility of unintended ignition as an issue to resolve together through a clarification of the Flashlight's instructions.

Even if PM had provided some form of notice to AAI of a possible breach of warranty, PM never elected a remedy or communicated its election to AAI. PM never told AAI that AAI

- 5 -

was required to refund the purchase price or provide a replacement of the Flashlights. AAI therefore had no opportunity to "perform its remedial obligations" under the Warranty Clause, and the third provision of the remedial scheme was not triggered. Moreover, contrary to PM's argument, AAI was not required to "propose a replacement or refund," PM's Opp'n to AAI's MSJ at 9—those two remedial options were dictated by the terms of the Purchase Orders themselves. It was PM's obligation to either request a refund, or request and designate a delivery destination for replacement goods. *See* AAI's MSJ, Ex. 19; *supra* at 4. Because PM did not elect to receive a refund or request replacement goods, it cannot skip to the third, limited remedy option.

Accordingly, PM did not have a "right" to pursue its own "remedy" because it did not comply with the remedial scheme outlined in the Purchase Orders. AAI's MSJ at 11–12. As a result, PM is precluded from seeking reimbursement from AAI for PM's independently chosen, and extra-contractual, "remedy." The Court should therefore enter summary judgment for AAI on PM's breach of express warranty claims (Count I, in part, and Count II).[3]

### III. PM's Claim for Breach of the Warranty Clause Fails Because AAI Manufactured the Flashlight According to PM's Design Specifications.

PM inaccurately asserts that "no one disputes that AAI designed . . . [the] Flashlight." PM's Opp'n to AAI's MSJ at 3. That is simply untrue. AAI has presented a wealth of evidence showing that PM—not AAI—dictated the design of the Flashlight. *See* AAI's MSJ, Exs. 4-11, 16; AAI's Opp'n to PM's MSJ at 19, Exs. 7, 17, 24. The Flashlight was a "custom" product made to PM's specifications. *See* AAI's Opp'n to PM's MSJ, Exs. 4, 12, 17, 24. In its Supplier Guidelines, PM represented to AAI that PM "ha[d] hired [an] independent third party Quality Assurance Firm[]" —in this case Mary Isemann of Underwriters Laboratories (UL)—to "review the design and material specifications in areas of compliance, product safety and performance." AAI's MSJ, Ex. 17; AAI's Opp'n to PM's MSJ, Ex. 4. PM's Supplier Guidelines further

---

[3] Count II (breach of express warranty) alleges a breach of the Warranty Clause and is thus entirely duplicative of Count I, which also alleges a breach of the Warranty Clause.

provided that PM and the QA firm would determine the specifications for the products—including any appropriate testing. AAI's MSJ, Ex. 17. The specifications were mandatory: "Suppliers must deliver a quality product . . . according to approved product sample or specification . . . ." *Id.* PM and UL thus told AAI exactly what PM required in terms of product features (e.g., matches included) and which precise specifications the product had to meet. *See* AAI's Opp'n to PM's MSJ at 4, 8–9.

Because PM dictated the design specifications, it cannot recover from AAI for any alleged breaches of warranty. Because the Flashlight was a "custom" product built to PM's own specifications, AAI cannot be liable for any design defects in the product. *See Hall v. Int'l Paper Co.*, No. 3:07-CV-064, 2007 WL 2965054, at *3 (E.D. Va. Oct. 9, 2007); *see also Austin v. Clark Equip. Co.*, 48 F.3d 833, 837 (4th Cir. 1995); *Spangler v. Kranco, Inc.*, 481 F.2d 373, 375 (4th Cir. 1973); *see also* AAI's Opp'n to PM's MSJ at 18–24. Thus, the Court should enter summary judgment for AAI on PM's breach of express warranty claims (Count I, in part and Count II).[4]

### A. PM is Responsible for Product Safety Under Its Supplier Guidelines.

Recognizing that they are fatal to its case, PM makes a series of misguided attempts to escape the Supplier Guidelines.

*First*, PM argues that the Supplier Guidelines are not a part of the contract between the parties, PM's Opp'n to AAI's MSJ at 4, but that argument is contrary to the explicit text of the Purchase Orders. Paragraph 14 of the Purchase Orders explicitly incorporates the Supplier Guidelines. AAI's MSJ, Ex. 19. Paragraph 14 is not an "other term[]" separate from the parties' contract—*it is a part of the contract itself*. Again, "[i]t is a general tenet of contract law that a construction which gives meaning to all words and provisions of a contract is favored." *E. Gas*

---

[4] PM's claim for breach of the Indemnity Clause is based on an alleged breach of the express warranties in the Warranty Clause. Thus, even if PM's Indemnity Clause claim were not displaced by the Warranty Clause, *see supra* at 2-3, it would fail for the same reasons that PM's claim for a breach of the Warranty Clause fails.

*& Fuel Assocs.*, 374 F.2d at 454. When a business transaction is based upon multiple documents, a court must construe the documents together to determine the parties' intent. *Foothill Capital Corp.*, 259 B.R. at 844; *see also Wellmore Coal Co. v. Powell Constr. Co.*, 600 F. Supp. 1042, 1046 (W.D. Va. 1984) ("It is clear under Virginia law that when more than one document makes up a contract, those documents should be interpreted together, each one assisting and determining the meaning intended to be expressed by the others."). Thus, to ignore Paragraph 14 entirely would be contrary to basic rules of contractual interpretation. It is PM—not AAI—that is attempting to "alter the plain language of the Purchase Orders." PM's Opp'n to AAI's MSJ at 6. PM cannot ignore explicit contractual terms because it deems them unhelpful to its case.

Moreover, if there are any ambiguities in the Purchase Orders, they must be resolved in AAI's favor. When the language of a contract is ambiguous or unclear, "a court should construe ambiguous language against the interest of the party that drafted it." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995); *see also S. Ry. Co.*, 145 F.2d at 307 ("When the words of a contract are ambiguous, . . . such ambiguities should be resolved against the party that drew the contract and selected its terminology and nomenclature."). Because it is undisputed that PM drafted the Purchase Orders, the Court should resolve any ambiguities against PM and in favor of AAI.

*Second,* it is equally fallacious for PM to argue that the Supplier Guidelines imposed obligations only on AAI and not on PM. *See* PM's Opp'n to AAI's MSJ at 6. The Supplier Guidelines laid out the role that each party would play in the product design, development, and testing processes, imposing obligations on both suppliers *and* PM. *See* AAI's MSJ, Ex. 17. The Supplier Guidelines made it clear that PM—not AAI—was responsible for the product specifications, and specifically for product safety: ". . . ALCS has hired independent third party Quality Assurance Firms (QA Firm). These QA firms will review the design and material specifications in areas of compliance, *product safety* and performance." *Id.* (emphasis added). PM cannot disclaim the responsibilities that it assigned to itself in its own Supplier Guidelines.

- 8 -

It is absurd for PM to argue that AAI cannot rely on AAI's contractual obligations under the Supplier Guidelines as a defense to PM's claim that AAI supplied a defective product in breach of the Warranty Clause. The Supplier Guidelines provide that AAI *must* meet PM's mandatory specifications. *See* AAI's MSJ, Ex. 17. Accordingly, it would be impossible for AAI to be obligated to both (i) produce a product that meets PM's design specifications, and (ii) guarantee that the product is free from a design defect. *See* AAI's Opp'n to PM's MSJ at 21.

*Finally*, in a last-ditch effort to avoid its own Supplier Guidelines, PM argues that the 2011 Guidelines do not apply to the development of the Flashlight because they were superceded by the 2013 Guidelines. *See* PM's Opp'n to AAI's MSJ at 4 n.3, 7–8. This is wrong. PM did not send the 2013 Guidelines to AAI until September 24, 2013, *after* the parties had been working on the 3-in-1 Flashlight project for four months (since May), *see* AAI's MSJ, Exs. 1–2; *after* PM had made multiple design revisions to the Flashlight, including adding matches, *see id.* Exs. 4–11; *after* PM and UL had issued multiple iterations of its precise Specifications Analysis, *id.* Ex. 16; and *after* PM had provided AAI with an initial version of its Purchase Order on September 13, 2013, *id.* Ex. 19. PM does not dispute that the 2011 Guidelines were in force this entire time. Consistent with the 2011 Guidelines, PM and UL dictated the product specifications. *See id.* Ex. 17. When PM sent the 2013 Guidelines, it did not make any comment on them, let alone notify AAI that PM was attempting to fundamentally change the terms of the relationship that had been in place for the previous eight years and that the parties had followed in the Flashlight development process. Moreover, UL did not cease to perform its role outlined in the 2011 Guidelines *after* PM sent the 2013 version on September 24, 2013. Rather, UL *continued* to work on the Specification Analysis and play an active role in the Flashlight's development. *See id.* Ex. 16. Thus, the 2011 Supplier Guidelines apply because they are the Guidelines under which both parties operated during the development of the Flashlight.

In any event, PM produces no evidence that AAI ever signed and accepted the 2013 version of the Supplier Guidelines, let alone that AAI accepted them on September 24, 2013. As the 2011 Supplier Guidelines demonstrate, PM required its suppliers to sign and accept a new

version of the Guidelines. *See* AAI's Opp'n to PM's MSJ, Ex. 3. Because AAI never signed and accepted the 2013 Guidelines, they do not apply for this additional reason.

### B. PM Dictated the Design Specifications for the Flashlight.

In addition to repudiating its own Supplier Guidelines, PM also attempts to distance itself from the specifications that it created for the Flashlight. Each of its arguments is erroneous.

*First,* PM alleges that "AAI, and not UL, drafted the initial specifications, proposed revisions, and approved the final specifications." PM's Opp'n to AAI's MSJ at 3. That is highly misleading. PM fails to mention that although AAI provided the first draft of the specifications, they were a cut-and-paste job, based entirely on specifications previously drafted by Mary Isemann of UL (PM's quality assurance firm). Ms. Isemann had previously prepared specifications for another flashlight (which did not include matches) that AAI supplied to PM in 2011. AAI's Opp'n to PM's MSJ, Ex. 27. PM (Rick Clements) requested that AAI send over an "initial draft" of the specifications for the 3-in-1 Flashlight. *Id.* That "initial draft," however, was based entirely on the specifications that Ms. Isemann drafted for the previous 2011 flashlight. *Id.* Thus, AAI essentially provided UL *with a copy of UL's own previous specifications*.

This case is therefore directly analogous to the case cited by PM, *AAF-McQuay, Inc. v. MJC, Inc.*, No. CIV.A 5:00CV00039, 2002 WL 172442 (W.D. Va. Jan. 10, 2002). *See* PM's Opp'n to AAI's MSJ at 12. In that case, the defendant attempted to escape liability by claiming that the plaintiff provided its own product specifications to the defendant. *AAF-McQuay, Inc.*, 2002 WL 172442 at *6-7. However, the specifications that the plaintiff provided to the defendant "merely repeated" information found in the defendant's own marketing documents. *Id.* at *7. The Court thus found that "by following the plaintiff's specifications, the defendant would also be following its own." *Id.* The same analysis applies here. AAI copied UL's own previous design specifications in its creation of an "initial draft" for UL's modification and review. Thus, by building off the specifications in the initial draft, UL was, in essence,

- 10 -

following *its own* previous specifications. The evidence also demonstrates that UL dictated the extensive revisions and ultimately issued the final specifications. *See* AAI's MSJ, Ex. 16.

*Second,* PM tries to classify the Specification Analysis as only a "post-design document" that was generated "after the Flashlight design was complete," and addressed only post-design issues. *See* PM's Opp'n to AAI's MSJ at 7, 11. This is incorrect. The design of the Flashlight was developed over the six-month period between May 31, 2013, when the idea was first proposed, and November 7, 2013, when the final Specifications Analysis document was signed. During the initial phase of the project, from May to July, AAI made multiple revisions to the product's design based on PM's express demands, including adding matches. UL then created the Specification Analysis, which provided the formal design specifications for the product. UL issued the first complete draft of the Specification Analysis on August 27, 2013. *See* AAI's MSJ at 4; AAI's Opp'n to PM's MSJ at 9–10. The Specification Analysis then went through six sets of revisions, including the additions of numerous testing and other requirements. *See* AAI's MSJ Ex. 16; AAI's Opp'n to PM's MSJ at 10, Exs. 4, 9, 29. Thus, UL's creation of the Specification Analysis was an integral part of the final phase of the design process.

Likewise, PM incorrectly asserts that the Specification Analysis "ensured only that the Flashlight components met minimum regulatory requirements and that units were manufactured in accordance" with the product's design. PM's Opp'n to AAI's MSJ at 7. The Specification Analysis includes PM-dictated details regarding the Flashlight's label (including how to mark the battery compartment); specifications for the type of materials used in the Flashlight; performance testing for workmanship, product dimensions, product weight, resistance to certain temperatures, functionality, and durability; the product's instruction sheet; and transportation test requirements. AAI's MSJ, Ex. 16. This document—created and modified by UL on behalf of PM—was an essential component in the design and testing process. It does not speak solely to "post-design" issues.

*Finally,* PM also erroneously asserts that "no one disputes that AAI designed . . . a Flashlight that included a storage compartment for wooden matches, a set of matches within the

storage compartment, and a striker pad located inside the match storage compartment." PM's Opp'n to AAI's MSJ at 3. The evidence shows that PM—not AAI—dictated that the product include matches and a striker pad. *See supra* at 9, 11; AAI's MSJ, Exs. 7–8, 12; AAI's Opp'n to PM's MSJ, Ex. 7. AAI's original idea for the product was *solely* for a 3-in-1 compass, flashlight, and matches storage compartment—AAI never intended for the product to include matches or a striker pad. AAI's MSJ, Ex. 13; AAI's Opp'n to PM's MSJ, Exs. 5–7. Further, contrary to PM's assertion that AAI "at no point suggested any modifications" that might have avoided the unintended ignitions, *see* PM's Opp'n to AAI's MSJ at 12, PM rejected AAI's ideas to either include separate striker sheets in a protective plastic poly-bag within the Flashlight or place the striker pad on the exterior of the Flashlight. *See* AAI's Opp'n to PM's MSJ, Ex. 8. Thus, PM rejected AAI's proposed modifications that would have avoided the risk of unintentional ignition.

## IV. PM's Claim for Breach of the Implied Warranty of Merchantability Fails.

PM's claim for breach of the implied warranty of merchantability fails for the same reasons as its express warranty claims fail: The Flashlight was a custom product made to PM's specifications. *See* Va. Code Ann. § 8.2-316, UCC cmt. 9; *see also* AAI's MSJ at 14. AAI's express warranty that it would comply with PM's specifications displaces any inconsistent implied warranty of merchantability. *See* Va. Code Ann. § 8.2-317(c); *see also* AAI's Opp'n to PM's MSJ at 26. "[I]n case of such an inconsistency the implied warranty of merchantability is displaced by the express warranty that the goods will comply with the specifications." Va. Code Ann. § 8.2-316, UCC cmt. 9. As explained above, PM dictated the specifications for the Flashlight, and its attempts to distance itself from these specifications are unpersuasive.

Likewise, PM's assertion that "a buyer of a consumer product is not responsible for identifying latent defects," PM's Opp'n to AAI's MSJ at 10, is completely off the mark. PM is not a buyer of a consumer product—it dictated the design of the Flashlight as a "custom" product manufactured to PM's own specifications. Accordingly, it is irrelevant whether the defect in the design is latent because PM is not entitled to any implied warranties. PM's latent defect

argument does not supersede the well-settled principle that a product made to the buyer's own design specifications does not come with an implied warranty of merchantability. *See* AAI's MSJ at 14; Va. Code Ann. § 8.2-316, UCC cmt. 9.

The case that PM cites to support its argument, *Twin Lakes Mfg. Co. v. Coffey*, 222 Va. 467 (1981), demonstrates the fallacy of PM's argument. Unlike PM, the buyer of a trailer in *Twin Lakes* was a lay purchaser who did not have an opportunity to examine and test a sample trailer prior to its manufacture. *See id.* at 472–73. The *Twin Lakes* court did not hold the lay buyer responsible for its failure to detect "defects in manufacture [which] did not become apparent, even to experienced workmen, until pressure was applied to join the two sections and level the unit on its foundation." *Id.* at 473. This case could not be more different. Not only did PM have an opportunity to inspect the Flashlight—*it designed it*. Thus, *Twin Lakes* is inapposite. *See also Va. Transformer Corp. v. P.D. George Co.*, 932 F. Supp. 156, 160 (W.D. Va. 1996) (distinguishing *Twin Lakes* because the buyer "withheld purchase pending a sample test").

For each of these reasons, AAI is entitled to summary judgment on PM's claim for alleged breach of the implied warranty of merchantability (Count III).

## V. PM's Claim for Breach of the Implied Warranty of Fitness for a Particular Purpose Fails.

PM's Opposition fails to offer any defense of its claim for breach of the implied warranty of fitness for a particular purpose. The Court should therefore dismiss this claim. PM's complaint is that the Flashlight was not merchantable because of the risk of unintended ignition. PM is not complaining that the Flashlight failed a meet a particular purpose; rather, it claims that it was unsafe for its ordinary purpose of being distributed to consumers for use as a flashlight, compass, and matches holder. Under Virginia law, there can be no breach of an implied warranty of fitness for a particular purpose where the buyer's intended use of the goods is their ordinary use. *See Sanders v. Medtronic, Inc.*, No. 4:06cv57, 2006 U.S. Dist. LEXIS 45516, at *31-32 (E.D. Va. June 26, 2006). "A '*particular purpose*' differs from the ordinary purpose for

- 13 -

which the goods are used in that it *envisages a specific use by the buyer which is peculiar to the nature of his business* whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question." Va. Code Ann. § 8.2-315, cmt. 2. PM has not offered any evidence that the Flashlight had any "particular purpose" distinct from the product's ordinary use as a 3-in-1 combination flashlight, compass, and matches holder. *See* AAI's MSJ at 16–17. Thus, AAI is entitled to summary judgment on this claim (Count IV).

## VI. PM's Unjust Enrichment Claim Fails.

PM's Opposition highlights why its unjust enrichment claim has no place in this case. PM repeatedly recognizes—and AAI does not dispute—the existence of a contract between the parties. *See, e.g.*, PM's Opp'n to AAI's MSJ at 1 ("The parties entered into a contractual arrangement[.]" ). Although the parties disagree over the terms of the Purchase Orders and the relevance of the incorporated Supplier Guidelines, the Purchase Orders were a contract. As a matter of Virginia law, there is no claim for unjust enrichment when the parties' relationship is governed by a contract. *See Middle E. Broad. Networks, Inc. v. MBI Global, LLC*, No. 1:14-cv-01207-GBL-IDD, 2015 U.S. Dist. LEXIS 98484, at *13–14 (E.D. Va. July 28, 2015); *see also* AAI's MSJ at 17. Thus, AAI is entitled to summary judgment on PM's unjust enrichment claim (Count V).

## **CONCLUSION**

For the foregoing reasons, those stated in AAI's Motion for Summary Judgment and supporting memorandum, and those stated in AAI's Memorandum in Opposition to PM's Motion for Partial Summary Judgment, AAI respectfully requests that the Court grant AAI's Motion and enter judgment in AAI's favor.

Dated: June 22, 2016  Respectfully submitted,

      /s/ J. Andrew Keyes
J. Andrew Keyes (VSB No. 37972)
    Email: akeyes@wc.com
Richmond T. Moore (*pro hac vice*)
    Email: rmoore@wc.com
Shauna M. Kramer (*pro hac vice*)
    Email: skramer@wc.com

WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005
Tel: (202) 434-5000
Fax: (202) 434-5029

- AND -

F. Douglas Ross (VSB No. 23070)
    Email: douglas.ross@ofplaw.com
Luke J. Archer (VSB No. 81815)
    Email: luke.archer@ofplaw.com

ODIN, FELDMAN & PITTLEMAN, PC
1775 Wiehle Avenue
Suite 400
Reston, VA 20190
Tel: (703) 218-2100

*Attorneys for American Accessories International, L.L.C.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the twenty-second day of June, 2016, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Anand Agneshwar
    Email:  anand.agneshwar@aporter.com

ARNOLD & PORTER LLP
399 Park Ave
New York, NY 10222-4690
Tel:  212.715.1107

Turner A. Broughton
    Email:  tbroughton@williamsmullen.com

WILLIAMS MULLEN (RICHMOND)
200 South 10th St, 16th Floor (23219)
P. O. Box 1320
Richmond, VA 23218-1320
Tel:  804.420.6588
Fax:  804.420.6507

Emily Muriel May
    Email:  email.may@aporter.com
Jocelyn Wiesner
    Email:  jocelyn.wiesner@aporter.com
Michael Erich Kientzle
    Email:  michael.kientzle@aporter.com
Paige Hester Sharpe
    Email:  paige.sharpe@aporter.com

ARNOLD & PORTER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel:  202.942.5000
Fax:  202.942.5999


*Attorneys for Plaintiff PM*


    /s/ J. Andrew Keyes
J. Andrew Keyes
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005
Tel:  (202) 434-5000
Fax: (202) 434-5029
Email:  akeyes@wc.com

*Attorney for American Accessories International, L.L.C.*