**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| PHILIP MORRIS USA INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:15-cv-577 |
| | ) | |
| AMERICAN ACCESSORIES | ) | |
| INTERNATIONAL, L.L.C., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**AMERICAN ACCESSORIES INTERNATIONAL, L.L.C.'S
OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE***

As an initial matter, the Court should deny most of PM's motions *in limine* ("MIL")

because they repeat the arguments the Court rejected when it denied PM's motion for summary

judgment.[1]  Two of AAI's primary defenses are that (i) PM, not AAI, was responsible for the

design and safety of the 3-in-1 Flashlight; and (ii) PM's voluntary product replacement recall

was unnecessary and motived by its own interests.  The Court denied PM's motion for summary

judgment because there are material factual disputes on those issues (and others).  Yet five of

PM's eight motions *in limine* rehash exactly the same arguments that PM made in its summary

judgment briefing and would require the Court to resolve those key factual disputes in PM's

favor:

- Motion to Exclude References to the 2011 Flashlight (Section C);

- Motion to Prohibit AAI from Challenging the Scope of the Recall (Section D);

---

[1] Although PM USA is the Plaintiff, AAI dealt with other Altria entities in the project: Altria
Client Services, Inc. and Altria Group Distribution Company.  Unless otherwise indicated, we
refer to them collectively as "PM."

- Motion to Prohibit Any Reference to the Quality Assurance Guidelines and Specification Analysis (Section E);

- Motion to Prohibit AAI from Contesting the Flashlight's Defect (Section F); and

- Motion to Prohibit AAI from Contesting That It Designed the Flashlight (Section G).[2]

Thus, the Court should summarily deny these five motions for this threshold reason.

Even if the Court had not already addressed these issues, PM does not offer any valid

legal basis for excluding this highly relevant and admissible evidence at the heart of AAI's case.

Nor does PM offer any valid basis for granting two of the three remaining motions *in limine*:

- Motion to Preclude All References to PM USA's Financial Resources or the Value of the Marlboro® Brand (Section A); and

- Motion to Prohibit Any Argument that the Flashlight's Defect Was Open and Obvious (Section H).

Accordingly, the Court should deny each of PM's motions *in limine* except for Section B,

which AAI does not oppose.

**A.     The Court Should Deny Plaintiff's Motion to Preclude All References to PM USA's Financial Resources or the Value of the Marlboro® Brand.**

AAI has agreed that it will not offer any evidence or make any references to "big

tobacco" or the harmful consequences of tobacco use.  Moreover, AAI will not seek to offer any

evidence of the specific monetary value of PM's financial resources or brand.   But AAI *should*

be permitted to offer general evidence and argument about PM's desire to protect the value of its

---

[2] The fact that PM's motions *in limine* repeat its summary judgment briefing is clearly indicated by PM's objections to AAI's exhibits, which contain parallel citations to its summary judgment briefs and its motions *in limine*. *See, e.g.*, PM's Objections to Def.'s Ex. List, ECF No. 111, Ex. A at 1 (objecting to Supplier Guidelines and Specification Analysis, citing PM's S. J. Opp'n at 5–8 and PM's MIL at 4–8).  Because the Court has denied PM's motion for summary judgment, it should also deny PM's companion motion *in limine*.  If the Court denies PM's five summary judgment-based motions *in limine*, that will resolve the vast majority of PM's objections to AAI's exhibits.

Marlboro brand because that information is highly relevant to the jury's evaluation of what motivated PM's decision to pursue a voluntary product replacement recall.

The jury will have to decide whether AAI's actions *caused* the damages sought by PM and whether PM failed to *mitigate* its damages. *See* PM's Mem. in Supp. of Mot. for Partial Summ. J. ("PM's MSJ"), ECF No. 34, at 24–25; AAI's Opp'n to Pl.'s Mot. for Partial Summ. J. ("AAI's Opp'n"), ECF No. 77, at 27–29; PM's Reply in Supp. of Its Mot. for Partial Summ. J. ("PM's Reply"), ECF No. 88, at 11. The resolution of both questions turns on whether PM's voluntary product replacement recall was the *necessary* response to consumer incident reports of unintended ignitions. PM's MSJ at 24–25; AAI's Opp'n at 27–29; PM's Reply at 11. AAI contends that it was not necessary, and that AAI's proposed remedial action—sending a blast email to consumers alerting them to the risk of unintended ignition, reminding them to use the foam insert provided, and offering replacement foam inserts—would have been more effective and less costly. *See* AAI's Opp'n at 29. AAI further submits that PM's sudden decision to move ahead with a voluntary product replacement recall, despite AAI's objections, was not driven by consideration of what was necessary, but by PM's own self-interests, including its concern that it would face civil penalties for failing to report to the CPSC sooner and its desire to preserve its reputation and the value of its Marlboro brand.

Accordingly, AAI should be permitted to explain to the jury that PM, as the largest tobacco company in the United States and the leading cigarette manufacturer for more than 30 years,[3] had a significant interest in maintaining a good reputation and the value of its brand. Although PM will seek to portray its conduct as purely altruistic, the evidence supports the conclusion that it did not want the CPSC to impose any fines for PM's late reporting or to make

---

[3] *See* PhilipMorrisUSA an Altria Company, http://www.altria.com/our-companies/philipmorrisusa/Pages/default.aspx (last visited July 2, 2016).

a finding that the Flashlight, a promotional product tied to PM's Marlboro brand, was defective. Mr. Eric Rubel, one of PM's lawyers, admitted as much in his deposition.  Ex. 1 (Rubel Dep. 112:18-113:7; 120:7-121:5).  PM's concern for its reputation and value of its brand is further demonstrated by the testimony of David Anderson, who agreed that PM wants consumers to "feel good about the Marlboro brand" and explained that PM's response to consumer complaints can be driven by "customer relation reasons," not necessarily the validity of a claim.  Ex. 2 (Anderson Dep. 78:1-79:15, 190:4-191:15).  Therefore, AAI should be permitted to offer evidence and argument at trial that one motivating factor in PM's decision to quickly initiate a product replacement recall for the Flashlight was to protect its reputation and brand.

**B.      AAI Will Not Refer to Any Adverse Effect a Judgment for PM USA May Have on AAI or Its Employees.**

AAI does not oppose this motion.

**C.      The Court Should Deny Plaintiff's Motion to Exclude References to the 2011 Flashlight.**

PM's motion to exclude any references to the 2011 flashlight seeks to prevent AAI from offering evidence to refute PM's allegation that AAI was responsible for the 3-in 1 Flashlight's design.  PM has repeatedly and erroneously alleged that AAI designed the 3-in-1 Flashlight because one of AAI's administrative assistants, Jill Smith, provided PM and Mary Isemann, PM's Quality Assurance leader, with a first draft of the specifications.  *See* PM's MSJ at 5; PM's Mem. in Opp'n to AAI's Mot. for Summ. J. ("PM's Opp'n"), ECF No. 66, at 3.  In response, AAI seeks to offer evidence showing that the draft Ms. Smith emailed was based almost entirely on specifications for an earlier product, an LED flashlight that AAI supplied to PM in 2011 with no matches (the "2011 Flashlight"), and that *Ms. Isemann drafted those specifications*.  AAI's Opp'n at 9–10.  Accordingly, AAI's evidence regarding the 2011 Flashlight is highly relevant information for the jury to consider in evaluating PM's unsupported allegation that AAI was

responsible for the 3-in-1 Flashlight's specifications.  The Court should deny PM's motion because (i) it repeats PM's arguments from its summary judgment briefing and (ii) PM has not offered any valid reason to exclude this highly relevant evidence.

*First*, the Court should deny PM's motion because it rehashes the same arguments that PM made in its summary judgment briefing.  In its motion for summary judgment, PM alleged that there was no issue of material fact about who designed the 3-in-1 Flashlight because "AAI, and not UL, drafted the initial specifications."  PM's Opp'n at 3; *see also* PM's MSJ at 5.  AAI refuted PM's allegation by offering evidence that PM and Ms. Isemann had drafted the specifications for the 2011 Flashlight.  *See* AAI's Opp'n at 9–10; AAI's Reply in Supp. of Its Mot. for Summ. J. ("AAI's Reply"), ECF No. 100, at 10–11.  In denying the parties' motions for summary judgment, the Court recognized that material factual disputes exist on the issue of who designed the Flashlight.  Having denied summary judgment, the Court should not now resolve this issue through plaintiff's motion *in limine*.  *See Williams v. Johnson*, 747 F. Supp. 2d 10, 14 (D.D.C. 2010) (stating that motions *in limine* "should not be used to resolve factual disputes, which remains the function of a motion for summary judgment, with its accompanying and crucial procedural safeguards") (internal quotation marks omitted)).

*Second*, AAI's evidence is plainly relevant to AAI's defenses to PM's misleading allegation that AAI drafted the initial specifications.  As set forth in the summary judgment briefing, PM requires its suppliers to follow strict specifications in manufacturing a product.  *See* AAI's Mem. in Supp. of Mot. for Summ. J. ("AAI's MSJ"), ECF No. 45, at 15; AAI's Opp'n at 3.  Notably, under PM's Marketing Incentives Quality Assurance Guidelines for Suppliers ("Supplier Guidelines"), PM hires a third party Quality Assurance ("QA") firm to be responsible for product specifications and product safety.  AAI's Opp'n at 3.  In this case, the QA firm

responsible for the Flashlight was Underwriters Laboratories ("UL"), and Mary Isemann was the project leader.  *Id.*

AAI seeks to introduce evidence showing that Ms. Isemann drafted the specifications for the 2011 Flashlight and that the first-draft specifications for the 3-in-1 Flashlight provided by AAI copied those earlier specifications.  Specifically, Ms. Jill Smith, an administrative assistant with AAI, testified that when she emailed the first draft of the specifications for the 3-in-1 Flashlight to Ms. Isemann, they were merely a cut-and-paste job of the specifications used for the 2011 Flashlight, with very slight modifications.  Ex. 3 (Smith Dep. 74:5-77:12; 82:5-21; 95:22-99:7).  And AAI will introduce documents showing that the specifications for the 2011 Flashlight were drafted by Ms. Isemann.  *See* AAI Trial Exs. 60-69.  As such, evidence that Ms. Isemann drafted the specifications for the 2011 Flashlight is evidence that she, *and not AAI*, was responsible for the design of the Flashlight at issue in this case.

On these facts, this case is directly analogous to *AAF-McQuay, Inc. v.MJC, Inc.*, No. CIV.A 5:00CV00039, 2002 WL 172442 (W.D. Va. Jan. 10, 2002).  *See* PM's Opp'n at 12.  In that case, the defendant attempted to claim that the plaintiff was responsible for the product's design because it provided its own product specifications to the defendant.  *AAF-McQuay, Inc.*, 2002 WL 172442 at *6-7.  However, because the specifications plaintiff offered "merely repeated" information found in the defendant's own marketing documents, the Court found that "by following the plaintiff's specifications, the defendant would also be following its own." *Id.* at *7.  In this case, AAI's evidence will support the jury reaching the same conclusion.  The initial draft specifications AAI emailed to UL copied UL's own previous design specifications.  Thus, by building off the initial draft specifications, UL was, in essence, following *its own* previous specifications.

*Finally*, the probative value of these documents is not outweighed by any potential confusion to the jury.  The sequence of events is not complicated: Ms. Isemann drafted the specifications for the 2011 Flashlight; AAI provided those specifications back to Ms. Isemann as the starting point for the 3-in-1 Flashlight; Ms. Isemann then revised the 2011 Flashlight specifications to create the specifications for the 3-in-1 Flashlight, including by adding all the specifications regarding matches.  Accordingly, the Court should deny PM's motion to exclude references to the 2011 Flashlight.

**D.    The Court Should Deny PM's Motion to Prohibit AAI from Challenging the Scope of the Recall.**

PM seeks to prevent AAI from challenging the scope of its recall because it did not "challenge the recall through normal statutory and regulatory procedures."  PM's MIL at 3.  The Court should deny this motion for three reasons.

*First*, PM already made this argument in its summary judgment briefing, arguing that AAI was "estopped" from challenging the scope of the recall.  *See* PM's MSJ at 24–25; PM's Reply at 11.  As previously explained, AAI *did* challenge PM's decision.  AAI's Opp'n at 29–30.  To reiterate, AAI consistently objected to PM's plans to initiate a voluntary product replacement recall and offered an alternative plan.  Upon receipt of the first two customer incident reports, AAI proposed a response that entailed (i) sending a blast email reminding consumers to replace the foam insert and offering to provide replacement foam inserts, and (ii) including revised instructions in all unshipped Flashlights.  *See* AAI Opp'n Exs. 13, 33.  AAI further recommended sending consumers an instruction sheet and link to a short video (similar to YouTube) describing how to remove the striker pad.  AAI Opp'n Ex. 37.  Although PM initially agreed with AAI's recommendations, it abruptly changed course in early April and PM voluntarily proceeded with a "fast track" product replacement recall program, which asked

customers to mail back part of the flashlight in exchange for a "premium replacement item" worth more than the Flashlight.  *See* PM's MSJ Ex. 41.  PM did not consult with AAI about this decision.  When AAI learned of PM's unilateral action, it reiterated AAI's position that the product replacement recall was unnecessary, that there were other, more effective options available, and that AAI reserved any rights to challenge PM's independent recall decision. AAI's Opp'n Ex. 35.  Thus, AAI has consistently opposed PM's recall plan.

*Second*, PM erroneously argues that, notwithstanding these objections, AAI also should have engaged in some unspecified "statutory and regulatory procedure[]."  PM's MIL at 3.  By this, PM presumably means that AAI should have independently gone to the CPSC and proposed its recommendations.  But this completely ignores the fact that AAI did not find out about PM's product replacement recall plan until *after* PM had already proposed it to the CPSC.  It is entirely unrealistic to expect AAI to suggest a different plan to the CPSC when PM had already proposed its more extensive product replacement recall plan.  Indeed, despite his years of experience with the CPSC, Eric Rubel could not recall a single instance when, after a company had proposed a product replacement recall for a product, a second company came in and proposed an instruction or warning for the same product.  Ex. 1 (Rubel Dep. 150:14-152:13).

In any event, whether AAI should have suggested its plan to the CPSC is, at most, a factual question for the jury to consider.  PM cites no legal basis for its argument that AAI is somehow legally precluded from challenging PM's recall plan unless it petitions to the CPSC for another plan.  Indeed, PM cites absolutely no legal basis for its argument at all—electing not to explain how its motion is supported by the Rules of Evidence or case law.  As a seeming afterthought, PM tacks on a sentence about jury confusion under Rule 403, but provides no

explanation for why this evidence would confuse the jury.   Thus, there is no legal or factual

basis for PM's argument, and it should be rejected.

*Third*, PM also mistakenly argues that AAI should be prohibited from challenging its

recall because AAI's expert, Ms. Nancy Nord, stated that the recall plan was "appropriate and

reasonable."  PM's MIL at 3.  Again, PM has already made this misleading argument in its

summary judgment briefing.   PM's MSJ at 25.  As explained previously, Ms. Nord was asked

whether, *if she put aside her opinion* that PM should have pursued an instruction or repair

approach, she might have any criticism of how PM conducted the recall.  AAI's Opp'n Ex. 32

(Nord Dep. 118:12-120:11).  Ms. Nord testified that, *if* she accepted the premise of taking the

route chosen by PM, she did not have any criticisms of *how* the recall was conducted.  *Id.*  Thus,

PM is mischaracterizing Ms. Nord's testimony.  Moreover, AAI's disagreement is not with *how*

PM conducted its product replacement recall, but *whether* it should have conducted a product

replacement recall at all instead of AAI's proposal.  And in any event, PM once again fails to cite

any legal basis why this expert testimony (which has now been excluded) would somehow bar

AAI from challenging PM's voluntary product replacement recall at trial.

Thus, the Court should deny PM's motion *in limine* as it relates to AAI's challenging the

scope of the recall.

**E.     The Court Should Deny PM's Motion to Prohibit Any Reference to the Quality
         Assurance Guidelines and Specification Analysis.**

In this motion, PM seeks to exclude two of the most relevant documents in the case: (1)

its Quality Assurance Guidelines for Suppliers ("Supplier Guidelines"), which stated that PM

would hire a Quality Assurance Firm (here UL), to review the product design for product safety

and required AAI to strictly adhere to PM's product specifications, and (2) its Specification

Analysis, which dictated the design and required testing of the Flashlight.  The Supplier

Guidelines and Specification Analysis are plainly relevant to this dispute, and PM has offered no valid reason for excluding them.

As a threshold matter, PM's motion simply repeats the same arguments from its failed summary judgment motion.  In its summary judgment briefing, PM argued repeatedly that only the Purchase Orders apply to this dispute, and the Supplier Guidelines and Specification Analysis are not relevant.  PM's Opp'n at 3–8; 11–13; *see also* PM's MSJ at 15–16.  In response, AAI explained that these documents are highly relevant to the parties' respective responsibilities and are part of their contractual relationship.  AAI's Opp'n at 13, 21–22; AAI's Reply 7–12.  In denying summary judgment, the Court thus recognized that there is a dispute as to which documents make up the contractual relationship between PM and AAI.  *See* AAI's Opp'n at 13, 21–22; AAI's Reply at 7–10.  Thus, PM's argument asks the Court to resolve a factual issue that it has left to the jury.  The Court should deny the motion for this reason alone.

Moreover, as explained previously, PM's arguments are without merit.

### 1.  The 2005 and 2011 Quality Assurance Guidelines Are Highly Relevant and Admissible Evidence.

The Supplier Guidelines are highly relevant because, having been incorporated by reference in the Purchase Orders, they form a part of the contractual relationship between AAI and PM.  *See* AAI's Opp'n at 21–22; AAI's Reply at 7–8.  The Purchase Orders do not alone constitute the contractual relationship between AAI and PM because they explicitly incorporate by reference the Supplier Guidelines: "Supplier must comply with Buyer's Quality Assurance Guidelines in effect as of the date of this Order."  AAI's MSJ Ex. 19.  Moreover, that the Purchase Order states that the "*Supplier* must comply with the Buyer's Quality Assurance Guidelines" does not, in any way, negate the fact that the Supplier Guidelines dictated the role each party was to play in the product design, development, and testing processes, imposing

10

obligations on both suppliers and PM. *See id.* Most notably, the Supplier Guidelines made it clear that PM—not AAI—was responsible for the product specifications, and specifically for product safety: ". . . ALCS has hired independent third party Quality Assurance Firms (QA Firm). These QA firms will review the design and material specifications in areas of compliance, *product safety* and performance." AAI's MSJ Ex. 17 at 2 (emphasis added). PM cannot disclaim the responsibilities that it assigned to itself in its own Supplier Guidelines. A contractual requirement that AAI comply with the Supplier Guidelines necessarily obligates PM to do the same.

PM also mistakenly argues that the 2005 and 2011 Supplier Guidelines are irrelevant because they were superseded by 2013 Supplier Guidelines.[4] PM's MIL at 4. As explained previously, this is not the case. *See* AAI's Reply at 9–10. The 2011 Supplier Guidelines were operative during the entire development of the Flashlight, including during the four months the parties worked on the Flashlight's design, while PM and UL issued multiple iterations of its specification analysis, and when PM issued an initial version of the Purchase Order on September 13, 2013. *Id.* Moreover, when PM sent the 2013 Guidelines, it did not indicate they would fundamentally alter the relationship that had been in place during the development of the Flashlight. And even after PM sent them, UL continued to work on the Flashlight in accordance with the 2011 Guidelines. *Id.* In any event, AAI never signed the 2013 Guidelines, let alone signed them during the relevant time period of this case. *Id.* Thus, PM cannot avoid having the

---

[4] PM also claims that AAI "conceded that the 2011 Guidelines were not part of the 'contractual documents' that governed the Parties' rights with respect to the Flashlight" because they were not explicitly referenced in AAI's response to Interrogatory 16. PM's MIL at 5. AAI disagrees. In responding to Interrogatory 16, AAI provided a list of the types of documents that define the relationship between AAI and PM generally. Included in the list was an explicit reference to the 2005 Supplier Guidelines, which AAI meant to include subsequent amendments. And AAI has consistently and repeatedly used the 2011 Supplier Guidelines throughout discovery and in pre-trial proceedings. Thus, there is no such "concession."

jury consider its own Supplier Guidelines, a highly relevant document that is part of the contractual relationship between PM and AAI.  Accordingly, the Court should deny PM's motion.

**2.      The Specification Analysis Is Highly Relevant and Admissible Evidence.**

The Court should similarly deny PM's motion to exclude references to the Specification Analysis.  The Specifications Analysis is one of the most important documents in the case, as it dictates exactly what features the 3-in-1 Flashlight must have and what testing must be performed on it.   Because PM and UL were responsible for creating the Specifications Analysis, it is highly relevant evidence on the critical issue of who designed the Flashlight.

PM first repeats its argument from its summary judgment briefing that no matter what the specifications were, and who was responsible for them, AAI had an unassailable obligation to ensure the Flashlight was "free from defects . . . in design."  PM's MIL at 6.  As AAI explained previously, however, this argument does not take into account the entire Warranty Clause in the Purchase Orders, which distinguishes between (i) products designed by AAI and (ii) custom products, such as the Flashlight, that AAI manufactures in accordance with PM's strict product specifications.  AAI's Opp'n at 19–22.  And the Supplier Guidelines, which were incorporated into the Purchase Order, *required* AAI to follow *PM's* mandatory Specifications Analysis document.  *See* AAI's Opp'n at 3, 13; AAI's MSJ Ex. 17.  UL, PM's Quality Assurance firm, was responsible for the Specifications Analysis.  *See* AAI's MSJ Ex. 17 at 2.  Therefore, the Specification Analysis is central to this dispute because it is the document that contains PM's and UL's mandatory specifications for the Flashlight.

Moreover, the Specification Analysis was not, as PM argues, a "post-design document" that only "ensure[d] that the Flashlight's components met minimum regulatory requirements and

that units were manufactured in conformity" with the product's design. PM's MIL at 7. The Flashlight was developed between May 31, 2013 and November 7, 2013. *See* AAI's Reply at 11. During the initial phase of development, AAI made revisions to the Flashlight's design based on PM's express demands. On August 27, 2013, UL provided the first draft of the Specification Analysis, which then went through six sets of revisions, until it was finalized on November 7, 2013. The Specification Analysis included details regarding the Flashlight's label and instruction sheet; the materials to be used in the Flashlight; safety testing; performance testing; and transportation testing requirements. It provided the detailed requirements regarding matches, including what types of match testing AAI should perform. To suggest that the Specification Analysis was not a part of the design and testing process is thus directly contrary to the record.

Thus, it is hard to imagine evidence that is more relevant and admissible than the Specifications Analysis. PM may not like the Specification Analysis because it undermines PM's allegations, but that does not mean it is irrelevant. To the contrary, the Specification Analysis is critical to determining who designed the Flashlight, and it should be admitted.

## F.     The Court Should Deny PM's Motion to Prohibit AAI from Contesting the Flashlight's Defect.

The Court should deny PM's motion to exclude AAI from contesting the Flashlight's defect for four reasons.

*First*, PM's motion is practically verbatim from its summary judgment briefing. PM has already argued that AAI made allegedly dispositive "concessions" that the Flashlight was defective. PM's MSJ at 18–19; PM's Reply at 2–6. AAI showed that it did not make any such concessions, and AAI presented contrary evidence, including the fact that PM's project manager, Rick Clements, stated that the Flashlight was *not* defective. AAI's Opp'n at 1, 11, 16–17

13

(quoting Mr. Clements as stating: "Just want to clarify that the 3-in-1 Flashlight is <u>not</u> defective").  The Court rejected PM's argument, finding that there is a factual dispute on this issue.  Thus, AAI has not, as PM argues, "admitted" that the Flashlight was defective, and AAI should not be precluded from offering evidence that the Flashlight was *not* defective.  The Court should deny PM's motion on this threshold basis.

*Second*, in claiming that there is no dispute regarding the alleged "defect," PM once again uses the wrong definition of "defect."  Under Virginia law, to determine whether a product is defective, a *jury* must employ the "reasonably safe/unreasonably dangerous" standard.  Va. Prac. Products Liability § 3:4; *Morgen Indus., Inc. v. Vaughan*, 252 Va. 60, 65-66 (1996) ("The issue whether a product is unreasonably dangerous is a question of fact." (citing *Singleton v. Int'l Harvester Co.*, 685 F.2d 112, 115 (4th Cir. 1981))).  And just because a product could be safer does not mean that the product is unreasonably dangerous and defective as a matter of law. *Young v. J.I. Case Co.*, No. 3:90CV00630, 1994 WL 506403, at *5 (E.D. Va. June 3, 1991) ("Academically, it may be argued that all products are defective because they can be made more safe.  However, it does not automatically follow that the products are deemed unreasonably dangerous.").

Originally, PM acknowledged that Virginia products liability law defines "defect" in this case.  *See* PM's MSJ at 17 (citing Va. Prac. Products Liability § 3:5).  Nevertheless, PM now argues that Virginia products liability law does not apply at all and posits that the jury must use the "dictionary definition" of "defect," which is that the Flashlight was "incomplete, inadequate, and imperfect."  PM's MIL at 7.  Not so.  Under Virginia law, legal *terms of art* in a contract must be given their "specialized meaning under Virginia law."  *Buffalo Coal Company*, 418 B.R. 878, 893 (N.D. W. Va. 2009) (concluding that "direct" and "consequential" damages were terms

of art that must be interpreted "according to their specialized meaning under Virginia law").

Accordingly, when the Purchase Order refers to "defects in . . . design," that is a legal term of art

that must be given its specialized meaning under Virginia law.  In sum, because (a) the Purchase

Orders state that Virginia law governs the contract, (b) the Purchase Orders do not define

"defects in . . . design," and (c) Virginia products liability law gives meaning to the term of art

"design defect" or "defect in design," the Court must look to that law to define these terms.  And

Virginia law defines a design defect as a defect that renders the product "unreasonably

dangerous."  AAI's Opp'n at 15.  Accordingly, the question for the jury will be whether the

Flashlight was "unreasonably dangerous" and therefore defective.

Notably, PM has not cited *any* Virginia cases to support its position, and the one case PM

does cite, *Scientific Components Corporation v. Sirenza Microdevices, Inc.*, No. 03CV1851,

2006 WL 2524187 (E.D.N.Y. Aug. 30, 2006), is inapposite.  In that case, the dispute involved an

express warranty that the product would be "free from defects in material and workmanship" and

did not involve a claim for *design* defect.  *Sci. Components*, 2006 WL 2524187, at *6.

Furthermore, PM's position directly contradicts that of Mr. Richard Stern, its own design expert,

who explained that a product does not need to be perfect to be free from defect.  *See* AAI's

Opp'n Ex. 41 (Stern Dep. 215:14-215:19).  Thus, PM's interpretation of "defect" has no basis in

Virginia law and should be rejected.

*Third*, PM's purported "admissions" of defect are textbook examples of an attempt to use

subsequent remedial measures for the improper purpose of proving the Flashlight was defective.[5]

*See* Fed. R. Evid. 407 ("When measures are taken that would have made an earlier injury or

---

[5] These include that AAI "made adjustments to the instruction sheet better clarifying the importance of the foam divider" and suggested an email reminder to consumers to use the foam insert.  Pl.'s MIL at 8.

harm less likely to occur, evidence of the subsequent measures is not admissible to prove: negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction."). Moreover, even if these remedial measures, or alleged "concessions," were admissible for the purpose of showing a design defect, they are at best probative, and certainly are not dispositive, on that issue.

*Fourth*, AAI has never "conceded" that the Flashlight was defective, as PM claims. PM argues that AAI's witnesses testified that the risk of unintended ignition "would have been reduced" with additional instructions and that the instructions "could have been better." PM's MIL at 8. But a product is not defective under Virginia law simply because it could have been safer. *See Young*, 1994 WL 506403, at *5; *Morgen Indus.*, 252 Va. at 65-66 (1996). PM's design expert, Mr. Stern, stated as much in his deposition: "[J]ust because a product fails doesn't mean it's defective. Just because a product is defective doesn't mean it presents a risk of injury. Just because it presents a risk of injury doesn't mean it's an unreasonable risk of injury." AAI's Opp'n Ex. 41 (Stern Dep. 215:14-215:19). Thus, admissions that the Flashlight presented some risk of unintended ignition and that it could have been safer, are not equivalent to admissions that the Flashlight was defective.[6]

---

[6] PM also mischaracterizes testimony from AAI's experts. PM claims that Dr. Elizabeth Buc conceded the Flashlight was defective when she "opined that if consumers removed the foam insert, she 'would have had a problem with the product.'" Pl.'s MIL at 8 (citing Buc Dep. 69:14-17, 72:6-14). But that is not what Dr. Buc said. Rather, she said that she "would have had a problem" with a hypothetical product—that is, a flashlight without foam barrier. She did not concede that the Flashlight, with the foam barrier, was defective. PM also cites testimony from Nancy Nord regarding suggested improvements for the instructions, but she did not admit that the product was defective. And given the Court's ruling to exclude testimony from Ms. Nord, her opinions are no longer relevant anyway.

Because there remains a factual issue as to whether the Flashlight was defective, and AAI has not conceded this point, AAI should be permitted to introduce evidence at trial that the Flashlight was not defective.  Accordingly, the Court should deny PM's motion *in limine*.

**G.   The Court Should Deny PM's Motion to Prohibit AAI from Contesting That It Designed the Flashlight.**

The Court should deny PM's sweeping request to "preclude AAI from asserting that it is not responsible for the design of the Flashlight" for three reasons.  PM's MIL at 9.

*First*, PM's motion once again simply repeats the arguments from its summary judgment briefing, citing the exact same evidence that it previously cited for the proposition that there is no factual dispute that AAI designed the Flashlight.  PM's MSJ at 3–5; PM's Reply at 8–9.  AAI submitted contrary evidence, AAI's Opp'n at 19–20, and after considering this evidence, the Court found that there was a factual dispute regarding who designed the Flashlight.  The Court should decline to resolve this factual dispute now through PM's motion *in limine*, *see Williams*, 747 F. Supp. 2d at 14, and instead permit the jury to hear all evidence relevant to the critical issue of who designed the Flashlight.

*Second*, there is ample evidence that it was PM, not AAI, who designed the Flashlight. As AAI has outlined in depth elsewhere, *see* AAI's Opp'n at 4, 8–9, 19–20, the evidence demonstrates the Flashlight was a "custom" product manufactured to PM's own specifications. AAI's Opp'n Ex. 12 (Clements Dep. 35:13-22); AAI's Opp'n Ex. 17 (E. Zeanah Dep. 94:9-96:22).  The purported "admissions" PM cites in its motion *in limine* do not dictate otherwise. PM suggests that because the Flashlight was "custom," it was necessarily designed by AAI. PM's MIL at 8–9.  Diane Pinkney, however, stated the exact opposite.  She explained that a "custom" product—as opposed to an "off-the-shelf" product that is "currently available retail"— is "an item that [PM] either design[ed] completely" or "modif[ied] based on a request."  AAI's

17

Opp'n Ex. 24 (Pinkney Dep. 46:9-14).  Indeed, PM had extensive control over the design of the Flashlight.  For example, PM insisted that the Flashlight include matches, that a striker pad be placed in the interior compartment of the product (rejecting AAI's alternative placement recommendations), and developed and approved the product specifications and testing requirements.  *See* AAI's Opp'n at 4, 9–10, 19–20.  Such control was consistent with AAI's contractual obligations to produce a product made to PM's own specifications.  AAI's MSJ Ex. 17.

Likewise, PM's purported "admissions" are unrelated statements, taken out of context.  For example, PM cites an email from Eric Zeanah referencing the fact that AAI "developed and produced" the Flashlight.  But the point is that AAI developed and produced the Flashlight *according to PM's specifications*.  AAI has never admitted to "designing" the Flashlight, but maintains that it developed a custom product for PM.  AAI's Opp'n Ex. 17 (E. Zeanah Dep. 38:4-10; 94:9-96:22).   Likewise, PM cites an indemnification letter in which AAI was simply confirming to PM that no *third party* had any IP rights to the Flashlight, not that AAI designed the Flashlight.  And PM cites a Chinese patent application identifying David Zeanah as one of the inventors, but fails to mention Eric Zeanah's testimony that because China, unlike the United States, is a "first-to-file" country, the person filing for the patent need not be the "inventor."  Ex. 4 (E. Zeanah Dep. 45:12-48:5).  Mr. Zeanah further explained that he often asks his factories in China to apply for a patent *to protect his clients*, such as PM.  *Id.*  Thus, AAI has never admitted that it designed the Flashlight, and the jury can determine how much weight to place on its alleged admissions (insofar as they are admissible).

Thus, the Court should deny PM's motion to preclude AAI from contesting that it designed the Flashlight.

**H.      The Court Should Deny PM's Motion to Prohibit Any Argument that the Flashlight's Defect Was Open and Obvious.**

PM asserts that "[i]t would be unfair and unduly prejudicial" to allow AAI to suggest at trial "that the [alleged] defect was so open and obvious" because AAI "has never before" asserted this defense.  PM's MIL at 9.  As an initial matter, the Court should deny PM's motion because it is inaccurate.  In the Answer AAI filed on October 23, 2015, AAI explicitly states as its Sixth Defense that "[t]he alleged product defect, if it existed at all, was readily observable to Plaintiff, Plaintiff's corporate affiliates, and the consumer."  Answer, ECF No. 10, at 8.

Moreover, PM's motion is overbroad and seeks to exclude relevant evidence that AAI may seek to introduce at trial, depending on PM's evidence and argument.  To be clear, AAI does not intend to argue that the particular risk of unintended ignition that was reported by consumers in the first complaints—*i.e.*, that the matches would ignite if the foam insert was removed, the Flashlight was turned upside down, with just the right number of matches in the container, and twisted in a peculiar "pepper grinder" fashion—was obvious.  Indeed, UL, a world-leading authority on safety testing, could not replicate this ignition in its own testing, even after AAI told UL specifically what to look for after interviewing the two customers who reported incidents.  But to the extent that this risk rendered the product defective, as PM now claims, then that defect was just as easily discernable to PM and UL, the party responsible for safety testing, as it was to AAI.  Moreover, the general risk that the matches would ignite if rubbed against the striker pad was open and obvious to everyone, including the smokers who specially ordered and used the Flashlight.

Thus, the Court should deny PM's motion to prohibit any argument that any defect in the Flashlight was open and obvious.

## CONCLUSION

For all of the foregoing reasons, AAI respectfully requests that the Court deny PM's omnibus motion *in limine*.

Dated:  July 6, 2016                    Respectfully submitted

                                                      _____/s/ J. Andrew Keyes_____
J. Andrew Keyes (VSB No. 37972)
      Email:  akeyes@wc.com
Richmond T. Moore (*pro hac vice*)
      Email:  rmoore@wc.com
Shauna M. Kramer (*pro hac vice*)
      Email:  skramer@wc.com

WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005
Tel:  (202) 434-5000
Fax: (202) 434-5029

- AND -

F. Douglas Ross (VSB No. 23070)
      Email:  douglas.ross@ofplaw.com
Luke J. Archer (VSB No. 81815)
      Email:  luke.archer@ofplaw.com

ODIN, FELDMAN & PITTLEMAN, PC
1775 Wiehle Avenue
Suite 400
Reston, VA 20190
Tel:  (703) 218-2100

*Attorneys for American Accessories International, L.L.C.*

## CERTIFICATE OF SERVICE

I hereby certify that on the sixth day of July, 2016, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Anand Agneshwar
    Email:  anand.agneshwar@aporter.com

ARNOLD & PORTER LLP
399 Park Ave
New York, NY 10222-4690
Tel:  212.715.1107

Turner A. Broughton
    Email:  tbroughton@williamsmullen.com

WILLIAMS MULLEN (RICHMOND)
200 South 10th St, 16th Floor (23219)
P. O. Box 1320
Richmond, VA 23218-1320
Tel:  804.420.6588
Fax:  804.420.6507

Emily Muriel May
    Email:  email.may@aporter.com
Jocelyn Wiesner
    Email:  jocelyn.wiesner@aporter.com
Michael Erich Kientzle
    Email:  michael.kientzle@aporter.com
Paige Hester Sharpe
    Email:  paige.sharpe@aporter.com

ARNOLD & PORTER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel:  202.942.5000
Fax:  202.942.5999

*Attorneys for Plaintiff PM USA*

    /s/ J. Andrew Keyes
J. Andrew Keyes

*Attorney for American Accessories
International, L.L.C.*